FILED

2016 JAN 15  AM 9: 5

CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
TOLEDO

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | |
|---|---|
| **MOLLY S. BLYTHE,**<br>8453 Augusta Lane<br>Holland OH, 43528<br><br>**KB**, a minor by her next of friend and legal guardian<br>Claire S. Blythe, and<br>8453 Augusta Lane<br>Holland, OH 43528<br><br>**LB**, a minor by her next of friend and legal guardian,<br>Claire. S. Blythe<br>8453 Augusta Lane<br>Holland, OH 43528<br><br>Plaintiffs,<br><br>v.<br><br>**RANDALL S. SCHLIEVERT, M.D.**, in his individual<br>capacity;<br>5724 Aspen Drive<br>Toledo, OH 43615;<br><br>**RAYYAN M. ANWER, M.D.**, in his individual capacity;<br>1205 Steeple Chase Circle<br>Toledo, OH 43615;<br><br>**TIFFANY A. LISK, M.D.**, in her individual capacity;<br>6842 Walnut Creek Court<br>Temperance, MI 48182;<br><br>**SUSAN P. TOURNER, M.D.**, in her individual capacity;<br>3157 Andora Drive<br>Ypsilanti, MI 48198; | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>**3:16 CV 97**<br>)<br>CASE NO. _____<br>)<br>JUDGE JAMES G. CARR<br>)<br>JUDGE _____<br>)<br>MAG. JUDGE JAMES R. KNEPP II<br>)<br>**COMPLAINT**<br>)<br>)<br>**JURY TRIAL**<br>**DEMANDED**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

1

**JAMIE L. DARGART, M.D.**, in her individual capacity; )
7405 Oak Hill Drive )
Sylvania, OH 43506; )
)
**JOHN GREGORY ROSENTHAL, M.D.**, in his )
individual capacity; )
6936 Shadowcreek Drive )
Maumee, OH 43537; )
)
**JOHN DOE 1,** Promedica Toledo Hospital Coder )
052829, in his individual capacity; )
2142 North Cove Boulevard )
Toledo, OH 43606; )
)
**LUCAS COUNTY CHILDREN SERVICES,** )
705 Adams Street )
Toledo, OH 43604; )
)
**CHANDA BEAL**, in her individual capacity, )
705 Adams Street )
Toledo, OH 43604; )
)
**JASON WEGMAN**, in his individual capacity, )
1203 Kirk Street )
Maumee, OH 43537; and )
)
**JOHN DOES 2-20;** )
)
             Defendants. )
)

## COMPLAINT

### Nature Of The Action

1. This five count civil rights action brought pursuant to 42 U.S.C. § 1983 arises from the actions of various medical professionals who recklessly and deliberately fabricated inculpatory evidence of physical abuse and disregarded exculpatory evidence during the course of a State delegated child abuse investigation, which caused two infants to be torn from the care and custody of their innocent Mother; and also from the actions of Lucas County Children Services ("LCCS"), which ignored all information challenging its physicians' false and unfounded diagnosis of shaken baby syndrome, and continued to detain the children for a period of nine months without cause or justification.

2

2. Plaintiffs seek redress for infringements of their civil rights, including but not limited to, the deprivations of their right to substantive due process and of their fundamental liberty interest in familial associations, where the deprivations occurred through Defendants' actions taken under color of state law.

3. Plaintiffs seek to vindicate their rights under the First, Fourth, and Fourteenth Amendments to the Constitution of the United States.

4. Pursuant to 42 U.S.C. § 1983, Plaintiffs seek compensatory and punitive damages for the injuries to each Plaintiff, and pursuant to 42 U.S.C. § 1988, Plaintiffs seek attorney's fees.

## Jurisdiction

5. Jurisdiction over Plaintiffs' claims brought pursuant to 42 U.S.C. § 1983 is invoked under 42 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3), as the claims present questions arising under the Constitution and laws of the United States and specifically because it seeks to redress the deprivation of Plaintiffs' Constitutional rights under color of state law.

## Venue

6. Venue properly exists under 28 U.S.C. § 1391 in the Northern District of Ohio as substantially all of the acts or omissions giving rise to Plaintiffs' claims occurred in the Northern District of Ohio, and Defendants are found or are employed, or at the time of the incidents giving rise to this suit were so employed, in the Northern District of Ohio.

## Parties

7. Plaintiff Molly S. Blythe ("Molly") is a United States citizen residing in Holland, Ohio and the mother of LB and KB, who were, through the acts and omissions of Defendants, wrongfully removed from Molly's care and custody approximately two months after their birth.

8. Plaintiff LB is a minor. LB sues through her next friend and legal guardian

3

Claire S. Blythe.

9. Plaintiff KB is a minor. KB sues through her next friend and legal guardian Claire S. Blythe.

10. Defendant Rayyan M. Anwer, M.D. was, at the time of the incidents giving rise to this Complaint, a medical resident participating in an organized health care training program at the University of Toledo, located in the Northern District of Ohio. The University of Toledo is engaged in a partnership with Promedica Toledo Hospital, which grants University of Toledo residents access to patients at Toledo Children's Hospital. He is sued in his individual capacity.

11. Defendant Tiffany A. Lisk, M.D. was, at the time of the incidents giving rise to this Complaint, a medical doctor board certified in general pediatrics and working as a pediatric hospitalist at Promedica Toledo Hospital within Toledo Children's Hospital. As a pediatric hospitalist, Defendant Lisk was responsible for making informed diagnostic decisions based on patient information and current scientific evidence. Defendant Lisk was also responsible for affirming and/or evaluating diagnostic decisions made by residents working under her supervision. She is sued in her individual capacity.

12. Defendant Susan P. Tourner, M.D. was, at the time of the incidents giving rise to this Complaint, a medical doctor board certified in general pediatrics and fellowship trained in pediatric critical care medicine. Defendant Tourner works within Promedica Toledo Hospital's pediatric intensive care unit. As a pediatric intensivist, Defendant Tourner was responsible for making informed diagnostic decisions based on patient information and current scientific evidence. She is sued in her individual capacity.

13. Defendant Jamie L. Dargart, M.D. was, at the time of the incidents giving rise to this Complaint, a medical doctor board certified in pediatrics and pediatric hematology/oncology. Defendant Dargart works within the pediatric hematology/oncology program at Promedica Toledo Hospital. As a pediatric hematologist, Defendant Dargart was responsible for making informed diagnostic decisions based on patient information and current scientific evidence. She is sued in her individual capacity.

14. Defendant John Gregory Rosenthal, M.D. was, at time of the incidents giving rise to this Complaint, a medical doctor board certified in ophthalmology. Defendant

4

Rosenthal is affiliated with Promedica Toledo Hospital in that Defendant Rosenthal is regularly engaged in providing services to Toledo Children's Hospital patients. As an ophthalmologist, Defendant Rosenthal was responsible for making informed diagnostic decisions based on patient information and current scientific evidence. Defendant Rosenthal is sued in his individual capacity.

15. Defendant John Doe 1 is Promedica Toledo Hospital "Coder 052829". As a medical coder, Defendant Doe was responsible for detailing patients' final diagnoses in a matter consistent with the medical record. The true identity of Defendant Doe is unknown at the time of filing this Complaint.

16. Defendant Randall S. Schlievert, M.D. was, at the time of the incidents giving rise to this Complaint, a medical doctor board certified in general pediatrics and child abuse pediatrics. Defendant Schlievert was also, at the time of the incidents giving rise to this Complaint, the sole physician contracted by LCCS to provide medical consultation services to LCCS concerning cases of physical abuse and to provide expert testimony in legal proceedings instituted by LCCS. As a child abuse specialist interpreting medical information on behalf of LCCS, Defendant Schlievert was responsible for making informed diagnostic decisions based on patient information and current scientific evidence, was responsible for conveying unbiased information to LCCS, and was responsible for providing LCCS with reliable, objective, accurate, and truthful analyses. He is sued in his individual capacity.

17. Defendant Jason Wegman was, at the time of the incidents giving rise to this Complaint, a LCCS caseworker.

18. Defendant Chanda Beal was, at the time of the incidents giving rise to this Complaint, a LCCS "supervisor" responsible for the acts of Defendant Wegman on January 19, 2014.

19. Defendant LCCS is a public children services agency ("PCSA") of the State of Ohio. As per Ohio Revised Code section 5153.16, LCCS is charged with making investigations concerning any child alleged to be an abused, neglected, or dependent child. At the time of the incidents giving rise to this Complaint, LCCS was engaged in a Purchase of Service Agreement Contract for the services of Defendant Schlievert. Defendant Schlievert's services to be provided to LCCS included, but were not limited

to, consultation services concerning alleged incidents of child abuse. Defendant Schlievert is specified in the contract as the sole source provider of the aforementioned services to LCCS. At the time of the incidents giving rise to this Complaint, LCCS was also partners with Promedica Toledo Hospital in Lucas County's Children's Advocacy Center's Multidisciplinary Team, which functions as a cooperative effort stressing cooperation of investigation and intervention services pertaining to allegations of child abuse.

20.    Defendants John Does 2-20 are believed to be LCCS staff and personnel who are also responsible for the violations of civil rights alleged in this Complaint. Defendants John Does 2-20 are sued under fictitious names since their true names and capacities are unknown to Plaintiffs, who will amend this Complaint to identify the Defendants when this information becomes available through discovery.

## KB's Birth and Subsequent Pediatric Visits

21.    On November 12, 2013, KB and LB were born five weeks prematurely at an estimated gestational age of 35 weeks. Molly is the mother of LB and KB. KB and LB were a dichorionic diamniotic twin pregnancy. LB was delivered vaginally at 15:35. KB was delivered vaginally at 16:15, a full forty minutes after LB.

22.    KB's birth required artificial rupture of membranes and Pitocin to assist in the birthing process.

23.    KB required external cephalic version to aid in her delivery. During this procedure, KB was manually turned from outside Molly's abdomen from a transverse position into a vertex position.

24.    KB's birth also required the use of a silastic vacuum extractor delivery instrument. During this procedure, a vacuum cup was attached to KB's head, and KB was suctioned out of the birth canal.

25.    Due to risk of intracranial injury, vacuum extraction should be avoided when delivering preterm infants; however, contrary to practice recommendations, a vacuum extractor was used during KB's birth, despite her prematurity.

26.    Due to risk of intracranial injury, a vacuum extractor's suctioning device should be placed symmetrically astride the sagittal suture on the medial flexion point of

6

the baby's head (also known as the pivot point), which is two centimeters anterior to the posterior fontanelle or six centimeters posterior to the anterior fontanelle; however, contrary to practice recommendations, the vacuum extractor's suctioning device in KB's delivery was incorrectly placed directly over the anterior fontanelle.

27. Vacuum assisted vaginal delivery is associated with causing intracranial injuries and such injuries during vacuum assisted delivery are known to be related to incorrect suction cup placement.

28. Nurses and physicians noted significant bruising to KB's scalp after her delivery; however, no imaging studies were performed to determine what consequences KB may have suffered as a result of her traumatic delivery.

29. On November 14, 2013, two days after their birth, both LB and KB were discharged from the hospital.

30. Over the next two months, Molly was very concerned about KB's developmental progress and frequently took KB to her pediatrician, Dr. William Scovell, M.D., for evaluation.

31. Molly took KB to be evaluated by her pediatrician a total of eight times between KB's November birth and January hospitalization.

32. KB's pediatric visits occurred on November 15, 2013, November 22, 2013, November 26, 2013, December 13, 2013, December 20, 2013, December 26, 2013, January 10, 2014, and January 16, 2014.

33. Immediately following KB's birth, Dr. Scovell determined she was failing to thrive, as KB was not properly gaining weight.

34. Although KB had always seemed to "spit up" after feedings, in early December, Molly made Dr. Scovell aware that KB was increasingly vomiting after her feedings.

35. Dr. Scovell told Molly that emisis subsequent to feedings usually looks to be greater in volume to new parents than it is in actuality. Dr. Scovell reassured Molly that so long as KB was gaining weight, her emisis was nothing to be concerned about.

36. On KB's December 20, 2013 pediatric visit, KB had reportedly gained two pounds in one week. Dr. Scovell was pleased with KB's weight gain; however, Molly continued to bring KB to the pediatrician to have her weight checked, as Molly noticed

and made Dr. Scovell aware that although KB's weight, as reflected by numbers on the scale, was increasing, she was not appearing to "gain weight" in that she was not filling out her newborn sleepers in the same manner that her twin sister seemed to be. Molly also continued to question Dr. Scovell as to what might be causing KB to increasingly vomit after feedings.

37. At KB's pediatric appointments, Molly also discussed with Dr. Scovell other differences she noticed between KB and her twin sister, including KB's seeming inability to make eye contact, KB's pale appearance, and KB's listlessness.

38. On December 26, 2013, Molly again brought KB to Dr. Scovell to discuss a small, faint skin discoloration Molly had noticed on KB located where the leg and buttock meet. Molly was concerned that the mark, combined with KB's pale appearance, listlessness, and episodes of vomiting, might indicate that KB was suffering from a severe condition, similar to leukemia.

39. The faint skin discoloration was no larger in size than a dime. Dr. Scovell opined that the mark could have been caused by a buckle in KB's car seat, as Molly had been instructed to put KB in her car seat after feedings to keep KB upright in an effort to help with her episodes of vomiting.

40. Molly explained to Dr. Scovell that KB continued to seem pale and was often listless. Dr. Scovell opined that as a premature infant, KB was expected to sleep often and might be anemic. Dr. Scovell determined that if KB continued to acquire markings easily, he would contemplate having her take an iron supplement in the future.

41. On January 10, 2014, Molly again brought KB to Dr. Scovell and asked Dr. Scovell to investigate KB's increasing head circumference, as Molly had noticed KB's head appeared much larger than her sister's. Molly also made Dr. Scovell aware that KB continued to appear pale, exhibit a lack of energy, and vomit after feedings.

42. It was not until January 16, 2014, however, that Molly's growing concerns about KB's increasing head size prompted Dr. Scovell to order a cranial ultrasound. Upon Dr. Scovell's recommendation, Molly took KB directly from Dr. Scovell's office to Promedica Toledo Hospital for the cranial ultrasound to be performed.

43. On January 16, 2014, ultrasound findings suggestive of bilateral subdural hygromas, perhaps due to chronic subdural hematoma, prompted KB's admission to

Promedica Toledo Hospital's pediatric intensive care unit.

## Promedica Toledo Hospital and Defendant Anwer's, Lisk's Tourner's, Dargart's, Rosenthal's, and Doe 1's Participation In Child Abuse Investigations, Findings, And Prosecutions

### (a) January 16, 2014

44. Promedica Toledo Hospital is a non-profit corporation organized under the laws of the State of Ohio and located in the Northern District of Ohio.

45. Promedica Toledo Hospital is engaged in providing medical services.

46. Included within the corporate structure of Promedica Toledo Hospital is the account of Toledo Children's Hospital.

47. Toledo Children's Hospital specializes in pediatric medicine and treating pediatric patients.

48. Toledo Children's Hospital serves as a member of Lucas County's Children's Advocacy Center's Multidisciplinary Team, which functions as a cooperative effort stressing coordination of investigation and intervention services pertaining to allegations of child abuse.

49. Upon information and belief, Promedica Toledo Hospital is the recipient of funds from the State to foster this initiative of investigating and determining child abuse.

50. Cases to be handled by the Multidisciplinary Team include cases of any child who has sustained a serious physical injury that is not believed to be accidental.

51. Upon information and belief, the primary function of the agreement between Promedica Toledo Hospital and the State is to foster collaboration between the State and medical personnel when investigating and prosecuting crimes involving child abuse.

52. On January 16, 2014, Dr. Daniel Dessner, M.D. interpreted KB's ultrasound and concluded findings suggestive of bilateral subdural hygromas perhaps due to chronic subdural hematomas. He determined that these findings were concerning for non-accidental trauma in a patient of KB's age.

53. Dr. Jennifer Grogan, M.D., a member of Promedica Toledo Hospital's trauma team, ordered social work to be consulted and informed Molly a referral concerning KB's clinical presentation would be made to LCCS, as the mechanism of KB's injury was unknown, given that Molly could not definitively inform medical personnel as to what

9

had caused KB's injury.

54. In accordance with Ohio Revised Code section 2151.421, when abuse or neglect is suspected by medical professionals, the medical professional must make an immediate referral to LCCS or law enforcement.

55. LCCS is charged with making investigations concerning any child alleged to be abused or neglected.

56. Ohio law mandates every report of child abuse or child neglect that is known, reasonably suspected, or believed to have occurred be investigated by a PCSA within twenty-four hours.

57. In this case, however, instead of LCCS investigating the physical abuse referral and contacting those subject to the investigation as mandated by Ohio Law, Promedica Toledo Hospital and its staff investigated the cause of KB's clinical presentation on LCCS's behalf, thereby rendering Promedica Toledo Hospital and its staff as adjuncts and agents of LCCS at all times relevant to this suit.

58. As adjuncts and agents of LCCS, Promedica Toledo Hospital and its staff promptly commenced a non-accidental trauma investigation, whereby medical personnel at Toledo Children's Hospital began their investigation to uncover evidence of child abuse to be shared with LCCS.

59. As willing participants in KB's non-accidental trauma investigation, Promedica Toledo Hospital's staff went beyond making determinations necessary for KB's medical care and did not simply diagnose as to what KB was physically suffering from; instead, they diagnosed as to the mechanism of injury responsible for KB's clinical presentation and made determinations as to whether or not the injury was intentionally inflicted.

60. Promedica Toledo Hospital's and its staff's participation and cooperation in the alleged physical abuse investigation concerning KB consisted of providing medical evaluations and conducting evidence searches on behalf of LCCS, gathering and sharing of medical evidence with LCCS, and rendering of a diagnosis as to the causation of KB's injury to be used by LCCS, in order to establish a *prima facia* case of physical abuse in judicial proceedings.

61. As part of the non-accidental trauma workup, Promedica Toledo Hospital and

10

its staff conducted a skeletal survey and a thorough physical exam of KB. No external indications of trauma were revealed.

62.     Pediatric hematologist Defendant Dr. Jamie Dargart, M.D. was also consulted as part of Promedica Toledo Hospital's ongoing non-accidental trauma investigation to evaluate KB for a bleeding disorder, as a bleeding disorder may predispose a patient to easy bleeding, thereby causing a child's non-abusive clinical presentation to mimic that of inflicted injury.

63.     Promedica Toledo Hospital and its staff also performed brain magnetic resonance imaging ("MRI") and a cranial computerized tomography scan ("CT") on KB, which revealed large extra-axial fluid collections of mixed signal attenuation under some degree of tension as well as downward displacement of cerebral hemispheres.

### (b) January 17, 2014

64.     On January 17, 2014, neurosurgeon Dr. Brian Hoeflinger, M.D. recommended surgical drainage of the observed fluid via bilateral parietal burr holes due to the size of the subdural fluid collections noted on MRI and CT.

65.     This surgical intervention consists of the surgeon creating one or more holes in the patient's skull to release excess cranial pressure via fluid drainage.

