# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### WESTERN DIVISION

Molly S. Blythe, *et al.*,                                    Case No. 3:16CV97

      Plaintiffs,

      v.                                                      **ORDER**

Dr. Randall S. Schlievert, *et al.*,

      Defendants.

 

This is a suit under 42 U.S.C. § 1983 by a mother, Molly Blythe, on behalf of herself and her twin daughters, co-plaintiffs KB  and LB. The plaintiffs allege that the defendants, who include five physicians and John Doe employees affiliated with ProMedica Toledo Children's Hospital, a doctor affiliated with Toledo Mercy St. Vincent Medical Center, employees of the Lucas County, Ohio Children's Service Board (CSB), and the CSB, violated the plaintiffs' individual and collective rights to substantive due process and the First and Fourth Amendments.

The defendants did so, plaintiffs allege, through conscious-shocking actions after Molly brought KB to Toledo Hospital. The five Toledo Hospital doctors diagnosed and/or confirmed that KB was, under O.R.C. § 2151.031,[1] an "abused child," who had suffered non-accidental head trauma known as Shaken Baby Syndrome.

---

[1] O.R.C. § 2151.031 defines "abused child" as a child under eighteen who "[e]xhibits evidence of any physical . . . injury . . . inflicted other than by accidental means, or an injury . . .  which is at variance with the history given of it."

This diagnosis triggered a mandatory duty under O.R.C. § 2151.421 for the medical providers to notify the CSB that KB was a suspected victim of child abuse.[2]

On receiving the § 2151.421 notification, a CSB caseworker obtained Molly's agreement that her sisters, Amy and Erin Blythe, would become the twin's custodians. Thereafter, the CSB sought, and the Lucas County Common Pleas Court, Juvenile Division issued, a temporary custody order removing the twins from Molly's custody and placing them in the custody of Amy and Erin.

After several months, during which Amy and Erin had legal custody of the twins, Molly agreed to the twins being placed in the permanent custody of her mother, Claire Blythe.

Pending, and the subject of this opinion, are motions to dismiss and a motion for judgment on the pleadings by the five doctors affiliated with the Toledo Hospital:  jointly, Tiffany A. Lisk, Susan P. Tourner, and Jamie L. Dargart (Doc. 22), Rayyan M. Anwer (Doc. 27), and John Gregory Rosenthal (Doc. 39). For the reasons that follow, I grant the motions.[3]

_____

[2] O.R.C. § 2151.421(A)(1)(a) states in pertinent part that a physician:

acting in an official or professional capacity . . . [who] has reasonable cause to suspect based on facts that would cause a reasonable person in a similar position to suspect[] that a child under eighteen years of age . . . has suffered . . . any physical . . . injury . . . that reasonably indicates abuse . . . shall . . . immediately report that . . .  reasonable cause to suspect to . . . the public children services agency . . . .

Failure to make such a report is, under O.R.C. § 2151.99, a misdemeanor of the first degree.

[3] By separate orders, I am granting the motion for judgment on the pleadings of the defendant doctor affiliated with Toledo Mercy St. Vincent Medical Center, as well as the motion for judgment on the pleadings of defendants CSB and its employees.

2

## Background

## 1. Before KB's Admission to Toledo Hospital

On November 12, 2013, plaintiff Molly Blythe gave birth five weeks prematurely to plaintiffs KB and LB. KB's birth, which followed that of her twin sister, presented substantial problems. KB's position had to be turned from the outside, and doctors had to use a silastic vacuum extractor, which involved attachment of a vacuum cup to KB's head to pull her from the birth canal. This procedure can cause cerebral injuries. Nurses and doctors noted significant bruising to KB's scalp after delivery, but no images were taken to determine the effect, if any, of how doctors accomplished KB's delivery.

During the two-month period following KB's post-natal release from the hospital, Molly took KB to her pediatrician eight times. Molly told the doctor that KB was vomiting after feeding and that the frequency of vomiting was increasing. Though by a month after her birth KB had gained two pounds, Molly expressed concern that she was not filing out her sleepers as much as LB. Molly also reported concerns about KB's sleep patterns.

On December 26, 2013, Molly noticed a faint discoloration where KB's left buttock and leg joined. Her pediatrician thought that a buckle on KB's car seat, where, in accordance with the doctor's instructions, Molly placed KB after feeding to keep her upright to help with her episodes of vomiting, could have caused the mark. Molly continued to be concerned and expressed her concerns to the doctor before a visit on January 10, 2014. At that time, Molly pointed out that KB's head was noticeably larger than LB's. Molly also told the doctor that KB was, as she had been during previously visits, pale and continuing to vomit. Finally, on January 16, 2014, the pediatrician recommended taking KB to the hospital.