66.     Dr. Hoeflinger performed KB's surgical intervention at 11:42 a.m.

67.     During KB's surgery, upon his incision of the dura, Dr. Hoeflinger noted a spontaneous return of chronic to subacute subdural hematoma under fairly high pressure. He also identified a very thin, clear inner membrane, which he lifted off of the brain's surface and disrupted bilaterally. Dr. Hoeflinger noted that KB's brain appeared to expand toward the skull during periods of surgery.

68.     After surgery, KB received a blood transfusion due to having a hemoglobin of 6.9 mg/dL, indicating KB to be severely anemic.

69.     After her surgery and during the transfusion, KB had a seizure.

70.     Immediately following the seizure, a cranial CT was performed, which showed a new, large amount of extra-axial gas and bilateral hemorrhages, both parenchymal and extra-axial, that were acute and superimposed upon the chronic collections.

11

71. The onset of the new intraparenchymal hemorrhages in KB's frontal lobes was unexpected.

72. Intracerebral hemorrhage following evacuation of chronic subdural hematoma is associated with quick drainage of the subdural hematoma, which results in a rapid change in the patient's cranial pressure gradient.

73. The pressure volume curve in infants is steeper than that of adults due to infants' open sutures. As a result, small changes in volume result in significant pressure fluctuations.

### (c) January 19, 2014

74. On January 19, 2014, Defendant Dr. Rayyan Anwer, M.D., a resident at Promedica Toledo Hospital, attributed KB's subdural hematoma to non-accidental trauma and noted such in KB's medical record.

75. On the same day, Dr. Matthew Currie, M.D. was consulted to search KB's eyes for retinal hemorrhages via a dilated funds examination, as certain ocular manifestations have been thought to be indicative of abusive head injury.

76. Within the first twenty-four hours of a patient's admittance to the hospital in non-accidental trauma investigations, a prompt retinal exam should be performed to preserve the integrity of the retinal exam, as retinal hemorrhages may occur as a result of and/or worsen as a result of medical interventions a patient undergoes while at the hospital.

77. In KB's case, however, Promedica Toledo Hospital and its staff acted contrary to practice recommendations, as Dr. Currie did not examine KB until three days after her admittance to the hospital and two days after her traumatic surgical intervention.

78. Dr. Currie alleged to have observed intra and subretinal hemorrhages bilaterally. Dr. Currie was not board certified in ophthalmology at the time he examined KB, nor did he photograph his observations in an effort to preserve his findings.

79. Dr. Currie neither speculated as to what may have caused the retinal hemorrhages he allegedly observed, nor did he document in his medical notes any differential diagnosis considered.

80. Nevertheless, after KB's retinal exam, pediatric intensivist Defendant Dr.

12

Susan P. Tourner, M.D. determined KB suffered non-accidental trauma, concluded KB was a shaken baby, and notified LCCS of her investigatory finding.

81. Defendant Tourner did not document in her medical notes, nor make LCCS aware of, any differential diagnosis considered.

82. Contrary to what Promedica Toledo Hospital staff reported to LCCS, KB's clinical presentation did not support the conclusion that KB's injuries were inflicted and that KB was a shaken baby. Instead, KB's clinical presentation was consistent with KB suffering a subdural hematoma as a result of her traumatic birth and acquiring retinal hemorrhages as a result of medical interventions occurring at Promedica Toledo Hospital.

83. Once LCCS receives a referral alleging that a child was physically abused, LCCS then "screens" the referral, whereby LCCS makes a determination as to whether or not the information received in the referral constitutes a valid child abuse report.

84. Given that the hospital and its staff had been charged with investigating whether or not KB had been physically abused, the information received by LCCS predicated upon the conclusive determinations and diagnoses of Defendants Tourner and Anwer necessarily constituted a valid child abuse report, as social services caseworkers must defer to medical professional's determinations concerning complex medical presentations, given that caseworkers do not typically possess the requisite knowledge and skill to either make medical determinations based upon a patient's clinical presentation or to contest medical determinations based upon a patient's clinical presentation.

85. When LCCS determines a referral to constitute a valid child abuse report, LCCS must then complete a safety assessment, whereby a LCCS caseworker will make a determination as to whether or not the child and his or her siblings are currently safe.

86. "Safety Planning" is implemented immediately when the assessment of safety determines a child is in need of immediate protection.

87. LCCS uses a set of "safety factors" to assist in determining whether or not a child is in need of immediate protection from serious harm.

88. Whether a child is in immediate danger of serious harm is determined based upon credible information available at the time of the assessment of safety.

89. According to the Ohio Department of Job and Family Services Child

Protective Services Worker Manual, "credible information" is information worthy of belief.

90. The investigatory information rendered by Defendants Tourner and Anwer was deemed as worthy of belief by LCCS because the information was furnished to LCCS in the form of definitive conclusions and diagnoses. Essentially, when medical professionals, like Defendants Anwer and Tourner, conclusively determine a child to have been physically abused, all discretion is taken away from the caseworker as to whether or not physical abuse occurred. Similarly, all "safety measures" a PCSA has in place to "screen" unfounded abuse allegations are ineffective, given that deference will be given to medical professionals' determinations.

91. At approximately 7:00 p.m., as a result of Defendant Tourner's and Anwer's investigatory conclusions and upon information received from the hospital that indicated KB was a shaken infant, LCCS caseworker Jason Wegman made contact with Molly, advising Molly she was a named alleged perpetrator of KB's non-accidental injuries.

92. Father and Maternal Grandmother Claire Blythe were also named as alleged perpetrators by LCCS, as only Molly, Father, and Maternal Grandmother Claire had "unsupervised access" to KB between the time of her birth and her subsequent hospitalization.

93. Caseworker Wegman informed Molly that a "plan" would need to be made for LB, as the alleged perpetrator of KB's injuries was determined by LCCS to be unknown, given that Molly, Father, and Maternal Grandmother Claire all vehemently denied causing KB's injuries and vehemently denied witnessing another inflict any injury upon KB.

94. At the time Molly was at the hospital caring for KB, Maternal Grandmother Claire and Maternal Aunts Amy and Erin Blythe, who had come to Toledo from Chicago upon learning that KB would require a surgery, were caring for LB at the family home.

95. Molly initially raised concerns and resisted the idea that an official plan was needed to appoint someone to care for LB; however, after Molly was instructed by caseworker Wegman that if she did not give the name of a relative who was able to care for LB, LB would be immediately removed from her home and placed in foster care, Molly "consented" to a plan whereby Maternal Aunts would temporarily care for LB in

14

LB's home.

96.    At approximately 7:50 p.m., caseworker Wegman made contact with his supervisor Chanda Beal, who instructed caseworker Wegman that LB would need to be immediately seen by an emergency department doctor at Promedica Toledo Hospital.

97.    At approximately 8:20 p.m., caseworker Wegman called Maternal Aunts Amy and Erin and informed them that they needed to bring LB to Promedica Toledo Hospital for an evaluation.

98.    At approximately 9:40 p.m., at the direction of LCCS, Maternal Aunts Amy and Erin arrived at Promedica Toledo Hospital with LB. Although LB had never exhibited any signs or symptoms indicative of any type of trauma and was noted by medical professionals as being alert, happy, smiling, interactive, and playful, at the direction of LCCS, Dr. Eugene Izsak ordered a CT of LB's brain to be performed and ordered a full skeletal survey to be conducted. LB's cranial CT and skeletal survey were both negative for any indication of physical abuse.

99.    According to LB's medical record, the unnecessary and invasive search was conducted at LCCS's request to search for signs of possible abuse.

100.    At no time did Promedica Toledo Hospital or LCCS request parental consent prior to conducting the unnecessary and invasive "testing" on the two-month old infant; instead, LB's Maternal Aunt Amy Blythe was directed to sign LB's Consent for Treatment, as, upon information and belief, LCCS had determined and informed Promedica Toledo Hospital that Amy was LB's guardian.

101.    At approximately 10:45 p.m., as per instruction for LCCS, Promedica Toledo Hospital discharged LB to the care of her Maternal Aunt.

102.    At approximately 11:10 p.m., a social worker from Toledo Hospital called LCCS caseworker Dawn Lawson and indicated to LCCS that all of LB's tests had come back negative.


**January 20, 2014**

103.    At approximately 8:55 a.m., LCCS caseworker Lindsay Smallman informed Maternal Aunt Amy Blythe that she and Erin would need to come to LCCS immediately to be fingerprinted. Given the weather, Amy indicated that she did not want her niece to

15

have to go out into cold again, as LB had not been "discharged" from the hospital until 11:00 p.m. the prior night. Caseworker Smallman indicated to Amy that the trip to LCCS was not optional.

104. At approximately 10:55 a.m., Maternal Aunt Amy arrived at LCCS and was presented with a safety plan. Without hesitation, Amy signed the document, as she was instructed her signature indicated her willingness to care for LB and, upon her discharge from the hospital, KB.

105. LCCS is supposed to implement "safety plans" to immediately control threats of serious harm to children. To determine the degree of intervention necessary to protect the child, the caseworker will consider threats of serious harm identified in a safety assessment, the child's vulnerability, and the protective capacities of the family.

106. In a safety assessment, the caseworker must make a "Yes" or "No determination as to the presence of fifteen different safety factors to be assessed.

107. A "yes" response by the caseworker indicates that there is credible information to support the safety factor.

108. A "no" response by the caseworker indicates that the safety factor does not exist, that there is a lack of credible information that it does exist, or that information regarding a particular safety factor is currently unknown or incomplete.

109. The first safety factor to be assessed by the caseworker evaluates for whether the child has suffered any inflicted, serious injuries.

110. A child represented by medical professionals, like Defendants Tourner and Anwer, as suffering from shaken baby syndrome would necessarily be determined to have suffered inflicted, serious injuries, as the determinations made by the medical professionals would be deemed as credible.

111. Another safety factor the caseworker must assess considers whether the caretaker's explanation for the injury is consistent with the type of injury the child suffered. When assessing this safety factor, the caseworker is to consider whether or not the caretaker denies or attributes a child's injury to accidental causes when a medical evaluation indicates otherwise.

112. When all of those who had unsupervised "access" to a child, who medical professionals have determined to be an abused child, deny having caused the harm to the

child, the caseworker will necessarily conclude that all caretakers' explanations, or lack of explanations, for the injury are inconsistent with the type of injury the child suffered, thereby rendering all caretakers' as lacking a protective capacity to care for a child.

113.  A child determined by medical professionals, like Defendants Tourner and Anwer, to be a shaken baby would necessarily be deemed to necessitate immediate protection by all LCCS caseworkers, and to facilitate this protection, the child would necessarily be removed from his or her caregiver when the alleged perpetrator of the abuse was unknown.

114.  Although LCCS did determine KB and LB to be in immediate danger of serious harm on January 19, 2014, LCCS did not present Molly with the so-called "safety plan" until January 20, 2014.

115.  Under the "safety plan," Molly's custodial rights were to be limited and restricted, as Molly would only be permitted to have supervised contact with her children.

116.  Under the "safety plan," LB was to be cared for by her Maternal Aunts in Molly's residence and all contact between Molly and LB was to be supervised by Maternal Aunts.

117.  Under the "safety plan," while KB remained hospitalized, Molly's contact with KB was to be supervised by Toledo Children's Hospital staff, and upon her discharge, KB was to be released to the care of her Maternal Aunts, at which time all contact between Molly and KB was to be supervised by Maternal Aunts.

118.  Initially, Molly opposed and raised concerns about the "safety plan"; however, after being instructed that LCCS would immediately take Molly's children into protective custody and place Molly's children in foster care if the "safety plan" was not agreed upon, Molly "consented" to the plan. Molly was also informed if LB and KB were removed from the home, Molly would not be able to see her children.

119.  Furthermore, Molly was instructed that her signature on the "safety plan" indicated nothing more than an agreement to abide by the plan, as opposed to an agreement that the plan was necessary. Specifically, Molly was informed that the removal of her children would occur with or without her consent, and that her signature would allow for her children to remain in their home with family, as opposed to being moved to the home of a stranger, where Molly would not be able to see her children, supervised or

17

otherwise. Therefore, Molly also "consented" to remain out of her home during the pendency of the safety plan.

120. Later on January 20, 2014, hematologist Defendant Dargart determined KB's injuries could not be attributed to a bleeding disorder and noted such in KB's medical record. Defendant Dargart's representation that KB's injuries could not be attributed to a bleeding disorder necessarily lends itself to the conclusion Defendant Dargart conclusively determined KB did not suffer from a bleeding disorder, as had she determined otherwise, such would have been noted in Defendant Dargart's medical report.

### (d) January 21, 2014

121. On January 21, 2014, in an effort to provide the state with a witness competent to testify at subsequent legal proceedings, Defendant Dr. Gregory Rosenthal, M.D. was consulted to perform a second ophthalmological examination of KB, as Defendant Rosenthal, unlike Dr. Currie, was board certified in ophthalmology at the time of his examination.

122. Contrary to practice recommendations, Defendant Rosenthal's exam occurred five days after KB's initial hospitalization and four days after her traumatic surgical intervention.

123. The purpose of Defendant Rosenthal's exam was to conduct a search for evidence of physical abuse in the form of retinal hemorrhages via a dilated funds examination and to document such findings.

124. During the retinal exam he conducted on KB, Defendant Rosenthal stated he observed slight retinal hemorrhaging and stated he observed few retinal hemorrhages; however, in KB's medical record, Defendant Rosenthal documented to have observed moderate intraretinal hemorrhages in both retinas but not in the foveas.

125. Defendant Rosenthal did not take any images to preserve the integrity of his alleged observations.

126. Defendant Rosenthal concluded in KB's medical record that the presence of the retinal hemorrhages he observed were highly suggestive, if not pathognomonic of shaken baby syndrome.

18

127. Defendant Rosenthal did not document in his medical notes any differential diagnosis considered.

128. On the same day, Defendant Anwer again documented in KB's medical record his determination that KB's subdural hematoma was secondary to non-accidental trauma.

129. As Defendant Rosenthal was examining KB at the hospital, Molly was required to attend a Family Case Conference ("FCC") at LCCS. At this meeting, Molly was notified LCCS would be filing a Motion for Temporary Custody of LB and KB.

130. Upon making the determination to seek temporary custody, LCCS is to use a "Family Assessment" tool to identify strengths and needs present in the family of an allegedly abused child and to inform the caseworker assigned to the family what service needs may be present.

131. The risk assessment tool may be bypassed, however, when it has been determined that a child has suffered a non-accidental physical injury requiring medical or when the PCSA investigation consists of a case with non-accidental physical injury to an infant.

132. Essentially, when medical professionals, like Defendants Anwer, Tourner, and Rosenthal, conclusively determine a child to have been physically abused, all discretion is taken away from the caseworker as to whether or not physical abuse occurred. Similarly, all "safety measures" a PCSA has in place to "screen" unfounded abuse allegations are ineffective, given that deference will be given to the medical professionals' determinations.

133. At the FCC meeting at LCCS, LCCS caseworker Rose Cousino made contact with Toledo Hospital social worker Diana Whitehead and asked Ms. Whitehead what Defendant Rosenthal had determined. Ms. Whitehead then asked a Toledo Hospital nurse to read Defendant Rosenthal's notes. The nurse from Promedica Toledo Hospital indicated that the ophthalmologist said Kristen was a shaken baby.

134. Due to the fact Defendants Anwer, Tourner, and Rosenthal conclusively determined KB to be a shaken infant, LCCS instructed Molly that her custodial rights would continue to be limited and restricted in that LB and KB were to remain in the care or their Maternal Aunts and in that Molly's contact with her children would continue to

be supervised by Maternal Aunts. Molly was also instructed by LCCS that she would need to permanently vacate her home, and Molly did so.

### (e) January 22, 2014

135. On January 22, 2014, KB was discharged from Promedica Toledo Hospital into the care and custody of her Maternal Aunts.

136. Defendant Anwer and attending physician Defendant Dr. Tiffany Lisk, M.D. discharged KB with a diagnosis of non-accidental trauma.

137. Upon KB's discharge, Defendant Doe 1 prepared KB's "Promedica Health System Coding Factsheet," and diagnosed KB as suffering from "shaken infant syndrome."

138. Defendant Doe 1 also diagnosed KB with having retinal hemorrhages and documented the retinal hemorrhages as being present upon KB's admission to Promedica Toledo Hospital.

### Conscious Shocking Conduct of Defendant Anwer and Representations Made to LCCS Concerning the Same

139. Defendant Anwer was, at time of the incidents giving rise to this Complaint, a medical resident participating in an organized health care education and training program through the University of Toledo.

140. Defendant Anwer obtained his medical training license from the Ohio License Center on October 2, 2013, and had been practicing medicine for only three months at the time he observed KB in the hospital.

141. On January 19, 2014, January 20, 2014, and January 22, 2014, Defendant Anwer intentionally, deliberately, and recklessly fabricated inculpatory evidence of physical abuse when he determined and documented in KB's medical record that KB's subdural hematoma was secondary to non-accidental injury.

142. On January 22, 2014, Defendant Anwer intentionally, deliberately, and recklessly fabricated inculpatory evidence of physical abuse when he definitively diagnosed KB as suffering from non-accidental injury and when he documented such in KB's discharge summary, which he signed.

143. In making and documenting conclusive and diagnostic findings as to the

causation of KB's clinical presentation, Defendant Anwer acted as a willing participant in the non-accidental trauma investigation concerning KB, and thereby acted beyond the medical doctor's role of rendering treatment and willingly stepped into the role of LCCS child abuse investigator.

144. Defendant Anwer falsely and recklessly determined physical abuse, to the exclusion of all other explanations, as the cause of KB's clinical presentation and represented the same to LCCS.

145. Defendant Anwer's determinations and the diagnosis he rendered were false, deliberate, and reckless given that KB's clinical presentation was consistent with KB suffering a subdural hematoma as a result of her traumatic birth and acquiring retinal hemorrhages as a result of medical interventions occurring at Promedica Toledo Hospital; therefore, KB's clinical presentation did not support the conclusion that KB's injuries were inflicted and did not support the diagnosis of non-accidental trauma.

146. Defendant Anwer's conclusion and documentation of his definitive medical determination that KB's clinical presentation was necessarily attributable to non-accidental injury constitutes an intentional, deliberate, and reckless fabrication of inculpatory evidence of physical abuse to LCCS, as Defendant Anwer did not possess the requisite expertise, knowledge, and experience to render such a determination.

147. As a resident, Defendant Anwer knew or should have known a diagnosis of non-accidental trauma need be arrived at cautiously by qualified and competent medical professionals.

148. At the time of the incidents giving rise to this Complaint, Defendant Anwer possessed no specialized training concerning abusive head trauma, non-accidental trauma, injury biomechanics, pediatric neuroradiology, pediatric ophthalmology, and/or child abuse.

149. As a resident, Defendant Anwer knew or should have known he was in no way qualified to make definitive determinations as to the causation of KB's clinical presentation.

150. As a resident, Defendant Anwer knew or should have known he did not possess the requisite competency and expertise to render a diagnosis as to the causation of KB's injuries.

21

151. As a resident participating in an organized health care education and training program, Defendant Anwer must have or should have understood the limits of his knowledge and expertise concerning non-accidental trauma.

152. As a resident, Defendant Anwer must have known or should have known that any inculpatory diagnoses and inculpatory conclusive determinations he rendered constituted an intentional, deliberate, and reckless fabrication of inculpatory evidence of physical abuse, given Defendant Anwer knowingly did not possess the requisite knowledge and expertise to make such determinations.