3

## 2. Hospital Admission and Assessment
## That KB Was an Abused Child

Later on January 16, 2014, Molly took KB to ProMedica Toledo Hospital, where a cranial ultrasound was conducted. The ultrasound revealed an indication of bilateral subdural hygromas, perhaps due to chronic subdural hematomas. In addition, an MRI and CT scan revealed large extra-axial fluid collections of mixed signal attenuation under some degree of tension and downward displacement of cerebral hemispheres. The hospital admitted KB and placed her in the pediatric intensive care unit.

Molly offered no explanation for KB's injuries. In light of that fact and in view of KB's objective clinical presentation with severe head trauma, non-defendant Dr. Jennifer Grogan decided, and so informed Molly, that the hospital would make the referral to CSB.[4]

Before KB's discharge from the hospital on January 22, 2014, the defendant physicians continued to view and evaluate the cause of KB's condition as non-accidental trauma due to apparent child abuse. Plaintiffs claim that in doing so, the defendant doctors engaged in evidence gathering that went beyond their duties as physicians. As a result, plaintiffs allege, the defendant doctors improperly, and in a conscience-shocking way, supplanted CSB's statutory duty to investigate suspected child abuse.

On January 17, 2014, the day after KB's admission, non-defendant neurosurgeon Dr. Brian Hoeflinger surgically drained cranial fluid from KB. During that procedure, Dr. Hoeflinger noted a

---

[4] The only other persons who had access to KB following her birth were Molly's mother, Claire Blythe, and the twin's father, Eric Bonk. Like Molly, they denied causing or witnessing the cause of KB's injuries. Thus, from the outset, hospital medical personnel were diagnosing and treating an infant with serious head injuries for which there was no explanation whatsoever other than physical abuse.

spontaneous return of chronic to subacute subdural hematoma under fairly high pressure. Dr. Hoeflinger also noted that KB's brain appeared to expand toward her skull during the surgery.

While undergoing a post-surgical transfusion, KB suffered a seizure. An immediately performed cranial CT scan showed large areas of extra-axial gas and unexpected bilateral hemorrhages.

A skeletal survey revealed no other indicia of trauma elsewhere on KB's body. Pediatric hematologist defendant Dr. Jamie Dargart conducted blood tests to ascertain if KB had a bleeding disorder.[5] Dr. Dargart, whose panel of tests was, according to plaintiffs, incomplete, ruled out a blood disorder as a cause of the subdural bleeding.

Non-defendant Dr. Matthew Currie, a non-board-certified ophthalmologist, examined KB on January 19, 2014 for retinal hemorrhages, which are thought to be associated with child abuse. He observed intra- and subretinal hemorrhages bilaterally. Dr. Currie took no images during his examination; afterwards, he neither speculated as to the cause of what he had observed nor documented any differential diagnosis considered. According to plaintiffs, a retinal examination should have occurred within twenty-four hours of KB's admission and, in any event, before KB underwent cranial surgery on January 17, 2014. That surgery, plaintiffs assert, could have resulted in the intra-retinal bleeding that Dr. Currie observed. The absence of a post-admission, pre-surgery baseline, plaintiffs assert, negates and renders recklessly useless later observations of intra-retinal bleeding as an indicator of pre-admission child abuse.

---

[5] A bleeding disorder may predispose a patient with such disorder to present physical manifestations similar to KB's in the absence of non-accidental head trauma.

5

Also on January 19, 2014, defendant Dr. Rayyan Anwer, then in his third month of residency, examined KB. Dr. Anwer attributed KB's subdural hematoma to non-accidental trauma. This determination, plaintiffs claim, constituted the intentional, deliberate, and reckless fabrication of inculpatory evidence for later use by CSB to interfere with the constitutional right to family integrity and mutual care, custody, and control.

After Dr. Currie's retinal examination and findings, pediatric intensivist defendant Dr. Susan P. Tourner determined that KB appeared to be a shaken baby and, thus, an abused child under § 2151.031 (*i.e.*, having apparently suffered non-accidental trauma). On the basis of that diagnosis, Dr. Tourner, in compliance with the mandate of § 2151.421, notified CSB on January 19, 2014 that KB was a suspected child abuse victim.[6]

The complaint asserts that contrary to the report to CSB, KB's clinical presentation did not support the diagnosis of non-accidental trauma and the conclusion that KB was a shaken baby. Plaintiffs assert that KB's clinical presentation was, instead, consistent with trauma occurring during her birth.