153. Defendant Anwer's intentional, deliberate, and reckless fabrications of inculpatory evidence of physical abuse shock the conscience in that his determinations and representations to LCCS were made with a deliberate indifference for the truth and a reckless disregard for the truth.

## Conscious Shocking Conduct of Defendant Lisk Representations Made to LCCS Concerning the Same

154. Defendant Lisk was, at time of the incidents giving rise to this Complaint, a medical doctor certified in 2010 by The American Board of Pediatrics in general pediatrics.

155. Defendant Lisk was, at the time of the incidents giving rise to this Complaint, working as a pediatric hospitalist at Promedica Toledo Hospital.

156. Defendant Lisk was, at the time of the incidents giving rise to this Complaint, acting as an attending physician at Promedica Toledo Hospital, thereby making Defendant Lisk the supervisor of medical residents participating in organized health care education and training programs at the University of Toledo in partnership with Promedica Toledo Hospital.

157. As an attending physician, Defendant Lisk knew or should have known she was responsible for affirming and evaluating diagnostic decisions made by residents working under her supervision.

158. As an attending physician, Defendant Lisk knew or should have known her "signing off" on the work of residents working under her supervision constitutes her accepting, encouraging, and condoning the actions of the residents working under her supervision.

22

159. At the time of the incidents giving rise to this Complaint, Defendant Anwer was a resident working under Defendant Lisk's supervision.

160. On January 22, 2014, Defendant Lisk intentionally, deliberately, and recklessly fabricated inculpatory evidence of physical abuse when she falsely and recklessly determined KB had suffered non-accidental trauma and when she documented such in her attending note in KB's medical record.

161. On January 22, 2014, Defendant Lisk intentionally, deliberately, and recklessly fabricated inculpatory evidence of physical abuse when she approved the diagnosis of non-accidental trauma in KB's discharge summary.

162. In making and documenting conclusive and diagnostic findings as to the causation of KB's clinical presentation, Defendant Lisk acted as a willing participant in the non-accidental trauma investigation concerning KB, and thereby acted beyond the medical doctor's role of rendering treatment and willingly stepped into the role of LCCS child abuse investigator.

163. Defendant Lisk falsely and recklessly determined physical abuse, to the exclusion of all other explanations, as the cause of KB's clinical presentation.

164. Defendant Lisk's determinations and diagnosis rendered were false, deliberate, and reckless given that KB's clinical presentation was consistent with KB suffering a subdural hematoma as a result of her traumatic birth and acquiring retinal hemorrhages as a result of medical interventions occurring at Promedica Toledo Hospital; therefore, KB's clinical presentation did not support the conclusion that KB's injuries were inflicted and did not support a diagnosis non-accidental trauma.

165. Defendant Lisk's conclusion and documentation of her definitive medical determination that KB's clinical presentation was necessarily attributable to non-accidental trauma constitutes an intentional, deliberate, and reckless fabrication of inculpatory evidence of physical abuse, as Defendant Lisk did not possess the requisite expertise, knowledge, and experience to render such a determination.

166. As a pediatric hospitalist, Defendant Lisk knew or should have known that she was responsible for making informed diagnostic decisions based on patient information and current scientific evidence.

167. As a pediatric hospitalist, Defendant Lisk knew or should have known a

diagnosis of non-accidental trauma need be arrived at cautiously only after a complete medical history, all clinical findings, all imaging studies, all laboratory results, a detailed description of events, and differential diagnoses have been fully considered by qualified and competent medical professionals.

168. Upon information and belief, at the time of the incidents giving rise to this Complaint, Defendant Lisk possessed no specialized training concerning abusive head trauma, non-accidental trauma, injury biomechanics, pediatric neuroradiology, pediatric ophthalmology, and/or child abuse.

169. As a pediatric hospitalist, Defendant Lisk knew or should have known consultation of a physician possessing specialized training as to abusive head trauma is necessitated when evaluating a patient with a complex medical presentation.

170. As a pediatric hospitalist, Defendant Lisk knew or should have known KB's clinical presentation can be described as nothing other than complex, given the traumatic nature of KB's birth, the traumatic nature of KB's surgical intervention, and the ambiguities surrounding KB's retinal presentation.

171. Upon information and belief, at no time prior to Defendant Lisk's intentional, deliberate, and reckless conduct did Defendant Lisk seek the assistance of a physician possessing specialized training as to abusive head trauma, non-accidental trauma, injury biomechanics, pediatric neuroradiology, and/or child abuse to aid her in the rendering of her determinations and diagnosis.

172. As a pediatric hospitalist, Defendant Lisk knew or should have known she did not possess the knowledge, experience, and expertise to analyze KB's complete medical history, clinical findings, imaging studies, and laboratory results given the complexities of KB's clinical presentation.

173. As a pediatric hospitalist, Defendant Lisk knew or should have known she was not qualified to make definitive determinations as to the causation of KB's injuries.

174. As a pediatric hospitalist, Defendant Lisk knew or should have known she did not possess the requisite competency and expertise to render a diagnosis as to the causation of KB's injuries

175. As a pediatric hospitalist, Defendant Lisk must have or should have understood the limits of her knowledge and expertise concerning the diagnosis of non-

24

accidental trauma in complex clinical presentations, like KB's.

176. As a pediatric hospitalist, Defendant Lisk must have known or should have known that the inculpatory diagnosis and inculpatory conclusive determinations she rendered as to KB's complex medical presentation constituted an intentional, deliberate, and reckless fabrication of inculpatory evidence of physical abuse to LCCS, given Defendant Lisk knowingly did not possess the requisite knowledge and expertise to make such determinations.

177. Defendant Lisk's intentional, deliberate, and reckless fabrications of inculpatory evidence of physical abuse to LCCS shock the conscience in that her determinations or representations were made with a deliberate indifference for the truth and a reckless disregard for the truth.

## Conscious Shocking Conduct of Defendant Tourner and Representations Made to LCCS Concerning the Same

178. Defendant Tourner was, at time of the incidents giving rise to this Complaint, a medical doctor certified by The American Board of Pediatrics in general pediatrics and fellowship trained in pediatric critical care medicine.

179. Defendant Tourner was, at the time of the incidents giving rise to this Complaint, working as a pediatric intensivist at Promedica Toledo Hospital within its pediatric intensive care unit.

180. On January 19, 2014, Defendant Tourner intentionally, deliberately, and recklessly fabricated inculpatory evidence of physical abuse when she determined KB to be a shaken baby and represented such to Molly and LCCS.

181. In making conclusive and diagnostic findings as to the causation of KB's clinical presentation, Defendant Tourner acted as a willing participant in the non-accidental trauma investigation concerning KB, and thereby acted beyond the medical doctor's role of rendering treatment and willingly stepped into the role of LCCS child abuse investigator.

182. Upon information and belief, Defendant Tourner's determination that KB was a shaken baby was predicated upon Dr. Currie's retinal exam, where Dr. Currie alleged the presence of retinal hemorrhages in KB's eyes.

183. As a pediatric intensivist, Defendant Tourner knew or should have known

25

KB's alleged retinal presentation had wide differential diagnoses and that KB's alleged retinal presentation was not consistent with suffering an injury caused by shaking.

184. As a pediatric intensivist, Defendant Tourner knew or should have known the diagnosis of non-accidental trauma must be predicated on a patient's entire clinical presentation and that eye findings must be placed within the context of all clinical features.

185. As a pediatric intensivist, Defendant Tourner knew or should have known that KB's clinical presentation necessitated consideration be given to the compounding effects of the relief of intracranial pressure and the expansion of the brain during surgery, the intraparenchymal hemorrhages resulting from surgery, the subsequent seizure KB suffered post surgery, anemia, thrombocytopenia, anoxia, hypoxia, mild coagulopathy, obstruction of retinal venous flow, increased intracranial pressure, and KB's traumatic birth as causative factors of KB's alleged retinal presentation.

186. As a pediatric intensivist, Defendant Tourner knew or should have known that the presence of subdural hematoma and retinal hemorrhages in a pediatric patient does not necessitate the conclusion the patient has been physically abused.

187. As a pediatric intensivist, Defendant Tourner knew or should have known that to use shaken baby syndrome as a "default" diagnosis to be applied to all children exhibiting intracranial injury and retinal hemorrhages is simply wrong and does a grave disservice to the patient and his or her family.

188. Defendant Tourner intentionally, deliberately, and recklessly fabricated inculpatory evidence of physical abuse to LCCS when she determined the retinal hemorrhages allegedly observed in KB's eyes necessitated the determination that KB was a shaken infant, as Defendant Tourner knew or should have known that in her failing to consider all potential causative factors of the retinal hemorrhages allegedly observed, she failed to consider the complete context of KB's clinical presentation.

189. As a pediatric intensivist, Defendant Tourner knew or should have known a prompt retinal exam is recommended to be performed within the first twenty-four hours of a patient's admittance to the hospital, as retinal hemorrhages may occur as a result of and/or worsen as a result of medical interventions the patient undergoes while at the hospital.

190. As a pediatric intensivist, Defendant Tourner knew or should have known her determination that shaken baby syndrome was the only possible causative factor as to KB's alleged retinal presentation was one that would have been impossible for her to make, as no retinal examination was performed prior to KB undergoing a traumatic surgical intervention.

191. Defendant Tourner acted with a deliberate, intentional, and reckless disregard for the truth when she refused to suspend judgment as to the mechanism of injury concerning KB's clinical presentation until all other reasonable explanations were exhausted.

192. Defendant Tourner's fabrication of inculpatory evidence as to KB's clinical presentation shocks the conscience in that Defendant Tourner acted with a deliberate indifference and reckless disregard for the truth when she intentionally misrepresented, fabricated, and overstated the significance of KB's alleged retinal presentation to LCCS.

193. As a pediatric intensivist, Defendant Tourner knew or should have known that the methodology of her analysis and tactics used to investigate were so seriously flawed that such would necessitate serious doubt as to the validity of the conclusions rendered.

194. Defendant Tourner's intentional, deliberate, and reckless fabrication of inculpatory evidence to LCCS shocks the conscience in that her determination was made with a deliberate indifference for the truth and a reckless disregard for the truth.

## Conscious Shocking Conduct of Defendant Dargart and Representations Made to LCCS Concerning the Same

195. Defendant Dargart was, at the time of the incidents giving rise to this Complaint, a medical doctor certified by the American Board of Pediatrics in general pediatrics and pediatric hematology-oncology.

196. Defendant Dargart was, at the time of the incidents giving rise to this Complaint, working within Toledo Children's Hospital's pediatric hematology/oncology program at Promedica Toledo Hospital.

197. On January 20, 2014, Defendant Dargart intentionally, deliberately, and recklessly fabricated inculpatory evidence of physical abuse when she documented in KB's medical record that KB's injuries could not be attributed to a bleeding disorder.

27

198. In making and documenting conclusive and diagnostic findings as to the causation of KB's clinical presentation, Defendant Dargart acted as a willing participant in the non-accidental trauma investigation concerning KB, and thereby acted beyond the medical doctor's role of rendering treatment and willingly stepped into the role of LCCS child abuse investigator.

199. Defendant Dargart's representation to LCCS that KB's injuries could not be attributed to a bleeding disorder necessarily lends itself to the conclusion that Defendant Dargart conclusively determined that KB did not suffer from a bleeding disorder, as had she determined otherwise such would have been noted in Defendant Dargart's medical report.

200. The representation made by Defendant Dargart to LCCS that KB's injuries could neither be attributed to nor compounded by a bleeding disorder is patently and intrinsically untrue, as KB was diagnosed as having a platelet function disorder one year after her hospitalization.

201. As a pediatric hematologist, Defendant Dargart knew or should have known when children present to the hospital with manifestations of bleeding, as KB did, it is necessary for medical professionals to consider and evaluate the patient for medical conditions that may predispose the patient to easy bleeding.

202. As a pediatric hematologist, Defendant Dargart knew or should have known the clinical presentation of an infant suffering from a bleeding disorder may mimic the clinical presentation of an infant suffering from inflicted injury.

203. As a pediatric hematologist, Defendant Dargart knew or should have known the list of congenital and acquired bleedings disorders that can potentially be confused with abusive injury is extensive and no single panel of tests can rule out all bleeding disorders.

204. As a pediatric hematologist, Defendant Dargart knew or should have known the panel of tests she chose to run on KB was incomplete.

205. As a pediatric hematologist, Defendant Dargart knew or should have known her representation to LCCS that KB's injuries could not be attributed to a bleeding disorder was patently false and an intentional, deliberate, and reckless fabrication of inculpatory evidence of physical abuse.

28

206. While KB was hospitalized, Defendant Dargart failed to screen KB for a platelet function defect.

207. In April 2015, over one year after her hospitalization, KB was diagnosed as having a platelet function defect.

208. As a pediatric hematologist, Defendant Dargart knew or should have known the prevalence of intracranial injury in patients suffering from platelet disorders is unknown.

209. As a pediatric hematologist, Defendant Dargart knew or should have known that many aspects of bleeding disorders, including platelet function disorders, are not fully understood and that changes in the understanding of the severity of bleeding symptoms related to certain disorders, including platelet function disorders, is expected.

210. Defendant Dargart intentionally, deliberately, and recklessly exaggerated and misrepresented the significance of the tests she interpreted as they applied to KB to LCCS when she conclusively ruled out a bleeding disorder as a causative and contributing factor of KB's clinical presentation, as Defendant Dargart knew or should have known doing so was impossible.

211. As a pediatric hematologist, Defendant Dargart knew or should have known that the methodology of her analysis and tactics used to investigate were so seriously flawed that such would necessitate serious doubt as to the validity of the conclusions rendered.

212. Defendant Dargart's intentional, deliberate, and reckless fabrication of inculpatory evidence to LCCS shocks the conscience in that her determination was made with a deliberate indifference for the truth and a reckless disregard for the truth.

## Conscious Shocking Conduct of Defendant Rosenthal and Representations Made to LCCS Concerning the Same

213. Defendant Rosenthal was, at the time of the incidents giving rise to this Complaint, a medical doctor certified by the American Board of Ophthalmology.

214. Defendant Rosenthal was, at the time of the incidents giving rise to this Complaint, specifically trained as to the retina and represented himself as a pediatric retinal specialist.

29

215. Defendant Rosenthal was, at the time of the incidents giving rise to this Complaint, affiliated with Promedica Toledo Hospital, in that Defendant Rosenthal regularly examined Toledo Children's Hospital patients.

216. On January 21, 2014, Defendant Rosenthal performed a dilated fundus examination on KB. During his examination, Defendant Rosenthal orally indicated to have observed slight retinal hemorrhaging, evidenced by few retinal hemorrhages; however, Defendant Rosenthal documented in KB's medical records as having observed moderate intraretinal hemorrhages in KB's eyes.

217. On January 21, 2014, Defendant Rosenthal intentionally, deliberately, and recklessly fabricated inculpatory evidence of physical abuse when he determined and documented in KB's medical record that the retinal hemorrhages he allegedly observed in KB's eyes as pathognomonic of shaken baby syndrome.

218. In making and documenting conclusive and diagnostic findings as to the causation of KB's clinical presentation, Defendant Rosenthal acted as a willing participant in the non-accidental trauma investigation concerning KB, and thereby acted beyond the medical doctor's role of rendering treatment and willingly stepped into the role of LCCS child abuse investigator.

219. As an ophthalmologist, Defendant Rosenthal knew or should have known "pathognomonic" is a medical term used to indicate the presence of a sign or symptom so characteristic of a disease or condition that it alone can be used to make a diagnosis.

220. As an ophthalmologist, Defendant Rosenthal knew or should have known his use of the term "pathognomonic" necessarily determined the cause of KB's injuries to be physical abuse, to the exclusion of all other potential causes.

221. As an ophthalmologist, Defendant Rosenthal knew or should have known that, in fact, there are no pathognomonic clinical ocular features of shaken baby syndrome.

222. Defendant Rosenthal's representation to LCCS that the alleged retinal hemorrhages he observed in KB's eyes as pathognomonic for shaken baby syndrome constitutes a deliberate, intentional, and reckless fabrication of inculpatory evidence of physical abuse, as Defendant Rosenthal knew or should have known there are no pathognomonic clinical ocular features of shaken baby syndrome.

30

223. As an ophthalmologist, Defendant Rosenthal knew or should have known the methodology of his analysis and tactics used to investigate were so seriously flawed that such would necessitate serious doubt as to the validity of the conclusions rendered.

224. Defendant Rosenthal's intentional, deliberate, and reckless fabrication of evidence to LCCS shocks the conscience in that his determination was made with a deliberate indifference for the truth and a reckless disregard for the truth.

225. On January 21, 2014, Defendant Rosenthal intentionally, deliberately, and recklessly fabricated inculpatory evidence of physical abuse when he determined and documented in KB's medical record that the retinal hemorrhages he allegedly observed in KB's eyes were highly suggestive of shaken baby syndrome.

226. As an ophthalmologist, Defendant Rosenthal knew or should have known the type, classification, and severity of retinal hemorrhages highly suggestive of physical abuse was not consistent with the ocular presentation he documented and alleged to have observed in KB.

227. As an ophthalmologist, Defendant Rosenthal knew or should have known KB's alleged retinal presentation had a large number of differential diagnoses and that KB's alleged retinal presentation was not consistent with suffering an injury caused by shaking.

228. As an ophthalmologist, Defendant Rosenthal knew or should have known the diagnosis of non-accidental trauma must be predicated on a patient's entire clinical presentation and that eye findings must be placed within the context of all clinical features.

229. As an ophthalmologist, Defendant Rosenthal knew or should have known KB's clinical presentation necessitated consideration be given to the compounding effects of the relief of intracranial pressure and the expansion of the brain during surgery, the intraparenchymal hemorrhages resulting from surgery, the subsequent seizure KB suffered post surgery, anemia, thrombocytopenia, anoxia, hypoxia, mild coagulopathy, obstruction of retinal venous flow, increased intracranial pressure, and KB's traumatic birth as causative factors of the KB's alleged retinal presentation.

230. Defendant Rosenthal intentionally, deliberately, and recklessly fabricated inculpatory evidence of physical abuse to LCCS when he determined and documented in

31

KB's medical record that the retinal hemorrhages he allegedly observed in KB's eyes as being highly suggestive of shaken baby syndrome, as Defendant Rosenthal knew or should have known that in his failing to consider all potential causative factors of the retinal hemorrhages allegedly observed, he necessarily failed to consider the complete context of KB's clinical presentation.

231. As an ophthalmologist, Defendant Rosenthal knew or should have known a prompt retinal exam is recommended to be performed within the first twenty-four hours of a patient's admittance to the hospital, as retinal hemorrhages may occur as a result of and/or worsen as a result of medical interventions the patient undergoes while at the hospital.

232. As an ophthalmologist, Defendant Rosenthal knew or should have known his determination that shaken baby syndrome was the only possible causative factor as to KB's alleged retinal presentation was one that would have been impossible for him to have made, as no retinal examination was performed prior to KB undergoing a traumatic surgical intervention.

233. Defendant Rosenthal acted with a deliberate, intentional, and reckless disregard for the truth when he refused to suspend judgment as to the causative factor of KB's alleged retinal hemorrhages until all other reasonable explanations were exhausted.