### 3. Events Following Notification to CSB That KB Was a Suspected Child Abuse Victim

Later on January 19, 2014, after CSB had received Dr. Tourner's § 2151.421 notice of suspected child abuse, CSB casework Jason Wegman, acting at the direction of his supervisor, Chandra Beal, informed Molly that he wanted her to consent to having her sisters, Amy and Erin Blythe, become the twin's custodian. Unless she agreed, Wegman told her, he would obtain a

---

[6] The plaintiffs fault Dr. Tourner for failing to document in her medical notes that there had been no differential diagnosis considered to rule out other causes for KB's injuries.

6

temporary custody order from the Juvenile Court and place the twins in a foster home. Molly agreed that her sisters could assume custody of the twins.

Later that evening, Wegman contacted Molly's sisters, who had assumed temporary care, and asked them to bring LB to the hospital for an examination to determine whether she manifested any injuries. That examination disclosed no indicia of injury or child abuse.

Molly confirmed her decision that her sisters would be the twin's custodian in a "safety plan" that she signed on January 20, 2014.

Also on January 20, 2014, Dr. Dargart provided her report (which, as noted, plaintiffs contend was based on insufficient data) that she could not attribute KB's injuries to a bleeding disorder.

On January 21, 2014, defendant Dr. Gregory Rosenthal, board certified ophthalmologist, conducted a second opthalmological examination of KB. Dr. Rosenthal observed slight retinal hemorrhages in both eyes but not in the foveas. Dr. Rosenthal's observations, were, in his view, highly suggestive of Shaken Baby Syndrome. Plaintiffs fault Dr. Rosenthal's failure to take images and to consider a differential diagnosis.

On the same day, Dr. Anwer again documented his opinion that KB's subdural hemorrhages were secondary to non-accidental trauma. In addition, either on that date or the next, January 22, 2014, Dr. Anwer, according to plaintiffs, "falsely and recklessly determined physical abuse, to the exclusion of all other explanations, as the cause of KB's clinical presentation and represented the same to [CSB]." (Compl. ¶144). In so doing, plaintiffs allege, Dr. Anwer intentionally, deliberately, and recklessly fabricated false inculpatory evidence, thereby performing CSB's investigatory

7

function. When Dr. Anwer did so, plaintiffs assert, he knew that a diagnosis of child abuse should be arrived at "cautiously." (*Id.* ¶147).

On January 22, 2015, defendant Doctor Tiffany A. Lisk was serving as Dr. Anwer's attending physician *vis-a-vis* Dr. Anwer's duties as a resident. Dr. Lisk was responsible for affirming and evaluating Dr. Anwer's diagnostic decisions, and she concurred in Dr. Anwer's diagnosis of non-accidental trauma.

On February 3, 2014, CSB filed an abuse, neglect, and dependency complaint in the Lucas County Court of Common Pleas, Juvenile Division. The Court found probable cause to believe placement in shelter care was needed to protect KB and LB from immediate or threatened physical harm. The Court placed the children in the temporary custody of their maternal aunts. The Court also ordered that Molly live outside the home and that her visits with KB and LB be supervised.

A dispositional hearing was to occur in Juvenile Court on October 20, 2014. The visiting judge assigned to the case indicated he intended to continue the hearing to a later date. Rather than prolong the emotional and financial burdens they had endured, Molly and Mr. Bonk entered into a consent agreement that Molly's mother, Claire Blythe, would become KB and LB's permanent custodian.

## Standard of Review

A Rule 12(c) motion is analyzed using the same standard of review as a 12(b)(6) motion. *Tucker v. Middleburg-Legacy Place*, 539 F.3d 345, 549 (6th Cir. 2008).[7]

---

[7] I note the similarity in standard because defendant Schlievert labeled his motion as a motion to dismiss despite having previously filed an answer to plaintiff's complaint. Therefore, I construe the pending motion as a motion for judgment on the pleadings pursuant to Fed. R. Civ. Pro. 12(c).