234. As an ophthalmologist, Defendant Rosenthal knew or should have known that the methodology of his analysis and tactics used to investigate were so seriously flawed that such would necessitate serious doubt as to the validity of the conclusions rendered.

235. Defendant Rosenthal's fabrication of inculpatory evidence as to KB's retinal presentation to LCCS shocks the conscience in that Defendant Rosenthal acted with a deliberate indifference and reckless disregard for the truth when he intentionally misrepresented, fabricated, overstated the significance of KB's alleged retinal presentation, and failed to make LCCS aware of other causes of KB's retinal presentation.

### Conscious Shocking Conduct of Defendant Doe 1 and Representations Made to LCCS Concerning the Same

236. Defendant John Doe 1 is Promedica Toledo Hospital "Coder 052829".

237. The true identity of Defendant Doe is unknown at the time of filing this

Complaint.

238. As a medical coder, Defendant Doe 1 was responsible for translating medical procedures and diagnoses into a standardized code.

239. Coding determinations are represented in the patient's permanent medical record on a "Coding Factsheet."

240. On January 22, 2014, Defendant Doe 1 intentionally, deliberately, and recklessly fabricated inculpatory evidence of physical abuse to LCCS when Defendant Doe 1 definitively represented KB's retinal hemorrhages as being present upon her admission to Promedica Toledo Hospital.

241. As a medical coder interpreting KB's medical record, Defendant Doe 1 knew or should have known KB was admitted to Promedica Toledo Hospital on January 16, 2014.

242. As medical coder interpreting KB's medical record, Defendant Doe 1 knew or should have known the first time any medical professional alleged the presence of retinal hemorrhages in KB's eyes was January 19, 2014, three days after KB's admittance to the hospital and two days after her traumatic surgical intervention.

243. Defendant Doe 1 necessarily fabricated inculpatory evidence of physical abuse when Defendant Doe 1 falsely and recklessly represented to LCCS that KB had retinal hemorrhages upon her admission to Promedica Toledo Hospital, as it would have been impossible for Defendant Doe 1 to have made this determination.

244. As a medical coder, Defendant Doe 1 knew or should have known it was his or her responsibility to accurately interpret KB's medical record.

245. Defendant Doe 1's representation that KB had retinal hemorrhages upon her admittance to Promedica Toledo Hospital necessarily and arbitrarily negated medical interventions KB underwent at the hospital as the cause of the alleged retinal hemorrhages observed.

246. As a medical coder, Defendant Doe 1 knew or should have known he or she did not possess the requisite knowledge and experience to conclusively exclude the compounding effects of the relief of intracranial pressure and the expansion of the brain during surgery, the intraparenchymal hemorrhages resulting from surgery, the subsequent seizure KB suffered post surgery, anemia, thrombocytopenia, anoxia, hypoxia, mild

33

coagulopathy, obstruction of retinal venous flow, increased intracranial pressure, and KB's traumatic birth as causative factors of the retinal hemorrhages allegedly observed.

247. As a medical coder, Defendant Doe 1 knew or should have known his or her representation to LCCS that KB had retinal hemorrhages upon her admission to Promedica Toledo Hospital constituted an intentional, deliberate, and reckless fabrication of inculpatory evidence of physical abuse given Defendant Doe 1 knowingly did not possess the requisite competency and expertise to make such a determination.

248. Defendant Doe 1's intentional, deliberate, and reckless fabrication of inculpatory evidence of physical abuse shocks the conscience in that his or her determination and representation to LCCS that KB had retinal hemorrhages upon her admission to Promedica Toledo Hospital was made with a deliberate indifference for the truth and a reckless disregard for the truth.

## Conscious Shocking Conduct of Defendants Anwer, Lisk, Tourner, Dargart, Rosenthal, and Doe 1 as the Actual and Proximate Cause of Plaintiffs' Constitutional Deprivations and the Foreseeability of the Same

249. As stated in Ohio Revised Code section 2151.031, an abused child includes any child who exhibits evidence of any physical injury inflicted other than by accidental means or any child who exhibits evidence of any physical injury at variance with the history given of it.

250. When Defendants Anwer, Lisk, Tourner, Rosenthal, and Doe 1 falsely and recklessly diagnosed and attributed KB's clinical presentation to shaken baby syndrome, they determined KB to be a an abused child.

251. When Defendant Dargart falsely and recklessly determined and documented that a bleeding disorder did not cause or contribute to KB's injury, Defendant Dargart necessarily and arbitrarily supported the determination that KB was an abused child.

252. When Defendant Doe 1 falsely and recklessly determined that KB's alleged retinal hemorrhages were present upon her admission to Promedica Toledo Hospital, Defendant Doe 1 falsely and arbitrarily supported the determination that KB was an abused child.

253. Given that social services caseworkers do not possess training as to medical manifestations of physical abuse in complex clinical presentations, LCCS caseworkers

34

must defer to the judgment of medical professionals when medical professionals determine that a child has suffered an inflicted physical injury other than by accidental means.

254. Defendants Anwer, Lisk, Tourner, Dargart, Rosenthal, and Doe 1 knew or should have known LCCS would rely upon their false and reckless determinations and diagnoses that KB suffered an inflicted physical injury.

255. Defendants Anwer, Lisk, Tourner, Dargart, Rosenthal, and Doe 1 knew or should have known LCCS would be aware of and use their determinations and diagnosis rendered in KB's medical records.

256. Defendants Anwer, Lisk, Tourner, Dargart, and Rosenthal stepped outside of their roles as treating physicians and stepped into the role of LCCS child abuse investigators when they falsely and recklessly determined and represented to LCCS KB's injury to be inflicted and determined the mechanism of KB's injury to be shaking.

257. Defendant Doe 1 stepped outside of his or her role as a medical coder and into the role of LCCS child abuse investigator when Defendant Doe falsely and recklessly determined and represented to LCCS that KB's alleged retinal hemorrhages were present upon her admission to Promedica Toledo Hospital.

258. Defendants Anwer, Lisk, Tourner, Dargart, Rosenthal, and Doe 1 knew or should have known the false and reckless conclusions and diagnoses they rendered determining KB to be a shaken baby constituted far more than a medical diagnosis.

259. Defendants Anwer, Lisk, Tourner, Dargart, Rosenthal, and Doe 1 knew or should have known that a shaken baby diagnosis conclusively establishes criminal action has occurred and that a child has been the victim of child abuse.

260. Defendants Anwer, Lisk, Tourner, Dargart, Rosenthal, and Doe 1 knew or should have known that their representations to LCCS that they had considered and rejected other bases for KB's injuries, when they neither possessed the requisite knowledge base nor had conducted the necessary tests to reach such conclusions, would necessarily lead to KB and LB being removed from the care and custody of Molly.

261. After LCCS concludes an investigation, it renders a case disposition. The case disposition is the final agency determination of whether or not abuse occurred and is tantamount to a finding of innocence or guilt.

35

262. According to LCCS's "Operational Definitions of Child Abuse and Neglect", a "substantiated" dispositional finding is appropriate where an admission of child abuse by persons responsible is made, an adjudication of child abuse occurs, where other forms of confirmation deemed valid by the agency exist, or where the professional judgment of LCCS's investigative staff determines incidents of abuse to have occurred.

263. On February 3, 2014, LCCS informed Molly that its investigation was complete and that the agency had determined that the physical abuse referral for shaken baby syndrome regarding KB was "substantiated."

264. LCCS did, in fact, rely upon the false and reckless determinations and diagnoses rendered by its "investigative staff" – Defendants Lisk, Anwer, Tourner, Dargart, Rosenthal and Doe 1 – as LCCS clearly indicated to Molly that the "substantiated" finding was due to KB suffering a non-accidental physical injury requiring medical treatment.

265. As a result of LCCS's "substantiated" finding, predicated upon the false and reckless determinations and diagnoses rendered by Defendants Lisk, Anwer, Tourner, Dargart, Rosenthal, and Doe 1, Molly's name has been placed on the central registry of persons who have been found to have engaged in child abuse or neglect maintained by the Ohio Department of Job and Family Services.

266. On February 3, 2014, LCCS staff attorney Jill E. Wolff filed in the Court of Common Pleas of Lucas County, Ohio Juvenile Division a Complaint in Dependency, Neglect and Abuse and a Motion for a Shelter Care Hearing asking the Court to find that the continued care of LB and KB by Molly would be contrary to LB and KB's best interests, that LB and KB be placed in shelter care, and that temporary custody of LB and KB be awarded to a relative or to LCCS.

267. Promedica Toledo Hospital's investigation on behalf of LCCS formed the factual basis upon which LCCS's Complaint was filed, as the Complaint states KB's injury was ruled non-accidental trauma and that doctors at Promedica Toledo Hospital diagnosed KB's condition as shaken baby, thereby establishing that LCCS's Complaint was necessarily predicated upon the false and reckless determinations made by Defendants Anwer, Lisk, Tourner, Dargart, Rosenthal, and Doe 1 during the course of the child abuse investigation, which they undertook on behalf of LCCS.

36

268. On February 3, 2014, Magistrate Pamela Manning, sitting in the Court of Common Pleas of Lucas County, Ohio Juvenile Division, found probable cause existed to believe LB and KB's placement in shelter care was required to protect the children from immediate or threatened physical harm.

269. On February 3, 2014, Molly's access to her children was to continue to be restricted, as it was so ordered that temporary custody of LB and KB be awarded to their Maternal Aunt Erin Blythe for placement in shelter care, it was ordered that Molly's visitation with her children would continue to be supervised, and it was ordered that Molly was to continue to reside outside of her home.

270. An order granting temporary custody of a child to another party constitutes the removal of the child from the parents' physical and legal custody, which is to continue until the Court terminates the order or permanently divests the parents of all parental rights.

271. The Court's concern that LB and KB might suffer physical harm if they were to continue to be cared for by Molly was necessarily predicated upon Defendant Anwer's, Lisk's, Tourner's, Dargart's, Rosenthal's, and Doe 1's intentional, deliberate, and reckless fabrications of inculpatory evidence of physical abuse in the form of conclusive determinations and diagnoses as to the mechanism of injury concerning KB's clinical presentation.

272. Defendant Anwer's, Lisk's, Tourner's, Dargart's, Rosenthal's, and Doe 1's investigatory, pre-trial, non-testimonial acts of fabricating inculpatory evidence of physical abuse in the form of false and reckless conclusive determinations and diagnoses is egregious and conscience shocking in that their conduct intended to injure Plaintiffs and was unjustifiable by any government interest.

273. The Fourteenth Amendment to the United States Constitution prohibits state governments from depriving any person of life, liberty, or property without due process of law.

274. Molly, as a parent, has a protected Fourteenth Amendment liberty interest in making decisions regarding the custody and control of her children.

275. Plaintiffs, as family members, have a protected First Amendment right to familial association.

37

276. As a result of Defendants Anwer's, Lisk's, Tourner's, Dargart's, Rosenthal's, and Doe 1's investigatory, pre-trial, non-testimonial acts of fabricating inculpatory evidence of physical abuse in the form of false and reckless conclusive determinations and diagnoses and representing the same to LCCS, a complete deprivation of Plaintiffs' parent-child relationship occurred, and Plaintiffs were deprived of their rights secured by the Fourteenth and First Amendments of the United States Constitution.

277. Defendant Anwer's, Lisk's, Tourner's, Dargart's, Rosenthal's, and Doe 1's investigatory, pre-trial, non-testimonial acts of fabricating inculpatory evidence of physical abuse in the form of false and reckless conclusive determinations and diagnoses violated clearly established constitutional rights of which a reasonable person should have known.

278. Certainly, any reasonable physician and/or medical coder would have known that he or she was putting the rights of a mother and her children at risk when he or she made intentional, reckless, and deliberately indifferent misrepresentations conclusively indicating a child to have been the victim of child abuse, when, in fact, the child had not been.

279. Defendants Anwer, Lisk, Tourner, Dargart, Rosenthal, and Doe 1 did in fact know their intentional, reckless, and deliberately indifferent misrepresentations were being used by LCCS to deprive Plaintiffs of their clearly established constitutional rights, as the aforementioned Defendants were in constant contact with LCCS concerning their investigation, conducted testing on the children at the request of LCCS, agreed to supervise Molly's contact with her children, and ultimately released KB from the hospital to the control of her Maternal Aunts.

280. In the rendering of their false and reckless conclusive determinations and diagnoses, Defendant Anwer, Lisk, Tourner, Dargart, Rosenthal, and Doe 1 acted intentionally and/or recklessly or with a deliberate indifference as to the consequences of their actions.

281. The acts and omissions of Defendants Anwer, Lisk, Tourner, Dargart, Rosenthal, and Doe 1 foreseeably caused Plaintiffs great monetary harm in the form of attorney and expert fees required to refute the Defendants' false and reckless conclusive determinations and diagnoses.

282. Furthermore, the acts and omissions of Defendants Anwer, Lisk, Tourner, Dargart, Rosenthal, and Doe 1 foreseeably caused Plaintiffs great emotional harm, including stress and anguish. The harm to Plaintiffs personal security, privacy, and family life has been severe and long-term, as Molly is constantly worried medical doctors will again render false and reckless conclusive determinations and diagnoses as to her children, thereby providing LCCS with an excuse to again take away her children, constituting a constant state of fear perpetuated by the Defendants.

## Defendant LCCS's Failure to Train Hospital Employees Concerning Child Abuse Investigations

283. Under Ohio Revised Code section 5153.16, LCCS is charged with making investigations concerning any child alleged to be an abused, neglected, or dependent child.

284. Toledo Children's Hospital and LCCS serve as members of Lucas County's Children's Advocacy Center's Multidisciplinary Team, which functions as a cooperative effort stressing coordination of investigation and intervention services pertaining to allegations of child abuse.

285. Cases to be handled by the Multidisciplinary Team include cases of any child who has sustained a serious physical injury that is not believed to be accidental.

286. Upon information and belief, the primary function of the agreement between Promedica Toledo Hospital and the State is to foster collaboration between the State and medical personnel when investigating and prosecuting crimes involving child abuse.

287. Upon information and belief, LCCS routinely delegates its responsibility of investigating instances of alleged physical abuse to Promedica Toledo Hospital.

288. If LCCS did not routinely delegate its investigatory responsibilities into instances of alleged physical abuse, there would be no need for an agreement for a Multidisciplinary Team.

289. Defendant LCCS has systematically failed to train hospital employees that it routinely delegates its responsibility of investigating alleged incidents of abusive head trauma.

290. This systematic failure is evidenced by the complete and utter disregard Promedica Toledo Hospital employees exhibited when diagnosing KB as a shaken infant.

39

291. Upon information and belief, Defendant LCCS offered inadequate training to Toledo Hospital personnel conveying accurate information to hospital personnel concerning the importance of the differential diagnosis in the diagnosing of abusive head trauma.

292. When participating in forensic investigations, it is of the utmost importance that those responsible for evaluating evidence on behalf of the State be aware of changes concerning the foundation upon which the investigators make their diagnoses.

293. However, the aforementioned Defendants' actions in diagnosing KB as a shaken baby clearly demonstrates their reliance on the archaic assumption that a child who has a subdural hematomas and retinal hemorrhages, without even considering when the retinal hemorrhages were acquired, must have been shaken.

294. In reality, research has demonstrated that the classic triad at the foundation of the shaken baby syndrome theory – cerebral edema, subdural hematomas, and retinal hemorrhages – can all be caused by forces other than shaking; therefore, the classic "triad" is not exclusively diagnostic of shaken baby syndrome, and no one sign or symptom is pathognomonic of the theory.

295. When LCCS decided to delegate child abuse investigations to Toledo Hospital personnel, it then assumed the responsibility of educating those responsible for determining whether medical evidence supports a diagnosis of abusive head trauma.

296. Given that LCCS failed to adequately train physicians entrusted with rendering diagnostic determinations as to whether or not a child had been abused, the likelihood Promedica Toledo Hospital physicians would render incorrect and reckless diagnoses in complex medical presentations, resulting in deprivations of constitutional rights, was or should have been readily apparent to Defendant LCCS.

297. Upon information and belief, LCCS exhibited a deliberate indifference to the obvious consequences of its failure to train Toledo Hospital when LCCS offered inadequate training to Toledo Hospital personnel concerning the importance of the differential diagnosis in the diagnosing of abusive head trauma.

298. Defendant LCCS's failure to train Toledo Hospital personnel is so closely related to the deprivation of the Plaintiffs' rights, it may be considered to be the moving force causing Plaintiffs' ultimate injury.

## Defendant Schlievert's Participation in Child Abuse Investigations, Findings, and Prosecutions and LCCS's Reliance Thereon

299. Defendant Schlievert was, at the time of the incidents giving rise to this Complaint, a medical doctor certified by the American Board of Pediatrics in general pediatrics and child abuse pediatrics.

300. Defendant Schlievert was, at the time of the incidents giving rise to this Complaint, a signatory to "Purchase of Service Agreement Contract # 2014" between LCCS and Mercy St. Vincent Medical Center, entered into January 1, 2014.

301. In this agreement, LCCS contracted with Mercy St. Vincent Medical Center for the services of its employee, Defendant Schlievert.

302. In this contract, Defendant Schlievert agreed to furnish medical examinations and consultation services to LCCS, represent and promote the philosophy of LCCS to community medical providers and hospitals, provide written documentation of physical examination for abuse and neglect where such documentation could be used as court evidence, participate in court hearings as requested by LCCS to provide testimony regarding abuse and neglect, and train LCCS service delivery and medical staff on issues including abuse and neglect identification.

303. In an effort to portray Defendant Schlievert as "independent," LCCS pays Mercy St. Vincent Medical Center, not Defendant Schlievert, for the services rendered by Defendant Schlievert. In turn, Mercy St. Vincent Medical Center pays Defendant Schlievert a salary.

304. Upon information and belief, Defendant Schlievert does not practice medicine in the typical sense at Mercy St. Vincent Medical Center. For example, one cannot make an appointment to receive medical treatment from Defendant Schlievert. Instead, the only "patients" Defendant Schlievert sees are children LCCS and other PCSAs refer to be evaluated for physical and/or sexual abuse.

305. At all times relevant to this suit, Defendant Schlievert acted as an adjunct and agent of LCCS, as Defendant Schlievert was contractually obligated to investigate suspected cases of child abuse or neglect on behalf of LCCS, obligated to evaluate evidence on behalf of LCCS, and contractually obligated to provide expert testimony in legal proceedings instituted by LCCS.

41

306. Upon information and belief, Defendant Schlievert is the sole and exclusive physician LCCS engages to review medical records concerning the investigation of suspected cases of child abuse and neglect and is the sole and exclusive physician LCCS engages to provide expert testimony in legal proceedings instituted by LCCS concerning physical abuse.

307. On January 21, 2014, Molly was informed by LCCS staff at the Family Case Conference that LCCS would be having its child abuse "expert", Defendant Schlievert, review KB's medical file.

308. On January 23, 2014, at a home visit, LCCS caseworkers Ventimiglia and Fraber informed Molly that the remainder of LCCS's involvement with her children would be dependent on Defendant Schlievert's report. Molly was told that if Defendant Schlievert determined physical abuse to not be the cause of KB's medical presentation, LCCS would dismiss its Complaint, unsubstantiate the case disposition finding, and close its case.