A complaint must contain a "short and plain statement of the claim showing the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

To survive a motion to dismiss under Rule 12(b)(6), the complaint "must contain sufficient factual matter, accepted as true, to state a claim that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

In ruling on a motion to dismiss, I may consider "the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein."  *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

**Discussion**

**1. Plaintiffs' Claims Against the
Five Doctor Defendants**

Of the five counts in the complaint, Count One alone asserts a cause of action against the defendant doctors: namely that they, individually and together, violated plaintiffs' rights:

A.   Under the Fourteenth and First Amendments by disregarding the likelihood that KB's clinical presentation had a cause other than child abuse as a shaken baby and notifying CSB of that diagnosis, rather than an alternative cause for their clinical observations;

B.   On Molly's part, to substantive due process of law and the right of familial association, autonomy, integrity, and privacy; and

C.   On Molly's part, to make decisions about the care, custody, and management of her children.

9

Plaintiffs' core and repeated contention is that the five doctor defendants individually had a common, intentional, deliberate, and reckless mindset whereby each separately, but doing so along with the other doctor defendants, fabricated false evidence of non-accidental child abuse.

Plaintiffs also claim the creation of that false evidence supplanted CSB's investigative role, thereby foreseeably and proximately enabling the ensuing intervention by CSB and the Juvenile Court until the October, 2014, consent judgment placed permanent custody of the twins in Molly's mother.

The fabrication of that false evidence and its consequent deprivation of parental care, custody, and control, plaintiffs claim, "shock the conscience" and, thereby, violated the plaintiffs' rights to substantive due process under the Fourteenth Amendment.

The defendant doctors seek dismissal on the basis that aside from Dr. Anwer, they were not acting under color of state law, nothing any of them did shocks the conscience, and, in any event, they are entitled to qualified immunity.

I agree with each of these contentions.

## 2. Grounds for Dismissal

### A. Four of the Doctor Defendants–
### Lisk, Tourner, Dargart, and Rosenthal–
### Are Not State Actors

Except for Dr. Anwer, who admits he was, through medical educational affiliation with the University of Toledo, a state supported entity, the other four doctor defendants (Lisk, Tourner,

10

Dargart, and Rosenthal) assert they were not acting under color of state law and are not amendable to suit under § 1983.[8] I agree.

Action under color of state law is a *sine qua non* of a § 1983 suit. *E.g., West v. Atkins*, 487 U.S. 42, 48 (1988); *Jones v. Duncan*, 840 F.2d 359, 361-62 (6th Cir. 1988).

With regard to persons who otherwise indisputably are private individuals, working in a private capacity for a private employer (such as Toledo Hospital), a court may find that they became state actors where their actions became "clothed with the authority of state law." *U.S. v. Classic*, 313 U.S. 299, 326 (1941). In such circumstances, a court can fairly attribute their actions to the state, rather than a private entity. *E.g., Lugar v. Edmonson Oil Co., Inc.,* 457 U.S. 922, 937 (1982).

Plaintiffs claim that Drs. Lisk, Tourner, Dargart, and Rosenthal went beyond their duties as physicians treating KB for her medical needs and took over CSB's statutory role as principal investigator of suspected child abuse. Indeed, plaintiffs contend that the doctors' activities "were not conducted for the purpose of treating KB but rather were conducted for the purpose of determining whether KB's clinical presentation was the result of criminal activity." (Doc. 35, at 5).

The facts that plaintiffs allege do not support their otherwise conclusory assertions that the doctors somehow morphed into state actors while engaged in their treatment and diagnosis of KB's severe, unexplained head trauma and its apparent cause. Everything the plaintiffs claim the doctor defendants did occurred within the hospital and the scope of their duties as doctors. They observed

---

[8] The contention that the doctors acted as investigators performing the function the State entrusted to CSB appears to relate more to the issue of state action, rather than the substantive due process issue of conscience-shocking acts. To the extent, though, that plaintiffs may be asserting that the doctors' alleged displacement of CSB as primary investigators relates to their substantive due process claim, I reject that contention for the same reasons that I conclude that what they did did not make them state actors. The same reasoning applies to Dr. Anwer, whose actions were in the course and scope of his duties as a physician responsible for KB's care and welfare.

11

KB on admission and ascertained immediately that she presented what they diagnosed as classic indicia of Shaken Baby Syndrome. They then conducted follow-up tests and examinations that, in their professional view, confirmed that initial assessment.

Plaintiffs do not dispute that § 2151.421 required the doctors, once they had "reasonable cause to suspect" that KB was an abused child–*whether their conclusions were accurate or not*–to "immediately report that . . . reasonable cause to suspect" to the "public children services agency."

Plaintiffs, moreover, ignore the definition of an abused child in § 2151.03–namely a child under eighteen who "[e]xhibits evidence of any physical . . . injury . . . inflicted other than by accidental means, or an injury . . . which is at variance with the history given of it . . . ."