309. At the same visit, Molly was informed that if Defendant Schlievert determined physical abuse to be the cause of KB's medical presentation, LCCS would be holding a Permanency Planning Conference ("PPC") on February 6, 2014, at which time Molly and her family would need to provide LCCS with the name of a relative who would be willing and able to care for LB and KB until they turned eighteen years old. Molly and her family were also informed that if no relative could be provided, KB and LB would be placed in foster care and subsequently placed up for adoption.

310. On February 3, 2014, Molly was informed by caseworker Ventimiglia that the PPC previously scheduled for February 6, 2014, would need to be rescheduled for February 20, 2014. Molly was told that the meeting needed to be rescheduled because LCCS was waiting on Defendant Schlievert's report. Again, Molly was informed that the manner in which LCCS would proceed with its case would be dependent upon Defendant Schlievert's report.

311. On February 19, 2014, Molly was informed by LCCS caseworker Brianna Ventimiglia that LCCS had received Defendant Schlievert's report and that Defendant Schlievert had determined KB's injuries to have been caused by physical abuse. Molly was informed by LCCS caseworker Brianna Ventimiglia that a permanent plan for LB

42

and KB would be determined at the PPC, which was to be held the following morning.

312. In his report (hereinafter referred to as "February Report"), addressed to both LCCS and law enforcement, Defendant Schlievert concluded, "KB is a two month old who has injuries that are due to abusive head trauma, sometimes called Shaken Baby Syndrome. I see no other possible cause for these injuries....The injuries to the head and buttocks are abuse...She and her twin should not return to the environment that caused these injuries."

313. In his February Report, Defendant Schlievert failed to make LCCS aware of the significance of the traumatic nature of KB's birth, failed to make LCCS aware of the significance of the traumatic surgical intervention KB suffered while at Promedica Toledo Hospital, and failed to make LCCS aware of the significance of the ambiguities surrounding KB's retinal presentation.

314. On February 20, 2014, Molly attended the PPC at LCCS and was informed by LCCS facilitator Rose Cousino that due to Defendant Schlievert's February Report, LCCS would be changing LB and KB's permanency goal from family reunification to granting permanent legal custody of LB and KB to a relative.

315. LCCS's determination to seek permanent legal custody of LB and KB to be awarded to a relative, as opposed to family reunification, was predicated upon Defendant Schlievert's February Report, as LCCS determined that when an unknown perpetrator exists and a report by a child maltreatment specialist indicates an infant to have been seriously physically abused, establishment of parental protective capacities is impossible and, therefore, necessitates that the child cannot safely return to the custody of his or her alleged perpetrator parents.

316. On March 4, 2014, LCCS staff attorney Jill E. Wolff filed in the Court of Common Pleas of Lucas County, Ohio Juvenile Division an Amended Complaint in Dependency, Neglect and Abuse seeking legal custody of LB and KB to be awarded to Maternal Aunt Erin Blythe.

317. LCCS bore the burden of proving all allegations in its Complaint by clear and convincing evidence, which necessarily would have been met if Defendant Schlievert's determinations in his February Report were left uncontested.

318. Subsequent to Defendant Schlievert rendering his February Report, Molly

43

engaged several experts in the field of abusive head trauma to review KB's file, as once Defendant Schlievert definitively determined KB to have been have been physically abused, the burden of proof, for all practical purposes, shifted to Molly.

319. Molly obtained expert reports from Dr. Patrick D. Barnes, M.D., Dr. Gregory M. Shoukimas, M.D. Ph.D., Dr. Khaled A. Tawansy, M.D., Dr. Stephen R. Guertin, M.D., and Dr. Faris A. Bandak, Ph.D. (hereinafter referred to collectively as "Plaintiffs' Experts").

320. All medical reports rendered by Plaintiffs' Experts indicate Defendant Schlievert's February Report was incorrect, contrary to evidence-based medicine, and failed to take into account all explanations pertaining to KB's clinical presentation.

321. Dr. Patrick D. Barnes, M.D. was, at the time of the incidents giving rise to this Complaint, Chief of Pediatric Neuroradiology and Co-Director of the Pediatric MRI & CT Center at Lucile Packard Children's Hospital, and Professor of Radiology at Stanford University Medical Center. Dr. Barnes's report states, "According to the evidence-based medical literature, there is nothing about the imaging findings in this case, including in the presence or absence of retinal hemorrhage, that is specific for, or characteristic of [non-accidental injury]."

322. Neuroradiologist Dr. Gregory M. Shoukimas, M.D. Ph.D. stated in his report, "The conclusions that the findings in this patient are secondary to nonaccidental trauma are without any merit."

323. Ophthalmologist Dr. Khaled A. Tawansy, M.D., of the Los Angeles based Children's Retina Institute concluded, "The retinal hemorrhages [allegedly observed in KB] can be completely explained by the intracranial pressure fluctuations, and there is no need to medically invoke a diagnosis of shaken injury. To remove the twins from their parents care would indeed be a tragic injustice."

324. Dr. Stephen R. Guertin, M.D., Director of the Pediatric Intensive Care Unit and Medical Director at Sparrow Children's Center and Associate Professor of Pediatrics at Michigan State University College of Human Medicine, highlighted in his report that a finding of abuse in KB's case ignores all aspects of KB's clinical presentation supportive of an alternative explanation concerning KB's clinical presentation.

325. Biomechanical engineer Dr. Faris A. Bandak, Ph.D. rendered an expert report

after reviewing KB's file and stated that, "In summary, based on the biomechanical evidence in the material [Plaintiffs] provided in this case, my training, and experience, Shaken Baby Syndrome was not the cause of baby [KB]'s condition."

326.  In April 2014, Defendant Schlievert and LCCS staff attorney Jeremy Young were presented with the expert reports rendered by Plaintiffs' Experts in an effort to educate Defendant Schlievert and LCCS staff attorney Jeremy Young.

327.  Defendant Schlievert refused to discuss any and all of his medical findings or conclusions at this time.

328.  On April 30, 2014, Defendant Schlievert sent to LCCS staff attorneys Jeremy Young and Jill Wolff and to law enforcement a second report  (hereinafter referred to as "April Report"), in which Defendant Schlievert outlined the "problems" he found in Plaintiffs' Experts' reports, wrongfully criticized Molly's defense counsel for not acquiring an expert report generated by a doctor trained in child abuse pediatrics, and reaffirmed his original determination that the injuries to KB's head and buttocks were caused by physical abuse.

329.  In his April Report, Defendant Schlievert again indicated to LCCS that, "Because [my diagnosis] is not accepted by the family, ongoing placement is needed for the children's safety."

330.  On July 29, 2014, Defendant Schlievert sat for a discovery deposition.

331.  LCCS staff attorney Young and LCCS caseworker Melva Grier were present for the deposition.

332.  At this deposition, Defendant Schlievert stated to LCCS that he does not speculate as to whether or not a child was abused, he diagnosis based upon medical evidence.

333.  At this deposition, Defendant Schlievert stated he was the sole medical provider in Northwest Ohio that is referred to, presumably by the State, concerning allegations of abuse.

334.  At this deposition, Defendant Schlievert admitted to LCCS that he had never conducted any research or had been published concerning retinal hemorrhages, shaken baby syndrome, or non-accidental head injury.

335.  At this deposition, Defendant Schlievert indicated to LCCS that he did not

45

review KB's birth record in making his diagnosis, and stated, "[T]here's not much that's going to be helpful in there given the timeframes between birth and her current age [of two months]."

336. At this deposition, Defendant Schlievert admitted to LCCS that he did not know any potential consequences a child might suffer based on where a vacuum was placed on a child's head at birth.

337. At this deposition, Defendant Schlievert admitted to LCCS that he was not in a position to make a determination as to whether or not KB's surgery caused the onset of the intraparenchymal bleeds or seizure KB suffered.

338. At this deposition, Defendant Schlievert indicated to LCCS that he could not state to a reasonable degree of medical certainty whether or not at the time KB was admitted to the hospital she had retinal hemorrhages.

339. At this deposition, Defendant Schlievert stated to LCCS, "Well, all I can say to that is I firmly believe [KB] was a victim of abusive head trauma. Had [the subdural hematomas and retinal hemorrhaging] not been present, and the only thing that was present was the buttock injury, I would still state [KB] was physically abused and my recommendations in my original report would be the same."

340. At this deposition, Defendant Schlievert indicated to LCCS that he knew KB's single, smaller-than-a-dime-sized "bruise" that he had never observed was caused by "direct physical blows to the buttock."

341. At this deposition, Defendant Schlievert indicated to LCCS that he had never spoken to KB's pediatrician concerning the alleged bruise observed.

316. At this deposition, Defendant Schlievert indicated to LCCS that it was not necessary for him to contact KB's pediatrician regarding the alleged bruise observed on KB.

342. At this deposition, Defendant Schlievert admitted to LCCS that he never asked KB's pediatrician to describe the size or location of the alleged buttock bruise.

343. At this deposition, Defendant Schlievert indicated to LCCS that the number of bruises a child suffers is also not relevant.

344. At this deposition, Defendant Schlievert indicated to LCCS that any bruise, no matter how insignificant or small, on a child KB's age is an abusive injury if not

46

explained by an accident or other medical condition.

345. At this deposition, Defendant Schlievert admitted to LCCS that he did not know what information KB's family had provided to KB's pediatrician concerning the alleged buttock bruise.

346. At this deposition, Defendant Schlievert stated, "I do my best to stay relevant with what literature I can or in reviews. No one person can stay current with the literature even in child abuse, there's far too may articles that are out there. So what's important is not to be a walking encyclopedia necessarily, but be willing to ask questions and look things up when you're not certain."

347. At this deposition, Defendant Schlievert stated to LCCS that he considers Dr. Randell Alexander, M.D. to be authoritative in the field of abusive head trauma or shaken baby syndrome.

348. At this deposition, Defendant Schlievert indicated to LCCS that he considered Dr. Alexander to be a published expert he would rely on concerning shaken baby syndrome and in making determinations concerning non-accidental trauma.

349. Subsequent to Defendant Schlievert's deposition, an expert report rendered by Dr. Randell Alexander, M.D. Ph.D was provided to LCCS. Not only is Dr. Alexander board certified in child abuse pediatrics, he was also, at the time of the incidents giving rise to this Complaint, the Chief of the Division of Child Protection and Forensic Pediatrics at the University of Florida College of Medicine-Jacksonville, the Program Director of the Pediatric Child Abuse Fellowship at the University of Florida College of Medicine-Jacksonville, and Statewide Medical Director for the Florida Child Protection Teams. Dr. Alexander has published countless articles and delivered numerous lectures on the topic of abusive head trauma and is directly involved with several professional societies focusing solely on child abuse pediatrics.

350. Dr. Alexander is universally regarded as a leading national expert on abusive head trauma. As previously indicated, Defendant Schlievert indicated to LCCS that Dr. Alexander was considered authoritative in the filed of shaken baby syndrome.

351. Furthermore, LCCS, on its website in its section dedicated to providing the community with resources for child abuse prevention and education, directs viewers to the National Center for Shaken Baby Syndrome and the International Society for the

47

Prevention of Child Abuse and Neglect, which is significant given that Dr. Alexander is on the International Advisory Board of the former and serves as an Executive Counselor for the latter.

352. In Dr. Alexander's report, dated August 1, 2014, Dr. Alexander determined that after his review of KB's medical file, he could not conclude that any abuse occurred.

353. LCCS staff attorney Jeremy Young was provided with Dr. Alexander's report, and upon information and belief, LCCS staff attorney Young provided Dr. Alexander's report to Defendant Schlievert.

354. On October 8, 2014, LCCS staff attorney Young was provided with a letter from Dr. Arthur Norman Guthkelch, M.D.

355. Dr. Guthkelch is considered to be the "father" of shaken baby syndrome, as Dr. Guthkelch is the pediatric neurosurgeon who is credited with first observing the condition in young children.

356. After his review of KB's medical file, Dr. Guthkelch determined that KB's clinical presentation was completely explainable by medical conditions and circumstances and in no way indicative of child abuse and/or inflicted trauma. Dr. Guthkelch wrote, "In any case, jumping to the conclusion of shaken baby syndrome or non-accidental trauma without knowing all the facts and ruling out differential diagnoses does a grave disservice to our children and their families. I believe that this happened in this case."

357. Upon information and belief, LCCS staff attorney Young provided Dr. Guthkelch's letter to Defendant Schlievert.

358. On the morning of October 20, 2014, the day this matter was set for adjudication, LCCS staff attorney Young informed the parties that LCCS would be willing to voluntarily dismiss its Complaint if Molly and Father agreed to enter into and sign a Consent Judgment Entry granting Maternal Grandmother Claire custody of LB and KB. As previously indicated, LCCS had determined Maternal Grandmother Claire to be an alleged perpetrator of KB's injuries.

359. Under the agreement proposed by LCCS, Molly and Maternal Grandmother Claire would be able to move back into their home, LCCS would retain no control over LB and KB, and Molly's sister Erin Blythe would be able to move back to Chicago and

resume her own life, which she had selflessly put on hold when she agreed to assume custody of LB and KB and relocate to Ohio in order to prevent LCCS from placing LB and KB in foster care.

360.  On the morning of October 20, 2014, the day this matter was set for adjudication, Molly was also informed that Judge C. Douglas Chamberlin, sitting by assignment, was considering postponing the trial set to occur that morning if the parties could not come to an agreement to resolve the matter, as Judge Chamberlin was concerned with the timeline of the case, given that the Ohio Rules of Juvenile Procedure provide that dispositional hearings shall not be held more than ninety days after the date on which the Complaint in the case was filed, as it had been nearly nine months since LCCS had filed its original Complaint.

361.  Furthermore, Molly was informed that LCCS would not dismiss its case, without strings attached, so long as Defendant Schlievert's diagnosis of physical abuse remained. At his deposition, Defendant Schlievert represented that he had never incorrectly determined a child to have been abused. Given that Molly knew Defendant Schlievert had misdiagnosed a child in the past, Molly was certain that nothing could be provided to Defendant Schlievert that would make him amend his diagnosis in KB's case, as Defendant Schlievert had lost his objectivity in this case and demonstrated an inability to be intellectually honest.

362.  After contemplating the emotional and financial toll that prolonging this matter would have on her family, Molly agreed to the terms of LCCS's dismissal in order to guarantee that LB and KB would not be removed from Molly's family's care, to guarantee that LCCS would retain no control over her children, and to avoid prolonging the dispositional hearing, as Molly and her family had already endured a living nightmare for nearly nine months, and Molly could not fathom living it all over again.

363.  On October 20, 2014, Molly, Father, and Maternal Grandmother Claire signed a Consent Judgment Entry agreeing to Maternal Grandmother Claire being awarded custody of LB and KB and such was entered as a Court order.

364.  On October 20, 2014, Judge Chamberlin ordered, adjudged and decreed LCCS's Complaint in this case dismissed.

**Conscious Shocking Conduct of Defendant Schlievert - February Report – and Representations Made to LCCS Concerning the Same**

365. Defendant Schlievert, in his February Report, intentionally, deliberately, and recklessly fabricated inculpatory evidence of physical abuse, when he falsely and recklessly determined and represented to LCCS that abusive head trauma alone, to the exclusion of all other causes, was responsible for KB's clinical presentation.

366. Defendant Schlievert necessarily acted as an adjunct and agent of LCCS at the time of the incidents giving rise to this Complaint, as Defendant Schlievert was the sole physician contractually obligated to render reports in cases of physical abuse on behalf of LCCS.

367. Defendant Schlievert intentionally, deliberately, and recklessly fabricated inculpatory evidence of physical abuse when he falsely and recklessly determined that KB's intracranial injury was necessarily caused by abusive head trauma.

368. Although Defendant Schlievert was aware that KB's birth required the use of a vacuum extractor delivery instrument, Defendant Schlievert, in his February report, intentionally and recklessly failed to make LCCS aware of the significance of KB's traumatic delivery as it related to her intracranial injury.

369. As a pediatric child abuse physician investigating the source of KB's intracranial injury, Defendant Schlievert knew or should have known vacuum extraction should be avoided when delivering preterm infants due to the risk of intracranial injury and knew or should have known a vacuum extractor was used during KB's birth.

370. As a pediatric child abuse physician investigating the source of KB's intracranial injury, Defendant Schlievert knew or should have known vacuum extraction is not recommended for use with infants with an estimated weight less than five pounds, five ounces due to the risk of intracranial injury and knew or should have known a vacuum extractor was used on KB despite her twin sister's birth weight of four pounds, fifteen ounces and KB's birth weight of five pounds, five ounces.

371. As a pediatric child abuse physician investigating the source of KB's intracranial injury, Defendant Schlievert knew or should have known a vacuum extractor's suctioning device should be placed symmetrically astride the sagittal suture on the medial flexion point of the baby's head (also known as the pivot point), which is two

centimeters anterior to the posterior fontanelle or six centimeters posterior to the anterior fontanelle and knew or should have known the vacuum extractor's suctioning device in KB's delivery was incorrectly placed directly over her anterior fontanelle.

372. As a pediatric child abuse physician, Defendant Schlievert knew or should have known vacuum assisted vaginal delivery is associated with causing intracranial injury and knew or should have known that injury resulting from vacuum assisted delivery relates to incorrect suction cup placement.

373. As a pediatric child abuse physician, Defendant Schlievert knew or should have known that the presentation of KB's intracranial injury was most consistent with a vacuum-induced subdural hematoma that continued to bleed and re-bleed after birth.

374. Defendant Schlievert's conduct in intentionally, deliberately, and recklessly fabricating inculpatory evidence of physical abuse when he falsely and recklessly determined that KB's intracranial injury was necessarily caused by abusive head trauma shocks the conscience in that Defendant Schlievert acted with a deliberate indifference for the truth and a reckless disregard for the truth when he rendered his determination and represented such to LCCS.

375. As a pediatric child abuse physician, Defendant Schlievert knew or should have known that he was responsible for informing LCCS of any and all potential causes of KB's clinical presentation.

376. As a pediatric child abuse physician, Defendant Schlievert knew or should have known that his unwillingness to make LCCS aware of the fact that KB's intracranial injury was consistent with a subdural hematoma caused by her vacuum extraction constitutes a deliberate and reckless failure to disclose exculpatory evidence.

377. As a pediatric child abuse physician, Defendant Schlievert knew or should have known his deliberate and reckless exclusion of relevant information from his report to LCCS constitutes egregious misconduct, given that Defendant Schlievert necessarily excluded the information in an effort to bolster a false and reckless determination.

378. As a pediatric child abuse physician, Defendant Schlievert knew or should have known that his failure to make LCCS aware of the significance of KB's traumatic vacuum extraction constitutes a deliberate and reckless falsification of evidence.

379. As a pediatric child abuse physician, Defendant Schlievert knew or should

51

have known that the diagnosis of non-accidental trauma must be made on the basis of a patient's entire clinical presentation and that any and all findings must be placed within the context of all clinical features.

380. As a pediatric child abuse physician, Defendant Schlievert knew or should have known that he was responsible for taking the necessary steps to ensure that he had access to all information available to establish the facts of his analysis and was responsible for making himself aware of all circumstances surrounding the facts used in his analysis.