Here, to the extent that KB's care givers provided a "history" of what happened–namely, that none of them either caused or witnessed what caused her severe head injury–that injury was clearly "at variance with" the protestations of ignorance and non-responsibility.

Plaintiffs' complaint, when read in its entirety, inconsistently claims the defendant doctors both did too much–allegedly supplanting CSB's investigative role and, thus, becoming state actors –and too little, by failing to: learn about KB's birth trauma, establish a baseline retinal examination, conduct an adequate blood screen, and engage in a differential diagnosis.

In sum, *none of the plaintiffs' factual statements of what the doctors did shows anything out of the ordinary*. Plaintiffs' repeated conclusory incantations that the defendant doctors went beyond their proper role as doctors under the mandate of § 2151.421 and fulfilled CSB's investigatory role are simply insufficient under *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corp. v. Twombley*, 550 U.S. 544 (2007) to state a plausible basis for finding state action. Plaintiffs fail to provide any factual basis on which a rational trier of fact could find that the defendant doctors did

12

anything out of the ordinary during their course of treating KB, diagnosing the cause of her injuries, suspecting she was a child abuse victim, and fulfilling their legal duty to report that suspicion to CSB.

If these four doctors were state actors, then so would be every private healthcare professional who fulfills his or her duty under § 2151.421 to report suspected child abuse.

The law in our Circuit supports my conclusion that the complaint fails to show a basis, much less a plausible basis, under *Iqbal/Twombley* for finding the defendants were state actors.

In *Harville v. Vanderbilt University, Inc.*, 95 F. App'x 719, 726, 2003 WL 22025028, at *6 (6th Cir. 2003) (unpublished), the Sixth Circuit, albeit without extended analysis, upheld a district court's dismissal of plaintiffs' § 1983 suit against physicians involved in reporting apparent Munchausen Syndrome to a child welfare agency. The court concluded, "it is clear that none of the Defendants were acting under color of state law."[9] *Id.*

Similarly, in *Haag v. Cuyahoga County*, 619 F. Supp. 262, 283 (N.D. Oh. 1985), *aff'd*, 798 F.2d 1414 (6th Cir. 1986), the court reached the same conclusion. In that case, a psychologist, on the basis of a statement by a four year old child about her father's sexual abuse, filed a § 2151.421 report. The court found her doing so did not constitute state action. *Id.*

Plaintiff contends that *Haag* is distinguishable on its facts, such that I should disregard its holding. Plaintiffs point out that in *Hagg*, the defendant's sole involvement with the public child services agency was to report the child's claim.

---

[9] The court reached this conclusion, even though the record showed that one of the doctor defendants in that case was a member of a hospital abuse assessment team. *Id.* at *3.

Contrary to the plaintiffs argument and as I have already pointed out, I do not find that the substantially more extensive medical assessment the doctors undertook here makes the holding in *Haag* inapplicable. In that case, the psychologist acted, as she should have, on the basis of a single statement giving her reason to suspect sexual abuse. Here, several doctors from different specialties undertook their own examinations and assessments. All agreed that what they saw through their expert professional eyes was consistent with child abuse, specifically Shaken Baby Syndrome. Dissimilar circumstances require different professional responses under § 2151.421.

To be sure, no meaningful factual or legal analysis undergirds *Harville* and *Haag*. Other courts have, however, consistently and repeatedly rejected claims that private healthcare providers became state actors when they, in compliance with state abuse reporting laws, reported findings of abuse to state agencies. *See, e.g., Tracy v. SSM Cardinal Glennon Children's Hosp.*, 2016 WL 3683000, *8 (E.D. Mo.) (collecting cases).

In sum, I entirely agree with the First Circuit's statement upholding dismissal of § 1983 claims against private medical personnel and a social worker that, "Nothing seems more counterintuitive to us than to reason that a statute which protects one who complies from civil or criminal actions under state law should be the vehicle for subjecting the actor to liability under federal law." *Brown v. Newberger*, 291 F.3d 89, 93 (1st Cir. 2002).

Finally, plaintiffs assert in passing that the defendant doctors were state actors because their employer, Toledo Hospital, was a "partner" with CSB. This conclusory contention has no merit in view of Ohio's definition of a partnership: "'Partnership' means an association of two or more persons to carry on as co-owners a business for-profit formed under section 1776.22 of the Revised Code, a predecessor law, or a comparable law of another jurisdiction." O.R.C. § 1776.01(M).