381. As a pediatric child abuse physician, Defendant Schlievert knew or should have known that his intentional and reckless failure to review KB's birth records necessitates any conclusion he rendered as deliberately indifferent to the truth and recklessly disregardful of the truth.

382. As a pediatric child abuse physician, Defendant Schlievert knew or should have known that the methodology of his analysis and tactics used to investigate the cause of KB's intracranial injury were so seriously flawed that such would necessitate serious doubt as to the validity of the conclusions rendered.

383. As a pediatric child abuse physician, Defendant Schlievert knew or should have known that KB's alleged retinal presentation had a wide differential diagnosis and that KB's alleged retinal presentation was not consistent with suffering an injury caused by shaking.

384. As a pediatric child abuse physician, Defendant Schlievert knew or should have known that a prompt retinal exam is recommended to be performed within the first twenty-four hours of a patient's admittance to the hospital, as retinal hemorrhages may occur and/or worsen as a result of medical interventions the patient undergoes while at the hospital.

385. As a pediatric child abuse physician, Defendant Schlievert knew or should have known that KB's ocular presentation necessitated consideration be given to the compounding effects of the relief of intracranial pressure and the expansion of the brain during surgery, the intraparenchymal hemorrhages resulting from surgery, the subsequent seizure KB suffered post surgery, anemia, thrombocytopenia, anoxia, hypoxia, mild coagulopathy, obstruction of retinal venous flow, increased intracranial pressure, and

52

KB's traumatic birth as causative factors of KB's alleged retinal presentation.

386. As a pediatric child abuse physician, Defendant Schlievert knew or should have known that his failure to make LCCS aware of the wide differential diagnosis applicable to KB's alleged retinal presentation and knew or should have known that his failure to make LCCS aware that KB's alleged retinal presentation was not consistent with suffering an injury caused by shaking constitute a deliberate and reckless failure to disclose exculpatory evidence.

387. As a pediatric child abuse physician, Defendant Schlievert knew or should have known his deliberate and reckless exclusion of relevant information from his report constitutes egregious misconduct, given that Defendant Schlievert necessarily excluded the information in an effort to bolster a false and reckless determination.

388. As a pediatric child abuse physician, Defendant Schlievert knew or should have known that his failure to make LCCS aware of the wide differential diagnosis applicable to KB's alleged retinal presentation and knew or should have known that his failure to make LCCS aware that KB's alleged retinal presentation was not consistent with suffering an injury caused by shaking constitutes a deliberate and reckless falsification of evidence.

389. As a pediatric child abuse physician, Defendant Schlievert knew or should have known that the presence of subdural hematoma and retinal hemorrhages in a pediatric patient does not necessitate the conclusion that the patient has been physically abused.

390. As a pediatric child abuse physician, Defendant Schlievert knew or should have known that to use shaken baby syndrome as a "default" diagnosis to be applied to all children who have intracranial injury and retinal hemorrhages is simply wrong and does a grave disservice to the patient and his or her family.

391. Defendant Schlievert intentionally, deliberately, and recklessly fabricated inculpatory evidence of physical abuse when he determined KB to suffer from abusive head trauma, as Defendant Schlievert knew or should have known that in his failing to consider all potential causative factors of KB's clinical presentation, he deliberately and recklessly failed to consider the complete context of KB's clinical presentation.

392. Defendant Schlievert acted with a deliberate, intentional, and reckless

53

disregard for the truth when he refused to suspend judgment as to the mechanism of injury concerning KB's clinical presentation until all other reasonable explanations were exhausted.

393. Defendant Schlievert's fabrication of inculpatory evidence to LCCS as to KB's clinical presentation shocks the conscience in that Defendant Schlievert acted with a deliberate indifference and reckless disregard for the truth when he intentionally misrepresented, fabricated, and overstated the significance of KB's clinical presentation.

394. Defendant Schlievert's failure to inform LCCS as to all possible causes of KB's clinical presentation shocks the conscience in that Defendant Schlievert acted with a deliberate indifference and reckless disregard for the truth when he intentionally misrepresented, fabricated, and overstated the significance of KB's clinical presentation.

395. As a pediatric child abuse physician, Defendant Schlievert knew or should have known that the methodology of his analysis and tactics used to investigate the cause of KB's intracranial injury were so seriously flawed that such would necessitate serious doubt as to the validity of the conclusions rendered.

396. Defendant Schlievert, in his February Report, intentionally, deliberately, and recklessly fabricated inculpatory evidence of physical abuse when he represented to LCCS that KB had abusive injuries to her buttocks, as KB never had abusive injuries to her buttocks.

397. As previously indicated, on December 26, 2013, Molly did show KB's pediatrician a single, faint mark, smaller in size than a dime, Molly had discovered on KB, located where KB's leg and buttock met.

398. As a pediatric child abuse physician, Defendant Schlievert knew or should have known that a single mark on a child, smaller in size than a dime, cannot be said to necessarily be the result of physical abuse alone, to the exclusion of all other potential causes.

399. At no point during his physical abuse investigation on behalf of LCCS did Defendant Schlievert attempt to contact KB's pediatrician to question him as to the nature of the mark observed.

400. As a pediatric child abuse physician, Defendant Schlievert knew or should have known that he was responsible for taking the necessary steps to ensure that he had

54

access to all information used to establish the facts of his analysis and was responsible for making himself aware of all circumstances surrounding the facts used in his analysis.

401. Defendant Schlievert's willful ignorance concerning the circumstances surrounding and physical characteristics of the single mark Molly showed to KB's pediatrician indicates that Defendant Schlievert acted with a deliberate indifference for the truth and reckless disregard for the truth when he falsely, recklessly, and intentionally misrepresented to LCCS that the mark was absolutely the result of physical abuse.

402. As a pediatric child abuse physician, Defendant Schlievert knew or should have known that he was responsible for accurately conveying information to LCCS.

403. As a pediatric child abuse physician, Defendant Schlievert knew or should have known that his false and reckless representation that a single mark, smaller in size than a dime, was necessarily the result of physical abuse, that he never personally observed, without ever inquiring as to the nature of the mark, was reckless, irresponsible, and constitutes an intentional and deliberate fabrication of inculpatory evidence of physical abuse.

404. As a pediatric child abuse physician, Defendant Schlievert knew or should have known that his representation to LCCS that KB's pediatrician noted both of KB's buttocks to have bruising constitutes an intentional, deliberate, and reckless fabrication of inculpatory evidence, given that KB's pediatric records do not indicate that KB had bruising to both of her buttocks.

405. Defendant Schlievert's fabrication of inculpatory evidence as to his determination and representation to LCCS that KB suffered from abusive bruising shocks the conscience in that Defendant Schlievert acted with a deliberate indifference and reckless disregard for the truth when he intentionally misrepresented, fabricated, and exaggerated the significance of the mark and the physical characteristics of the mark on KB.

406. As a pediatric child abuse physician, Defendant Schlievert knew or should have known that the methodology of his analysis and tactics used to investigate the cause of the mark on KB were so seriously flawed that such would necessitate serious doubt as to the validity of the conclusions rendered.

407. In Defendant Schlievert's February Report, Defendant Schlievert

intentionally, deliberately, and recklessly fabricated inculpatory evidence of physical abuse when he verified to LCCS that pediatric hematologist Defendant Dargart conducted a complete bleeding workup on KB and when Defendant Schlievert supported Defendant Dargart's conclusion that KB's injuries could not be attributed to a bleeding disorder.

408. As a pediatric child abuse physician, Defendant Schlievert knew or should have known that it was his responsibility to accurately and objectively interpret KB's medical record on behalf on LCCS.

409. As a pediatric child abuse physician, Defendant Schlievert knew or should have known that the list of congenital and acquired bleedings disorders that can potentially be confused with abusive injury is extensive and that no single panel of tests can rule out every possible bleeding disorder.

410. As a pediatric child abuse physician, Defendant Schlievert knew or should have known that the panel of tests Defendant Dargart chose to run on KB was incomplete.

411. As a pediatric child abuse physician, Defendant Schlievert knew or should have known that his verification of Defendant Dargart's conclusion to LCCS that KB's injuries could not be attributed to a bleeding disorder constitutes an intentional, deliberate, and reckless fabrication of inculpatory evidence of physical abuse.

412. As a pediatric child abuse physician, Defendant Schlievert knew or should have known that while KB was hospitalized, Defendant Dargart failed to screen KB for a platelet disorder.

413. As a pediatric child abuse physician, Defendant Schlievert knew or should have known that the prevalence of intracranial injury in patients suffering from platelet disorders is unknown, thereby making an attempt to exclude such as a causative factor contributing to the presence of intracranial injury impossible.

414. As a pediatric child abuse physician, Defendant Schlievert knew or should have known that many aspects of bleeding disorders, including platelet function disorders, are still being studied and that changes in the understanding of the severity of bleeding symptoms related to certain disorders, including platelet function disorders, is expected, thereby making it impossible to definitively exclude a bleeding disorder as a

56

causative or contributing factor to certain patients', like KB's, clinical presentations.

415. Defendant Schlievert intentionally, deliberately, and recklessly exaggerated and misrepresented the significance of the tests conducted and interpreted by Defendant Dargart to LCCS as they applied to KB.

416. Defendant Schlievert intentionally, deliberately, and recklessly exaggerated and misrepresented the significance of the tests Defendant Dargart interpreted as they applied to KB to LCCS when he supported Defendant Dargart's conclusion definitively ruling out a bleeding disorder as a contributing factor to KB's clinical presentation, as Defendant Schlievert knew or should have known that doing so was impossible.

417. As a pediatric child abuse physician, Defendant Schlievert knew or should have known that the methodology of Defendant Dargart's analysis and tactics used to investigate were so seriously flawed that such would necessitate serious doubt as to the validity of the conclusions she rendered.

418. Defendant Schlievert's intentional, deliberate, and reckless fabrication of inculpatory evidence to LCCS concerning KB's hematological workup shocks the conscience in that his representation was made with a deliberate indifference for the truth and a reckless disregard for the truth.

### Conscious Shocking Conduct of Defendant Schlievert – April Report – and Representations Made to LCCS Concerning the Same

419. Defendant Schlievert, in his April Report, intentionally, deliberately, and recklessly fabricated inculpatory evidence of physical abuse when he again falsely and recklessly determined and documented that the single mark Molly showed to KB's pediatrician, smaller in size than a dime, necessitated that KB was physically abused.

420. Defendant Schlievert makes reference to the single mark Molly showed KB's pediatrician more than fifteen times in his eleven page April Report and repeatedly reaffirms his original false, reckless, and deliberately indifferent conclusion that this single mark indicates severe physical abuse, even going so far as to state, "Lastly, even if we took out the whole diagnosis of abusive head trauma, KB still had abusive buttock bruising in a high risk family. This, alone, merits a finding of abuse and protection out of the home in this case."

421. Defendant Schlievert, in his April Report, intentionally, deliberately, and

57

recklessly fabricated inculpatory evidence of physical abuse when he represented to LCCS that KB had abusive injuries to her buttocks, as KB never had abusive injuries to her buttocks.

422. Defendant Schlievert, in his April Report, intentionally, deliberately, and recklessly fabricated inculpatory evidence of physical abuse when he represented to LCCS that KB's family presented a "high risk" for physical abuse, as KB's family did not present a "high risk" for physical abuse.

423. As a pediatric child abuse physician, Defendant Schlievert knew or should have known that a single mark on a child, smaller in size than a dime, cannot be said to necessarily be the result of physical abuse alone, to the exclusion of all other potential causes.

424. Defendant Schlievert never personally observed the mark Molly showed KB's pediatrician.

425. At no point during his physical abuse investigation on behalf of LCCS did Defendant Schlievert attempt to contact KB's pediatrician to question him as to the nature of the mark observed.

426. As a pediatric child abuse physician, Defendant Schlievert knew or should have known that he was responsible for taking the necessary steps to ensure that he had access to all information used to establish the facts of his analysis and was responsible for making himself aware of all circumstances surrounding the facts used in his analysis.

427. Defendant Schlievert's willful ignorance concerning the circumstances surrounding and physical characteristics of the single mark Molly showed to KB's pediatrician indicates that Defendant Schlievert acted with a deliberate indifference for the truth and reckless disregard for the truth when he falsely, recklessly, and intentionally misrepresented to LCCS that the mark was absolutely the result of physical abuse.

428. As a pediatric child abuse physician, Defendant Schlievert knew or should have known that he was responsible for accurately conveying information to LCCS.

429. As a pediatric child abuse physician, Defendant Schlievert knew or should have known that his false and reckless representation to LCCS that a single mark, smaller in size than a dime, was necessarily the result of physical abuse, without ever inquiring as to the nature of the mark, was reckless, irresponsible, and constitutes an intentional and

58

deliberate fabrication of inculpatory evidence of physical abuse.

430.  As a pediatric child abuse physician, Defendant Schlievert knew or should have known that his representation to LCCS that KB's pediatrician noted both of KB's buttocks to have bruising constitutes an intentional, deliberate, and reckless fabrication of inculpatory evidence, given that KB's pediatric records do not indicate that KB had bruising to both of her buttocks.

431.  Defendant Schlievert's fabrication of inculpatory evidence as to his determination and representation to LCCS that KB suffered from abusive bruising shocks the conscience in that Defendant Schlievert acted with a deliberate indifference and reckless disregard for the truth when he intentionally misrepresented, fabricated, and overstated the significance of the mark on KB to LCCS.

432.  As a pediatric child abuse physician, Defendant Schlievert knew or should have known that the methodology of his analysis and tactics used to investigate the cause of the mark on KB were so seriously flawed that such would necessitate serious doubt as to the validity of the conclusions rendered.

433.  Defendant Schlievert, in his April Report, repeatedly, deliberately, and recklessly mischaracterized and distorted reports rendered by Plaintiffs' Experts to LCCS, evidencing either Defendant Schlievert's deliberate intent to mislead LCCS or Defendant Schlievert's inability to accurately review and analyze a complex clinical presentation, thereby making any determinations and conclusions he rendered reckless.

434.  As a pediatric child abuse physician, Defendant Schlievert knew or should have known that his representation to LCCS that Dr. Tawansy indicated KB's retinal presentation to be solely the result of increased intracranial pressure constitutes a deliberate and reckless mischaracterization of the information provided, as Dr. Tawansy, in actuality, referred to "intracranial pressure fluctuations," which necessarily encompasses, as potentially causative of KB's retinal presentation, both increases of intracranial pressure and the rapid decompression occurring during KB's surgical intervention.

435.  As a pediatric child abuse physician, Defendant Schlievert knew or should have known that his representation to LCCS that Dr. Guertin offered an analysis of KB's medical record pointing strongly to abuse constitutes a deliberate and reckless

mischaracterization of the information provided, as Dr. Guertin, in actuality, made it clear in his report that a finding of abuse clearly ignored clinical findings supportive of an alternative explanation.

436. As a pediatric child abuse physician, Defendant Schlievert knew or should have known that his representation to LCCS that Dr. Guertin only suggested KB to have a rapidly increasing head circumference after her first month of life constitutes a deliberate and reckless mischaracterization of the information provided, as Dr. Guertin, in actuality, clearly indicated in his report that KB's head, during her first month of life, was growing at two times the normal rate.

437. As a pediatric child abuse physician, Defendant Schlievert knew or should have known that his representation to LCCS that Dr. Guertin, in his report, "admits" that KB's retinal presentation supports a diagnosis of abuse constitutes a deliberate and reckless mischaracterization of the information provided, as Dr. Guertin, in actuality, was clear in his report that KB's retinal presentation did not rise to the level highly specific for abuse and also noted that children with craniocephalic disproportion, which KB had, may impart a special susceptibility to retinal hemorrhaging.

438. As a pediatric child abuse physician, Defendant Schlievert knew or should have known that his representation to LCCS that Dr. Guertin asserted KB's retinal presentation to be the result of increased intracranial pressure constitutes a deliberate and reckless mischaracterization of the information provided, as Dr. Guertin, in actuality, noted in his report that there is literature to suggest that the mechanical properties of the cranium and its contents are abnormal in cases of craniocephalic disproportion and that the enlarged space may transmit suddenly elevated intracranial pressure more efficiently to the eye and central retinal vein.

439. As a pediatric child abuse physician, Defendant Schlievert knew or should have known that he was responsible for conveying reliable, objective, accurate, and truthful analyses to LCCS, which is necessarily prohibitive of misrepresenting other's expert reports in an effort to reinforce a deliberately indifferent and reckless prior determination and is necessarily prohibitive of deliberately misleading a children services agency into believing a child was physically abused when the child, in fact, was not.

440. As a pediatric child abuse physician, Defendant Schlievert knew or should

have known that the methodology and tactics he used concerning his mischaracterization of Plaintiff's Experts' conclusions to LCCS constitutes such serious misconduct that such would necessitate serious doubt as to the validity of the conclusions he rendered.

441. Defendant Schlievert's repeated, deliberate, and reckless mischaracterization and distortion of reports rendered by Plaintiffs' Experts to LCCS shocks the conscience in that Defendant Schlievert acted with a deliberate indifference for the truth and a reckless disregard for the truth, as he either deliberately intended to mislead LCCS or demonstrated a reckless disregard for the truth when made representations to LCCS he was not, in fact, qualified to make.

442. Defendant Schlievert, in his April Report, failed to convey reliable, objective, accurate, and truthful analyses to LCCS in that Defendant Schlievert intentionally and recklessly failed to make LCCS aware of the significance of KB's traumatic surgical intervention when, as a pediatric child abuse physician, Defendant Schlievert knew or should have known that KB's ocular presentation necessitated consideration be given to the compounding effects of the relief of intracranial pressure during surgery, the expansion of the brain during surgery, and the intraparenchymal hemorrhages resulting from surgery.

443. Defendant Schlievert, in his April Report, failed to convey reliable, objective, accurate, and truthful analyses to LCCS in that Defendant Schlievert intentionally and recklessly failed to make LCCS aware of the significance of KB's delayed retinal exam.

444. Defendant Schlievert, in his April Report, failed to convey reliable, objective, accurate, and truthful analyses to LCCS in that Defendant Schlievert intentionally and recklessly failed to make LCCS aware of the significance of the discrepancies and inconsistencies in KB's two retinal exams.

445. Defendant Schlievert, in his April Report, failed to convey reliable, objective, accurate, and truthful analyses to LCCS in that Defendant Schlievert intentionally and recklessly failed to make LCCS aware of the significance of KB's hemoglobin being 6.9g/dL prior to her first retinal exam, as infants with a hemoglobin of less that 8g/dL are especially susceptible to the development of retinal hemorrhages.

446. Defendant Schlievert, in his April Report, failed to convey reliable, objective, accurate, and truthful analyses to LCCS in that Defendant Schlievert intentionally and

recklessly failed to make LCCS aware that ocular decompression retinopathy presents as retinal hemorrhage following acute lowering of intraocular pressure, which KB would have necessarily suffered during her traumatic surgical intervention, given that when KB's intracranial pressure was quickly reduced, her intraocular pressure would have also been reduced, as pressures from the intracranial cavity are transmitted to the eyes.

447. As a pediatric child abuse physician, Defendant Schlievert knew or should have known that the methodology and tactics he used concerning his intentional and reckless failure to provide LCCS with exculpatory information concerning KB's clinical presentation constitutes such serious misconduct that such would necessitate serious doubt as to the validity of the conclusions he rendered.