14

I conclude that the allegations in the complaint fail adequately to plead that defendant doctors Tiffany A. Lisk, Susan P. Tourner, Jamie L. Dargart, and John Gregory Rosenthal were state actors. They are entitled to dismissal on that basis alone.[10]

### B. Nothing Any Toledo Hospital Doctor Did "Shocks the Conscience"

### i. Plaintiffs' Claim

Plaintiffs' complaint claims that the five doctors' actions *vis-a-vis* the § 2151.421 report shock the conscience because they: 1) deliberately, intentionally, and recklessly, 2) fabricated evidence that 3) was false, and 4) in so doing, they went beyond their roles as diagnosticians and treatment providers, thereby supplanting CSB's function as investigator of child abuse.[11]

For the reasons discussed in the following subsections, I conclude that plaintiffs have failed to plead any of the components of their substantive due process claim adequately.

### ii. *Mens Re*

First, with regard to plaintiffs' assertions about the defendants' state of mind, the insufficiency under *Iqbal/Twombley, supra*, of conclusory allegations applies to claims about mindset. *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano,* 648 F.3d 365, 377 (6th Cir. 2011) (holding "vague and conclusory allegations of nefarious intent and motivation" are insufficient to state a claim); *Warren v. Lexington-Fayette Urban Cty. Gov't*, 2016 WL 4491837, *4 (E.D. Ky.) (holding conclusory assertions of intent to cause insufficient without supporting facts). Where a complaint

---

[10] For the same reasons, the Doe "coder" defendants, all of whom are employees of ProMedica Toledo Hospital, are entitled to dismissal.

[11] With regard to the claim of improper "investigation" supplanting CSB, I conclude, for the reasons I state in the preceding subsection, that there is no merit to that contention, either with regard to the four Toledo Hospital doctors or Dr. Anwer.

describes a defendant's state of mind in general terms, "the plaintiff still must plead facts about the defendant's mental state, which, accepted as true, make the state-of-mind allegation plausible on its face." *Crugher v. Prelesnik*, 761 F.3d 610, 617 (6th Cir. 2014) (internal citations and quotation marks omitted).

The complaint offers no direct proof of a malicious mindset or motive on the part of the doctor defendants. Instead, it asserts, as circumstantial proof of malicious intent, that the doctors intentionally, deliberately, and recklessly fabricated "evidence" that was "conclusive" and false.

The sufficiency of this allegation depends on whether the complaint contains a factual basis on which a rational trier of fact could find that any of the doctors did anything that was false: *i.e.*, something does not square with the facts about KB's clinical presentation and the truthfulness of what the doctors did in response to that clinical presentation. Because the alleged falsity is at the core of plaintiffs' related claim that the doctors engaged in conscience-shocking acts, I discuss the allegation of falsity in § 2.B.iv, i*nfra*.

### iii. The Doctors Did Not Fabricate "Evidence"

The false and fabricated "evidence" to which the complaint refers is, presumably, the § 2151.421 report. Plaintiffs do not assert that CSB ever offered any medical records or that any of the defendant doctors participated in any proceedings in Juvenile Court. Nor do plaintiffs allege that any doctor provided an affidavit or anything else that CSB offered or the Court admitted or might have admitted at any hearing in plaintiffs' case.

Thus, there is no factual support for the contention that the doctors fabricated "evidence." This is understandable, as, on its own, a § 2151.421 report simply notifies CSB that medical professionals have reason to believe a child has been abused. What use, if any, CSB makes of the

report in a court proceeding is up to it. CSB alone chooses whether to present the report to the Juvenile Court. The doctors might, as plaintiffs allege, have foreseen that CSB could and possibly would offer the report into evidence when and if a court proceeding took place. But that does not matter. What matters is that § 2151.421 mandated that the doctors provide the report to the agency when they reasonably suspected a patient was a child abuse victim. The doctors had no say over what happened next.

Indeed, the complaint fails even to allege that CSB, in fact, chose to offer the § 2151.421 report into evidence, either by attaching it to its February 3, 2014, abuse complaint or otherwise. Thus, the assertion that the defendant doctors created "evidence" lacks essential factual underpinning–namely, that CSB made evidentiary use of the report.

In any event, even if a § 2151.421 report becomes admitted into evidence in the course of a Juvenile Court abused child proceeding, it could not, as a matter of law, be, as plaintiffs claim, "conclusive." Aside from plaintiffs' failure to plead a factual basis for how that might have been so, a § 2151.421 report, standing alone, cannot meet the preponderance of evidence standard of proof for an adjudication. *E.g.*, *In re Starks*, 2005 WL 939851, at *2 (Ohio App.).[12] Nor, obviously, would a § 2151.421 report suffice, without much more, as a basis for permanent termination of parental rights. *In re Sink*, 1988 WL 40424, at *1 (Ohio App.) (requiring clear and convincing evidence).