448. As a pediatric child abuse physician, Defendant Schlievert knew or should have known his deliberate and reckless exclusion of relevant information from his April Report constitutes egregious misconduct, given that Defendant Schlievert necessarily excluded the information in an effort to bolster his prior false and reckless determination.

449. Defendant Schlievert's intentional and reckless failure to provide LCCS with exculpatory information concerning KB's clinical presentation shocks the conscience in that Defendant Schlievert acted with a deliberate indifference for the truth and a reckless disregard for the truth, given that Defendant Schlievert's intentional omissions necessitate that Defendant Schlievert either deliberately intended to mislead LCCS or recklessly rendered determinations as to KB's complex clinical presentation.

450. Defendant Schlievert, in his April Report, intentionally, deliberately, and recklessly fabricated inculpatory evidence of physical abuse when he represented to LCCS that KB's retinal hemorrhages could not have been from birth because birth hemorrhages "resolve usually in a week to a few weeks"; however, as a pediatric child abuse physician, Defendant Schlievert knew or should have known that retinal hemorrhages in an infant delivered via vacuum extraction have been documented as being present at 58 days after birth.

451. As pediatric child abuse physician, Defendant Schlievert knew or should have known that the methodology and tactics he used concerning his intentional and reckless failure to provide LCCS with accurate information concerning birth-related retinal hemorrhage constitutes such serious misconduct that such would necessitate serious

62

doubt as to the validity of the conclusions he rendered.

452. Defendant Schlievert's intentional and reckless failure to provide LCCS with accurate information concerning birth-related retinal hemorrhage shocks the conscience in that Defendant Schlievert acted with a deliberate indifference for the truth and a reckless disregard for the truth, given that Defendant Schlievert's misrepresentation necessitates that Defendant Schlievert either deliberately intended to mislead LCCS or recklessly rendered determinations as to KB's complex clinical presentation.

453. Defendant Schlievert, in his April Report, intentionally, deliberately, and recklessly fabricated inculpatory evidence of physical abuse when he represented to LCCS that KB could not have had external hydrocephalus, as no imaging studies were conducted on KB until her January hospitalization, thereby rendering Defendant Schlievert's assertion one that would have been impossible for him to have conclusively determined.

454. Defendant Schlievert, in his April Report, intentionally, deliberately, and recklessly fabricated inculpatory evidence of physical abuse when he represented to LCCS that benign external hydrocephalus and subdural hematomas are mutually exclusive entities, in that as a pediatric child abuse physician, Defendant Schlievert knew or should have known that the presence of external hydrocephalus in an infant increases that infant's risk of acquiring a subdural hematoma, either spontaneously or following minor trauma.

455. As pediatric child abuse physician, Defendant Schlievert knew or should have known that the methodology and tactics he used concerning his intentional and reckless failure to provide LCCS with accurate information concerning external hydrocephalus constitutes such serious misconduct that such would necessitate serious doubt as to the validity of the conclusions he rendered.

456. Defendant Schlievert's intentional and reckless failure to provide LCCS with accurate information concerning external hydrocephalus shocks the conscience in that Defendant Schlievert acted with a deliberate indifference for the truth and a reckless disregard for the truth, given that Defendant Schlievert's intentional misrepresentation necessitates that Defendant Schlievert either deliberately intended to mislead LCCS or recklessly rendered determinations as to KB's complex clinical presentation.

63

457. Defendant Schlievert, in his April Report, intentionally, deliberately, and recklessly fabricated inculpatory evidence of physical abuse when he made reference to Defendant Dargart's "full" blood workup conducted upon KB, in that as a pediatric child abuse physician, Defendant Schlievert knew or should have known that the panel of tests Defendant Dargart chose to run on KB was incomplete.

458. As a pediatric child abuse physician, Defendant Schlievert knew or should have known that it was his responsibility to accurately and objectively interpret KB's medical record on behalf on LCCS.

459. As a pediatric child abuse physician, Defendant Schlievert knew or should have known that the list of congenital and acquired bleeding disorders that can potentially be confused with abusive injury is extensive and that no single panel of tests can rule out every possible bleeding disorder.

460. As a pediatric child abuse physician, Defendant Schlievert knew or should have known that his verification to LCCS concerning Defendant Dargart's conclusion that KB's injuries could not be attributed to a bleeding disorder constitutes an intentional, deliberate, and reckless fabrication of inculpatory evidence of physical abuse.

461. As a pediatric child abuse physician, Defendant Schlievert knew or should have known that the methodology of Defendant Dargart's analysis and tactics used to investigate were so seriously flawed that such would necessitate serious doubt as to the validity of the conclusions he rendered.

462. Defendant Schlievert's intentional, deliberate, and reckless fabrication of inculpatory evidence to LCCS concerning KB's hematological workup shocks the conscience in that his representation to LCCS that Defendant Dargart conducted a "full" blood workup was made with a deliberate indifference for the truth and a reckless disregard for the truth.

463. Defendant Schlievert, in his April Report, in an effort to both bolster his own false and reckless prior determination that KB was physically abused and discredit other's determinations that KB's clinical presentation was not consistent with physical abuse intentionally and recklessly misrepresented medical literature to LCCS and intentionally and recklessly omitted relevant and exculpatory information from the literature he cited in a deliberate effort to mislead LCCS and falsify inculpatory evidence

of physical abuse.

464.  Throughout Defendant Schlievert's April Report, Defendant Schlievert cited nine studies in an attempt to both bolster his original determination that KB was physically abused and also discredit and refute Plaintiffs' Experts' reports, all of which determined KB's clinical presentation to be inconsistent with a diagnosis of non-accidental trauma.

465.  Defendant Schlievert was, at the time of the incidents giving rise to this Complaint, vice-president of academic affairs and research for Mercy Health's Northern Market.

466.  As a pediatric child abuse physician and vice-president of academic affairs and research, Defendant Schlievert knew or should have known that he was responsible for conveying unbiased information to LCCS and was responsible for providing LCCS with reliable, objective, accurate, and truthful analyses of medical literature.

467.  Defendant Schlievert, in his April Report, however, repeatedly, intentionally, and recklessly misrepresented the medical literature he cited as supportive of his determination and also intentionally and recklessly omitted from his April Report any and all information within the articles he cited that contradicted his original determination that KB was physically abused.

468.  Defendant Schlievert, in his April report, cited *Retinal Hemorrhages and Related Findings in Abusive and Non-abusive Head Trauma*, a systematic review, to bolster his prior determination that KB's retinal presentation was consistent with physical abuse; however, Defendant Schlievert intentionally and recklessly misrepresented this systematic review in that he intentionally failed to consider and failed to make LCCS aware that the systematic review he cited makes note that coexistent extradural hemorrhages and retinal hemorrhage were noted in five cases of non-abusive head trauma where the retinal hemorrhages were only noted following drainage of an extradural hemorrhage, as were KB's.

469.  Defendant Schlievert again intentionally misrepresented *Retinal Hemorrhages and Related Findings in Abusive and Non-abusive Head Trauma* to LCCS in a effort to bolster his previous determination that KB was physically abused, as Defendant Schlievert intentionally failed to consider and failed inform LCCS that retinal

hemorrhages were present in some cases of non-abusive head trauma in the systematic review, that about 10% of patients had retinal hemorrhages extending to the periphery in cases of non-abusive head trauma, and that the systematic review acknowledges that no retinal sign is unique to abusive injury.

470. Defendant Schlievert again intentionally misrepresented *Retinal Hemorrhages and Related Findings in Abusive and Non-abusive Head Trauma* to LCCS when he represented the study concluded that only 7% of abusive head trauma victims within the review had retinoschisis, when, in actuality, the authors of the paper make clear that the prevalence of traumatic retinoschisis or retinal folds in abusive head trauma could not be determined, as only one study included within the systematic review described retinal folds, and no study reviewed recorded the presence of retinoschisis.

471. Defendant Schlievert also deliberately and recklessly misrepresented *Retinal Hemorrhages and Related Findings in Abusive and Non-abusive Head Trauma* in that Defendant Schlievert failed to consider and failed to make LCCS aware that this study is biased, given that the authors accepted an abusive etiology when there was an admission, witnessed abuse, or a full multidisciplinary assessment, which necessarily neglects coerced confessions, neglects confessions offered as part of a plea agreement, neglects unsubstantiated accusations, and places unjustifiable reliance on witnesses and medical personnel untrained in injury biomechanics.

472. Defendant Schlievert, in his April Report, cited the study *Neuroimaging, Physical, and Developmental Findings After Inflicted and Noninflected Traumatic Brain Injury in Young Children* in an attempt to discredit Dr. Tawansy's assertion that the neuroimaging in KB's case, including preservation of gray-white differentiation and absence of axonal injury/edema, was not compatible with shaking injury; however, Defendant Schlievert intentionally and recklessly misrepresented this study in that Defendant Schlievert failed to consider and failed to inform LCCS that since the time this study was published in 1998, additional studies have been published showing a greater correlation between diffuse swelling/loss of grey white differentiation on CT and abusive head trauma.

473. Defendant Schlievert again intentionally misrepresented and misapplied *Neuroimaging, Physical, and Developmental Findings After Inflicted and Noninflected*

66

*Traumatic Brain Injury in Young Children* to KB's clinical presentation given that Defendant Schlievert failed to consider and failed to inform LCCS that the study he was basing his determination on was poorly powered and comprised of only 40 children, ages zero to six-years-old, a grouping Defendant Schlievert knew or should have known certainly cannot be said to be representative of all children, including KB.

474. Defendant Schlievert also deliberately and recklessly misrepresented *Neuroimaging, Physical, nad Developmental Findings After Inflicted and Noninflected Traumatic Brain Injury in Young Children* in that Defendant Schlievert failed to consider and failed to make LCCS aware that the authors of this study provided limited methodology as to how head trauma was designated as inflicted, which is significant in that determinations made by hospitals and county protective services can be incorrect, thereby tainting the classifications of the population, which was divided into twenty inflicted and twenty non-inflicted traumatic brain injuries, and tainting of the resulting study.

475. Defendant Schlievert, in his April Report, cited *Patterns of Retinal Hemorrhage Associated with Increased Intracranial Pressure in Children* in an attempt to bolster his determination that KB's retinal hemorrhages could not have been due to increased intracranial pressure; however, Defendant Schlievert intentionally and recklessly misrepresented and misapplied this study to KB's clinical presentation, as Defendant Schlievert failed to consider and failed to make LCCS aware that the cited study is inapplicable to infants given that the study was done on one hundred children, ages three to seventeen-years-old, which Defendant Schlievert, as a pediatric child abuse physician and a vice-president of academic affairs and research, knew or should have known cannot be used as determinative regarding the retinal presentation of a two-month-old, pre-term infant.

476. Defendant Schlievert also deliberately and recklessly misrepresented *Patterns of Retinal Hemorrhage Associated with Increased Intracranial Pressure in Children* in that Defendant Schlievert failed to consider and failed to make LCCS aware that this study was poorly powered and flawed in that no statistical analysis was conducted as to the results of its review.

477. Defendant Schlievert, in his April Report, cited *Neck Injuries in Young*

67

*Pediatric Homicide Victims* in an attempt to bolster his determination that it is "rare" for children to suffer soft tissue or bony neck injuries when they have been violently shaken; however, Defendant Schlievert intentionally and recklessly misrepresented this study, as Defendant Schlievert failed to consider and failed to make LCCS aware that this study does in fact support the conclusion that neck trauma is a frequent finding in victims of abusive head trauma and actually indicates a trend toward universal spinal cord injury in children who, like KB, did not present with blunt impact injuries.

478. Defendant Schlievert again deliberately and recklessly applied *Neck Injuries in Young Pediatric Homicide Victims* to KB's clinical presentation in that Defendant Schlievert failed to consider and failed to make LCCS aware that in this study, the majority of children (35 of 41 "abusive head trauma" victims) had evidence of blunt trauma, which KB did not, and also failed to consider and failed to make LCCS aware that in this study, the small population consisted of only deceased infants, thereby rendering the study inapplicable to KB.

479. Defendant Schlievert also deliberately and recklessly misrepresented *Neck Injuries in Young Pediatric Homicide Victims* in that Defendant Schlievert failed to consider and failed to make LCCS aware that the authors of this study specifically represent the study as generalizable to fatally injured children only, and that the significance of the study's findings as to the presentation and diagnosis of neck injuries in nonfatal abused children is unclear, thereby rendering Defendant Schlievert's conclusions from the study as applicable to KB untenable.

480. Defendant Schlievert also deliberately and recklessly misrepresented *Neck Injuries in Young Pediatric Homicide Victims* in that Defendant Schlievert used the study to support his conclusion that CT and MRI cannot detect all neck injuries; however, the authors of the study admit that imaging studies were not available for all patients and the authors are unclear as to whether or not the available imaging studies were interpreted by a board certified neuroradiologist, which thereby renders Defendant Schlievert's conclusion as flawed and untrue.

481. Defendant Schlievert, in his April Report, cited *Retinal Hemorrhage in Abusive Head Trauma* in an attempt to bolster his determination that KB's retinal hemorrhages could not have been caused by a venous thrombosis potentially suffered

68

during surgery; however, Defendant Schlievert intentionally and recklessly misrepresented this study, as Defendant Schlievert failed to consider and failed to make LCCS aware of the significance of the study's author's acknowledgment that there is communication of the intracranial subdural and subarachnoid spaces with the optic nerve sheath and the author's acknowledgment that the association of intracranial blood with intraocular blood is common in adults with spontaneous subarachnoid hemorrhage, which was almost always associated with increased intracranial pressure. Defendant Schlievert's omission is significant given that KB's neurosurgery caused subdural and intraparenchymal hemorrhages and given that KB had obvious symptoms of increased intracranial pressure.

482. Defendant Schlievert, in his April Report, cited *Use of the Skeletal Survey in the Evaluation of Child Maltreatment* to bolster his determination that KB's negative skeletal survey does not make physical abuse less likely to be the cause of KB's clinical presentation; however, Defendant Schlievert intentionally and recklessly misrepresented this study, as Defendant Schlievert failed to consider and failed to make LCCS aware that his representation "that unsuspected fractures were only found in 26% of children admitted to the children's hospital for physical abuse" is not applicable to KB in that the population referenced with regard to that percentage encompasses children admitted for having been suspected victims of all types of physical abuse. Furthermore, in a direct effort to bolster his own opinion and to mislead LCCS, Defendant Schlievert intentionally and recklessly omitted from his April Report the study's directly applicable determination to KB's clinical presentation that the incidence of occult fractures is relatively high with intracranial injuries and the study's representation that accompanying fractures of the skeletal system are identified in up to 50% of cases of abusive head injury, even though in its series, occult fractures were only found in 12% of children who presented with intracranial injuries.

483. Defendant Schlievert, in his April Report, cited *Abusive Head Trauma: Judicial Confessions Highlight Violent and Repetitive Shaking* to discredit the claim that one cannot injure a child by shaking alone, without neck injury; however, Defendant Schlievert intentionally and recklessly misrepresented this study, given that Defendant Schlievert failed to consider and failed to make LCCS aware of serious problems

69

concerning the application and the methodology of the study cited that would have been apparent to a vice-president of academic affairs and research, including the study's small sample size, the study's isolated use of CT to determine chronicity of abuse, and the study's use of an alleged perpetrator's legal statements as conclusive admissions without taking into consideration whether or not these "admissions" were coerced or offered as a condition of a plea agreement, and most importantly, the study's failure in evaluating the presence or absence of injury to the subjects' necks.

484. Defendant Schlievert, in his April Report, cited *Prevalence and Evolution of Intracranial Hemorrhage in Asymptomatic Term Infants* to bolster his determination that if the birth process causes subdural bleeding, the bleeding resolves promptly without becoming symptomatic; however, Defendant Schlievert intentionally and recklessly applied this study to KB's clinical presentation, as this study was only conducted on term infants. KB was a pre-term infant.

485. Defendant Schlievert, in his April Report, again intentionally and recklessly misapplied *Prevalence and Evolution of Intracranial Hemorrhage in Asymptomatic Term Infants* to KB's clinical presentation in that Defendant Schlievert used the study to conclude that because none of the population in the study had the same distribution of hemorrhages KB had, KB's subdural hematoma could not have been from her traumatic birth; however, Defendant Schlievert intentionally and recklessly failed to consider and make LCCS aware of the significance of the fact the vacuum during KB's delivery was applied more anteriorly on KB's head than where recommended.

486. Defendant Schlievert also deliberately and recklessly misrepresented *Prevalence and Evolution of Intracranial Hemorrhage in Asymptomatic Term Infants* in that Defendant Schlievert failed to consider and failed to make LCCS aware that the authors of this study suggest that although not typical in a neonate, prominent extra-axial space, which KB had, is a predisposing factor of subdural hematomas.

487. Defendant Schlievert also deliberately and recklessly misrepresented *Prevalence and Evolution of Intracranial Hemorrhage in Asymptomatic Term Infants* in that Defendant Schlievert failed to consider and failed to make LCCS aware that in this study, infants with subdural hematomas more commonly had a prolonged second stage labor and a cephalohematomas, both of which KB had.

70

488. Defendant Schlievert, in his April Report, again intentionally and recklessly misapplied *Prevalence and Evolution of Intracranial Hemorrhage in Asymptomatic Term Infants* to KB's clinical presentation in that Defendant Schlievert used the study to conclude subdural hemorrhages, found at eight weeks of age, cannot be birth related; however, Defendant Schlievert intentionally and recklessly failed to consider and make LCCS aware that the authors of this study actually concluded that subdural hematoma in an infant older than three months of age is unlikely to be birth related, whereas KB was only two months old at the time of hospitalization.

489. Defendant Schlievert, in his April Report, again intentionally and recklessly misapplied *Prevalence and Evolution of Intracranial Hemorrhage in Asymptomatic Term Infants* to KB's clinical presentation in that Defendant Schlievert used the study to discredit the assertion that birth related subdurals can rebleed; however, Defendant Schlievert intentionally and recklessly failed to consider and make LCCS aware that one test subject in this study had a new frontal subdural hematoma on a two-week followup MRI, which conclusively proves that rebleeds do happen.

490. Defendant Schlievert, in his April Report, again intentionally and recklessly misrepresented *Prevalence and Evolution of Intracranial Hemorrhage in Asymptomatic Term Infants* in that Defendant Schlievert used the study to conclude that when the birth process causes subdural bleeding, the bleeding resolves promptly; however, Defendant Schlievert intentionally and recklessly failed to consider and make LCCS aware that one of the sixteen patients who had a one-month followup MRI did not have resolution of subdurals.

491. Defendant Schlievert also deliberately and recklessly misrepresented *Prevalence and Evolution of Intracranial Hemorrhage in Asymptomatic Term Infants* in that Defendant Schlievert failed to consider and failed to make LCCS aware that this study was poorly powered with poor followup, as only eighteen of the forty-six patients with subdurals at birth received followup MRI.