Thus, there is no basis for the assertion that the report was either prepared to be offered as "evidence" or that even if offered, it was "conclusive."

---

[12] Some Ohio courts require clear and convincing evidence at that stage. *But see In re S.L.*, 56 N.E.3d 1026, 1031 (Ohio App. 2016).

17

### iv. There Was Nothing False in the Doctors'
### Findings, Conclusion, or Report to the CSB

In the entirety of plaintiffs' eighty-two page, 568-paragraph complaint, there is but one direct, non-conclusory assertion that any of the Toledo doctors stated something that was untrue–namely, that Dr. Anwer's diagnosis of shaken baby child abuse was "to the exclusion of all other explanations." (Compl. ¶144).

There is nothing false about that statement because there were no other explanations from anyone about how KB came to be injured. In such circumstances, there is nothing illogical, much less false, in concluding that all other explanations have been excluded.

At the very worst, assuming that: 1) that is exactly what Dr. Anwer stated somewhere, and 2) either CSB or the Juvenile Court became aware of that statement, the wording was infelicitous.[13]

Infelicity is not the same as intentionally, deliberately, or recklessly making a false statement–lying about something. There is no other specific record, report, or representation that Dr. Anwer or any other Toledo doctor made during the course of examining, treating, and diagnosing KB that plaintiffs claim was untruthful or even misleading. This is so with regard to both the doctors' records of what they saw and with regard to the suspicion that KB was a victim of shaken baby abuse.

That leaves the doctors' conclusion that KB was a victim of shaken baby child abuse.

---

[13] The complaint does not state whether Dr. Anwer made that exact statement, where and when he made it, or whether it ever came to the attention of the CSB or Juvenile Court. In any event, even if that statement came to the attention of CSB or the Court, both concurrently would no doubt have known, as Dr. Anwer and every other doctor did, that no one had provided any explanation as to what caused KB's severe head trauma. That being so, that sufficed, without more, to give rise to probable cause, as the Juvenile Court found, that KB was an abused child under § 2151.031. No harm, no foul.

18

In claiming that conclusion and, consequently, the § 2151.421 report, were false, the plaintiffs do not expressly claim that any doctor was deceiving himself or herself or seeking to do so *vis-a-vis* CSB or the Juvenile Court.

Such a claim would fail: KB's clinical presentation–bilateral subdural hematomas and retinal bleeding–are commonly accepted indicia of shaken baby child abuse. *See, e.g., Gimenez v. Ochoa*, 2013 WL 8178829, at *15 (citing authoritative medical textbook), *Report & Recommendation adopted*, 2014 WL 1302463 (S.D. Cal.).[14]

Instead, plaintiffs focus on what the doctors did not know–namely, the circumstances of KB's birth–and what they did not do–namely–consider differential diagnoses to rule out other causes.

Turning first to what the doctors did not know: unawareness of pertinent facts that might have led to a different conclusion does not rise to the level of a constitutional violation. *See Edwards v. Williams*, 170 F. Supp. 2d 727, 734-36 (E.D. Ky. 2001). This is especially true where plaintiffs' allegations, like those here, are conclusory. *Id*. at 734-35 (conclusory assertions that the defendants engaged in deliberate indifference, gross negligence, and/or recklessness insufficient under *Iqbal/Twombley*). It is not enough to point out ways in which an investigation into possible child abuse was flawed or less than textbook perfect. *Id.* at 736.

---

[14] Some cases (not cited by plaintiffs) note that medical research has raised doubts about the reliability of putting the symptoms that KB manifested into the pigeonhole of Shaken Baby Syndrome. *See generally Cavazos v. Smith*, 565 U.S. 1, 13-15 (2011) (Ginsburg, J., dissenting) (discussing medical articles). The decision in *Gimenez, supra,* 2014 WL 1302463 at *7, in addition to citing cases endorsing use of the Shaken Baby Syndrome as proof of child abuse, discusses medical research and notes that "[t]he American Academy of Pediatrics has recently reissued their position paper on Abusive Head Trauma eliminating the use of the term Shaken Baby Syndrome because it is an unproven mechanism of injury."