492. Defendant Schlievert, in his April Report, cited *Frequency and Natural History of Subdural Hemorrhages in Babies and Relation to Obstetric Factors* to bolster his determination that birth related subdural hematomas are "different" from those due to abuse, are "quick to go away," and "don't cause future problems"; however, Defendant

71

Schlievert intentionally and recklessly misapplied this study to KB's clinical presentation, as this study excluded preterm babies and neonates with symptoms of encephalopathy from its population.

493. Defendant Schlievert, in his April Report, also intentionally and recklessly misrepresented and exaggerated the findings in *Frequency and Natural History of Subdural Hemorrhages in Babies and Relation to Obstetric Factors*, as Defendant Schlievert intentionally and recklessly failed to consider and failed to make LCCS aware that his conclusion that all birth related subdurals are benign, that all birth related subdurals are clinically asymptomatic, and that that all birth related subdurals are of no long term importance was premised upon observation of eleven infants, a number Defendant Schlievert knew or should have known cannot be said to be representative of all children, including KB.

494. Defendant Schlievert's intentional and deliberate omissions of all relevant information contained within literature he cited, intentional and deliberate misrepresentations of the medical literature he cited, intentional and deliberate misapplications of the medical literature he cited, and intentional and reckless exaggerations of conclusions rendered within the medical literature he cited constitutes a deliberate, intentional and reckless falsification of inculpatory evidence of physical abuse, given that Defendant Schlievert knew or should have known that as a pediatric child abuse physician and a vice-president of academic affairs and research, he was responsible for conveying reliable, objective, accurate, and truthful analyses to LCCS, which is necessarily prohibitive of "cherry picking" studies in an effort to reinforce a deliberately indifferent and reckless prior determination.

495. As a pediatric child abuse physician and a vice-president of academic affairs and research, Defendant Schlievert knew or should have known that the methodology of his analysis of the medical literature and tactics he used to investigate KB's clinical presentation were so seriously flawed that such would necessitate serious doubt as to the validity of the conclusions he rendered.

496. Defendant Schlievert's intentional and deliberate omissions of all relevant information contained within literature he cited, intentional and deliberate misrepresentations of the medical literature he cited, intentional and deliberate

72

misapplications of the medical literature he cited, and intentional and reckless exaggerations of conclusions rendered within the medical literature he cited shocks the conscience in that his determinations and false conclusions represented as consistent with the medical literature were made with a deliberate indifference for the truth and a reckless disregard for the truth.

497. Defendant Schlievert, in his April Report, failed to convey reliable, objective, accurate, and truthful analyses to LCCS when Defendant Schlievert repeatedly, intentionally, and recklessly represented to LCCS that for an expert to offer a credible report concerning a patient's clinical presentation, that expert must be able to conclusively determine and/or diagnose as to what caused that patient's clinical presentation.

498. As a pediatric child abuse physician, Defendant Schlievert knew or should have known that he, and others consulted to review KB's file, were responsible for conveying reliable, objective, accurate, and truthful interpretations of KB's medical file to LCCS, indicating whether or not KB's medical file indicated physical abuse to the exclusion of all other causes, was causative of KB's clinical presentation, or whether other alternative explanations could have accounted for KB's clinical presentation. As a pediatric child abuse physician, Defendant Schlievert knew or should have known that he, and others consulted to review KB's file, were not responsible for diagnosing as to what necessarily caused KB's clinical presentation.

499. Defendant Schlievert's repeated misrepresentation that an expert must be able to conclusively determine and/or diagnose as to what caused a patient's clinical presentation in order to exclude physical abuse clearly represents Defendant Schlievert's lack of understanding as to what a "default" diagnosis references.

500. Defendant Schlievert repeatedly represents in his April Report that he did not "default" to a diagnosis of physical abuse; however, Defendant Schlievert's own statements in his April Report indicate otherwise, given that Defendant Schlievert repeatedly evidences a "you have to pick one" mentality.

501. As a child abuse pediatrician, Defendant Schlievert knew or should have known that his diagnosing of shaken baby syndrome in KB's case necessarily constituted his invoking of a "default" diagnosis, as KB's clinical presentation consisted of findings

73

that had a wide range of causes.

502. Defendant Schlievert's intentional and reckless misrepresentation to LCCS that KB's clinical presentation clearly indicated physical abuse as causative, to the exclusion of all other potential causes, shocks the conscience in that his determination, represented as conclusive, was made with a deliberate indifference for the truth and a reckless disregard for the truth.

## Conscious Shocking Conduct of Defendant Schlievert as the Actual and Proximate Cause of Plaintiffs' Constitutional Deprivations and the Foreseeability of the Same

503. Defendant Schlievert's investigatory, pre-trial, non-testimonial acts of fabricating inculpatory evidence of physical abuse in the form of false and reckless conclusive determinations and diagnoses is egregious and shocks the conscience in that his conduct intended to injure Plaintiffs and was unjustifiable by any government interest.

504. Defendant Schlievert knew or should have known that LCCS would rely upon his determinations and diagnosis rendered in his February Report, given that social services caseworkers do not possess requisite training as to medical manifestations of physical abuse in complex clinical presentations and therefore must defer to the judgment of medical professionals when medical professionals do so determine that a child has suffered an inflicted physical injury other than by accidental means.

505. LCCS did in fact rely upon the false and reckless determination rendered by Defendant Schlievert in his February Report, as LCCS repeatedly represented to Molly that Defendant Schlievert's determination concerning KB's clinical presentation as to whether or not physical abuse occurred would dictate LCCS's course of action concerning LB and KB.

506. LCCS did in fact rely upon the false and reckless determination rendered by Defendant Schlievert in his February Report, as LCCS changed LB and KB's permanency goal from that of family reunification to seeking permanent legal custody of LB and KB be granted to a relative upon receipt of Defendant Schlievert's February Report.

507. LCCS's determination to seek permanent legal custody of LB and KB to be awarded to a relative, as opposed to family reunification, was necessarily predicated upon Defendant Schlievert's February Report, as where an unknown perpetrator exists and a

74

report by a child maltreatment specialist indicates an infant to have been seriously physically abused, establishment of parental protective capacities is impossible and therefore necessitates that the child cannot safely return to the custody of his or her parents.

508. Defendant Schlievert knew or should have known that Molly's children would unnecessarily continue to be removed from Molly's care subsequent to the rendering of his February Report, as Defendant Schlievert recommended such to occur in his February Report.

509. Defendant Schlievert knew or should have known that the rendering of his April Report would unnecessarily prolong the Plaintiffs' forced separation from one another and prolong Molly's deprivation of the custody of her children, as Defendant Schlievert recommended such to occur in his April Report.

510. The Fourteenth Amendment to the United States Constitution prohibits state governments from depriving any person of life, liberty, or property without due process of law.

511. Molly, as a parent, has a protected Fourteenth Amendment liberty interest in making decisions regarding the custody and control of her children.

512. Plaintiffs, as family members, have a protected First Amendment right to familial association.

513. As a result of Defendant Schlievert's investigatory, pre-trial, non-testimonial acts of fabricating of inculpatory evidence of physical abuse in the form of false and reckless conclusive determinations and diagnoses, Plaintiffs' parent-child relationship was severed, and Plaintiffs were deprived of their rights secured by the Fourteenth and First Amendments of the United States Constitution.

514. Defendant Schlievert's investigatory, pre-trial, non-testimonial acts of fabricating of inculpatory evidence of physical abuse in the form of false and reckless conclusive determinations and diagnoses violated clearly established constitutional rights of which a reasonable person should have known.

515. In the rendering of his false and reckless conclusive determinations and diagnoses, Defendant Schlievert acted intentionally and/or with a deliberate indifference to the consequence of his actions.

75

516. The acts and omissions of Defendant Schlievert foreseeably caused Plaintiffs great financial and emotional harm, including stress and anguish. The harm to Molly's personal security, privacy, and family life has been severe and long-term, as Molly is constantly worried a medical doctor will again render false and reckless conclusive determinations and diagnoses as to her children, thereby providing LCCS with an excuse to again take away her children. Molly also fears that any slight bump or bruise on any of her children, no matter how innocuous, will be interpreted incorrectly and provide LCCS an excuse to again take away her children, constituting a constant state of fear perpetuated by Defendant Schlievert's acts and omissions.

## LCCS Defendant Does 2-20's Unconstitutional Continued Withholding of LB and KB

517. Unnamed John Does 2-20: Without discovery, it is not possible to determine all of the participants at LCCS and elsewhere who acted to deny Plaintiffs of their civil rights. This is mainly because throughout the period LCCS exerted control over Plaintiffs, all people directly engaged with Plaintiffs continually represented to Plaintiffs that their actions were not of their own volition but in furtherance of the policies of "supervisors" and "the agency." Additional defendants may therefore be added as discovery progresses. With regard to the unnamed Defendant Does 2-20, Plaintiffs allege the following:

518. Throughout LCCS's removal and holding of KB and LB, Plaintiffs continually provided LCCS and its agents with exculpatory information concerning KB's clinical presentation.

519. As previously indicated, in April 2014, Plaintiffs provided to LCCS five expert reports explaining to LCCS that KB was not a victim of abusive head trauma; the reports clearly indicated that an alternate, medical explanation was responsible for KB's clinical presentation.

520. Despite this significant new information affecting Defendant Schlievert's diagnosis, LCCS and its agents continued to hold LB and KB, continued to prevent Molly from having unsupervised contact with her children, and continued to press its claims. This continued withholding was necessarily predicated upon Defendant Schlievert's

unfounded medical diagnosis.

521.  After Defendant Schlievert's July 29, 2014, deposition, LCCS and its agents were aware that: (1) Defendant Schlievert had never conducted any research or had been published concerning retinal hemorrhages, shaken baby syndrome, or non-accidental head injury; (2) Defendant Schlievert did not review KB's birth record in making his diagnosis; (3) Defendant Schlievert did not possess the requisite knowledge base to consider potential consequences a child might suffer based on where a vacuum was placed on a child's head at birth; (4) Defendant Schlievert did not possess the requisite knowledge base to make determinations concerning the effects KB's traumatic surgical intervention may have had on her clinical presentation; and (5) Defendant Schlievert could not state to a reasonable degree of medical certainty whether or not at the time KB was admitted to the hospital she had retinal hemorrhages.

522.  At Defendant Schlievert's July 29, 2014 deposition, in an obvious attempt to overcome his willful and deliberate misrepresentations and fabrications concerning medical evidence, Defendant Schlievert represented to LCCS that regardless of whether or not KB had subdural hematomas and retinal hemorrhaging, he was of the opinion that KB was the victim of physical abuse given that she had previously had a "buttock injury."

523.  At the time Defendant Schlievert made this representation, LCCS was aware that the only "buttock injury" Defendant Schlievert could have been referring to constituted a faint mark on KB, located where the leg met the buttock, smaller than a dime in size, that Molly had taken KB to the pediatrician to address.  Furthermore, LCCS was aware that KB's pediatrician, who actually viewed the skin discoloration, in no way believed this mark to be the result of child abuse.

524.  Nevertheless, despite this significant new information affecting Defendant Schlievert's diagnosis, LCCS and its agents continued to hold LB and KB, continued to prevent Molly from having unsupervised contact with her children, and continued to press its claims.

525.  In August 2014, the expert report written by Dr. Alexander was provided to LCCS, indicating that he could not determine KB to be the victim of abusive head trauma.

526. Prior to receiving this report, LCCS was aware that Defendant Schlievert considered Dr. Alexander to be authoritative in the field of abusive head trauma or/and shaken baby syndrome and was also aware that Defendant Schlievert considered Dr. Alexander to be a published expert Defendant Schlievert would rely on concerning shaken baby syndrome and in making determinations concerning non-accidental trauma.

527. At the time LCCS received Dr. Alexander's report, the LCCS website, in its section dedicated to providing the community with resources for child abuse prevention and education, directs viewers to the National Center for Shaken Baby Syndrome and the International Society for the Prevention of Child Abuse and Neglect. Presumably, LCCS was also aware that Dr. Alexander was on the International Advisory Board of the former and served as an Executive Counselor for the latter.

528. Nevertheless, despite this significant new information affecting Defendant Schlievert's diagnosis, LCCS and its agents continued to hold LB and KB, continued to prevent Molly from having unsupervised contact with her children, and continued to press its claims.

529. At some point throughout LCCS's holding of LB and KB, LCCS and its agents were advised of sufficient information challenging Defendant Schlievert's diagnosis and sufficient information concerning Defendant Schlievert's inability to accurately diagnose KB to erode any definitive and articulable evidence giving rise to a reasonable suspicion that KB had been physically abused; however, instead of releasing KB and LB to the care and custody of Molly, LCCS continued to hold LB and KB.

530. This continued withholding perpetrated by LCCS and its agents violated Plaintiffs' Fourteenth Amendment due process rights.

## CLAIMS FOR RELIEF

### COUNT I:

531. Plaintiffs incorporate paragraphs 1- 530 as if fully set forth herein.

532. Plaintiffs in Count I are Molly Blythe, KB, and LB.

533. The Count I Defendants are Defendants Anwer, Lisk, Tourner, Dargart, Rosenthal, and John Doe 1.

534. The Count I Defendants are state actors.

78

535. The Count I Defendants, acting individually, and/or in concert with one or more of the other Count I Defendants, violated the rights of the Plaintiffs under the Fourteenth and First Amendments to the United States Constitution when they fabricated inculpatory evidence of physical abuse, disregarded any and all information concerning KB's clinical presentation indicating she was not abused, and when they represented to LCCS that KB was a "shaken baby."

536. Defendants' conscious shocking acts and omissions were the direct and proximate cause of Plaintiffs' Constitutional deprivations, including, but not limited to, their rights to due process, familial association, familial autonomy, familial integrity, and family privacy.

537. The Defendants, acting individually and/or in concert with one or more of the other Count I Defendants, also violated the rights of Plaintiff Molly Blythe under the Fourteenth and First Amendments to the United States Constitution, where, as a direct and proximate cause of the conscious shocking acts and omissions of the Count I Defendants, Plaintiff Molly Blythe was deprived of her fundamental constitutional right to make decisions about the care, custody, and management of her children.

## COUNT II

538. Plaintiffs incorporate paragraphs 1-537 as if fully set forth herein.

539. Plaintiffs in Count II are Molly Blythe, KB, and LB.

540. The Count II Defendant is Lucas County Children Services.

541. The acts of Defendants Anwer, Lisk, Tourner, Dargart, Rosenthal, and John Doe 1 deprived Plaintiffs of their rights under the United States Constitution.

542. Defendants Anwer, Lisk, Tourner, Dargart, Rosenthal, and John Doe 1 acted under color of law.

543. The training policies of Defendant Lucas County Children Services were not adequate to train those to whom Defendant Lucas County Children Services routinely delegated the task of its child abuse investigations.

544. Defendant Lucas County Children Services was deliberately indifferent to the obvious consequences of its failure to train its investigating physicians adequately.

545. The failure of Defendant Lucas County Children Services to provide adequate

training caused the deprivations of the Plaintiffs' rights by its investigating physicians; that is, Defendant Lucas County Children Services' failure to train is so closely related to the deprivation of the Plaintiffs' rights as to be the moving force that caused Plaintiffs' ultimate injury.

## COUNT III

546. Plaintiff incorporates paragraphs 1- 545 as if fully set forth herein.

547. Plaintiff in Count III is LB.

548. The Count III Defendants are Chanda Beal and Jason Wegman.

549. Defendants Wegman and Beal are state actors.

550. Under the Fourth Amendment, a person has the right to be free from an unreasonable search of her person.

551. Defendants Wegman and Beal intentionally violated Plaintiff's constitutional right not to be subjected to unreasonable searches of one's person when they mandated that LB be brought to Toledo Hospital and undergo invasive and unnecessary medical testing, consisting of a cranial CT scan and a skeletal survey, in an effort to uncover evidence of physical abuse.

552. The acts of Defendant Wegman violated Plaintiff's rights when he summonsed the Plaintiff to the hospital and ensured the Plaintiff receive the unnecessary and invasive search.

553. Defendant Beal, acting as Defendant Wegman's supervisor, directed Defendant Wegman in the acts that deprived the Plaintiff of these rights.

## COUNT IV

554. Plaintiffs incorporate paragraphs 1-553 as if fully set forth herein.

555. Plaintiffs in Count IV are Molly Blythe, KB, and LB.

556. The Count IV Defendant is Randall Schlievert.

557. The Count IV Defendant is a state actor.

558. The Count IV Defendant violated the rights of the Plaintiffs under the Fourteenth and First Amendments to the United States Constitution when he fabricated inculpatory evidence of physical abuse, disregarded any and all information concerning

80

KB's clinical presentation indicating she was not abused, and when he conclusively represented to LCCS that KB was an abused child.

559. The Defendant's conscious shocking acts and omissions were the direct and proximate cause of prolonging Plaintiffs' Constitutional deprivations, including, but not limited to, their due process rights, rights to familial association, familial autonomy, familial integrity, and family privacy.

560. The Defendant also violated the rights of Plaintiff Molly Blythe under the Fourteenth and First Amendments to the United States Constitution, where, as a direct and proximate cause of the conscious shocking acts and omissions of the Defendant, Plaintiff Molly Blythe's deprivation of her fundamental constitutional right to make decisions about the care, custody, and management of her children was unnecessarily and arbitrarily prolonged.

## COUNT V

561. Plaintiffs incorporate paragraphs 1-560 as if fully set forth herein.

562. Plaintiffs in Count V are Molly Blythe, KB, and LB

563. The Count V Defendants are John Does 2-20.

564. The Count V Defendants are state actors.

565. The Count V Defendants, either acting individually or in concert, violated the rights of the Plaintiffs under the Fourteenth and First Amendments to the United States Constitution when they continued to withhold LB and KB in blind reliance on Defendant Schlievert's diagnosis and when they disregarded any and all credible information contradicting their child abuse physician's diagnosis.

566. The acts and omissions of the Defendants were the direct and proximate cause prolonging Plaintiffs' Constitutional deprivations, including, but not limited to, their due proves rights, rights to familial association, familial autonomy, familial integrity, and family privacy.

567. The Defendants also violated the rights of Plaintiff Molly Blythe under the Fourteenth and First Amendments to the United States Constitution, where, as a direct and proximate cause of the acts and omissions of the Defendant, Plaintiff Molly Blythe's deprivation of her fundamental constitutional right to make decisions about the care, custody, and management of her children was unnecessarily and arbitrarily prolonged.

81

## RELIEF REQUESTED

568.  For each violation of 42 U.S.C. § 1983, Plaintiffs seek to recover:

(A) compensatory damages, in an amount to be determined by a jury;

(B) punitive damages, in an amount to be determined by a jury;

(C) reasonable attorney fees pursuant to 42 U.S.C. § 1988; and

(D) any further relief, including but not limited to an award of costs, as may be appropriate under the facts and circumstances.

Respectfully submitted,

Lorin J. Zaner
Attorney for the Plaintiffs
Ohio Supreme Court #0008195
241 N. Superior St., #200
Toledo, OH  43604
Telephone:  (419) 242-8214
Telecopier:  (419) 242-8658
Email:  lorinzaner@accesstoledo.com

## JURY DEMAND

Now come the Plaintiffs, by and through counsel, and pursuant to Rule 39 of the Federal Rules of Civil Procedure, herein demands a trial by jury of all issues triable of right by a jury in this action.

Lorin J. Zaner
Attorney for the Plaintiffs

82