Regardless of the dispute within the medical academy, plaintiffs do not challenge the defendants' application of conventional shaken baby abuse criteria in making their diagnosis and § 2151.421 report. Absent some satisfactory explanation, KB's symptoms came within the definition of physical abuse in § 2151.031 and, thereby, compelled the defendant doctors to submit the § 2152.421 report.

19

With regard to what the doctors did not do–namely, differential diagnosis–the plaintiff demands something that the law does not demand; indeed, what they urge is contrary to the law in light of § 2151.421.

Section 2151.421 requires immediate reports of *suspected* child abuse. A differential diagnosis undertakes to rule out all other causes of injury, a vastly more intense and time-consuming exercise that may begin with suspicion, but goes far beyond that modest and minimal starting point.[15] A doctor who waited until completing a differential diagnosis would unavoidably violate § 2151.241 and, as well, his or her oath "to do no harm" by leaving a child whom he or she reasonably suspects is a child abuse victim without the protection to which the law entitles that child.

Both with regard to what the defendant doctors did and did not do, the complaint fails to allege facts sufficient to enable a rational trier of fact to conclude that they violated the plaintiffs' right to substantive due process.

### C. The Doctor Defendants Are Entitled to Qualified Immunity

Even if all the defendant doctors were state actors and even if they, or anyone of them, had done anything conscience shocking, thereby depriving the plaintiffs of substantive due process, they would be entitled to dismissal on the basis of qualified immunity.

One court has recently summarized Sixth Circuit qualified immunity law:

The Supreme Court has repeatedly told courts . . . not to define clearly established law at a high level of generality, since doing so avoids the crucial question whether

---

[15] Differential diagnosis is defined as "[t]he method by which a physician determines what disease process caused a patient's symptoms. The physician considers all relevant potential causes of the symptoms and then eliminates alternative causes based on a physical examination, clinical tests, and a thorough case history." *Hardyman v. Norfolk & W. Ry. Co.*, 243 F.3d 255, 260-61 (6th Cir. 2001) (internal citation and quotation marks omitted).

20

the official acted reasonably in the particular circumstances that he or she faced. For a right to be clearly established, [t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. [I]n the light of pre-existing law the unlawfulness must be apparent. In other words, existing precedent must have placed the statutory or constitutional question . . . beyond debate. [B]inding precedent from the Supreme Court, the Sixth Circuit, [or] the district court itself can provide such clarity; persuasive authority from other circuits that is directly on point may also demonstrate that a law is clearly established. Notwithstanding those helpful indicators, [a] court need not have previously held illegal the conduct in the precise situation at issue because officials can still be on notice that their conduct violates established law even in novel factual circumstances.

*Moody v. Michigan Gaming Control Bd.*, 2016 WL 4272370, *2 (E.D. Mich.) (internal citations and quotation marks omitted).

Few cases, none involving doctors, appear to have considered whether qualified immunity protects persons involved in reporting suspected child abuse. Those which do consider qualified immunity *vis-a-vis* a § 1983 claim have upheld the defendants' immunity claim. *Doe v. Heck*, 327 F.3d 492, 515-17 (7th Cir. 2003) (caseworkers who removed child per state statute that court found unconstitutional entitled to qualified immunity); *Zappala v. Albicelli*, 980 F. Supp. 635, 638 (N.D.N.Y 1997) (school officials involved in child's removal entitled to qualified immunity; decision based, in part, on duty to report), *aff'd*, 173 F.3d 848 (2d Cir.1999); *Zappala v. Albicelli*, 954 F. Supp. 538, 544-45 (N.D.N.Y. 1997) (county officials entitled to qualified immunity), *aff'd*, 173 F.3d 848 (2d Cir.1999).

Most importantly, plaintiffs have failed to cite a single on-point case from any court at any level that withholds qualified immunity from a medical professional sued under § 1983 after making a mandatory report of suspected child abuse. There is no case, much less a clearly established legal doctrine, that would have put these defendants on notice that they were violating the plaintiffs'

constitutional rights, even if the § 2151.421 report was (as it was not) ill-founded, mistaken, reckless, or conscious shocking.

I conclude, accordingly, that the defendant doctors are entitled to qualified immunity and are entitled to dismissal.

### Conclusion

For the foregoing reasons, it is hereby,

ORDERED THAT:

1. The motions to dismiss of, jointly, Drs. Lisk, Tourner, and Dargart (Doc. 22), and Dr. Anwer (Doc. 27), and the motion for judgment on the pleadings of Dr. Rosenthal (Doc. 39), be, and the same hereby are, granted; and

2. The Doe "coder" defendants be, and the same hereby are, *sua sponte* dismissed.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge