IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Molly S. Blythe, *et al.*,  Case No. 3:16CV97

    Plaintiffs,

    v.  **ORDER**

Dr. Randall S. Schlievert, *et al.*,

    Defendants.

This is a suit under 42 U.S.C. § 1983 in which plaintiff Molly Blythe, mother of twin daughters, KB and LB–also plaintiffs–claims that the Lucas County, Ohio, Children's Services Board (CSB), a CSB supervisor, Chanda Beal, and a CSB caseworker, Jason Wegman, violated their constitutional rights.

The plaintiffs claim that the CSB violated their constitutional rights under the First and Fourteenth Amendment by failing to train medical personnel at the Toledo Hospital in how properly to evaluate possible child abuse. The plaintiffs also allege that defendants Beal and Wegman violated the Fourth Amendment rights of plaintiff LB by having her examined for possible indicia of child abuse.

Pending is the defendants' motion for judgment on the pleadings. (Doc. 50). For the reasons that follow, I grant the motion.[1]

---

[1] By separate orders, I am granting the motions to dismiss and motion for judgment on the pleadings of five defendant doctors affiliated with ProMedica Toledo Children's Hospital, as well as the motion for judgment on the pleadings of the defendant doctor affiliated with Toledo Mercy St. Vincent Medical Center.

**Background**

Plaintiff Molly Blythe gave birth five weeks prematurely to twin daughters, KB and LB, on November 12, 2013. Molly regularly took the children to their pediatrician. Molly expressed concerns that KB did not appear to be developing normally, was not putting on weight, and was vomiting. On January 16, 2014, the pediatrician, noticing that KB's head appeared abnormally large, told Molly to take KB to ProMedica Toledo Hospital. Molly did so that day.

After KB's admission, a cranial CT scan disclosed bilateral subdural hematomas. The following day, KB underwent surgery to relieve pressure on her brain. Thereafter, an opthalmological examination revealed retinal bleeding.

Molly offered no explanation for KB's injuries. Others who had unsupervised access to the twins since birth, namely Claire Blythe, Molly's mother, and Eric Bonk, the twins' father, denied causing or knowing how KB's injuries occurred.

Doctor Jamie Dargart ruled out a blood disorder as a cause of KB's injuries. The Toledo Hospital medical staff concluded there was reason to believe that KB had suffered non-accidental head trauma. In the absence of any other explanation, the doctors diagnosed KB with Shaken Baby Syndrome.

Section 2151.421 of the Ohio Revised Code requires health care providers to notify the local child welfare agency immediately when there is reason to believe a child is a victim of abuse. Failure to comply with the reporting requirement exposes the person failing to make a § 2151.421 report to criminal prosecution. The Toledo Hospital medical staff made the § 2151.421 referral to CSB on January 19, 2014.

On receiving the § 2151.421 notice, CSB began its investigation. It determined that only Molly, her mother, and the twins' father had unsupervised access to KB after her birth until her hospitalization. Each denied injuring her or witnessing anyone else doing so.

Later on January 19, 2014, after CSB had received the § 2151.421 notice of suspected child abuse, defendant CSB caseworker Jason Wegman contacted Molly and notified her that LB would be removed from the home and placed in foster care. When Molly resisted, Wegman told her a court order would be obtained authorizing such removal.

Thereon, Molly agreed that her sisters, Erin and Amy, would assume temporary care of LB.[2] Later, at about 7:50 p.m., after Erin and Amy had assumed temporary care of LB, defendant CSB supervisor Chanda Beal instructed Wegman that LB would have to be brought to the hospital. At 8:20 p.m., Wegman called Erin and told her to bring LB to the hospital. Erin did so, arriving at 9:40 p.m.

Ensuing cranial and skeletal examination of LB disclosed no indicia of injury.

This examination, conducted at the order of CSB, Beal, and Wegman, was, according to plaintiffs, in Fourth Amendment terms an unconstitutional "search" of LB. Because Molly had not given consent to the examination, she sues on LB's behalf for damages.

Thereafter, CSB sought an evaluation of KB's injuries and their possible cause or causes from Dr. Randall Schlievert, a Toledo Mercy St. Vincent Medical Center physician who is board certified in both pediatrics and child abuse pediatrics. Dr. Schlievert concurred in the initial child abuse diagnosis.

On February 3, 2014, CSB filed an abuse, neglect, and dependency complaint in the Lucas County Juvenile Court. The Court found probable cause to believe placement in shelter care was needed to protect KB and LB from immediate or threatened physical harm. The Court placed the children in the temporary custody of their maternal aunts–Erin and Amy. The Court also ordered that Molly live outside the home and any visits she had with KB and LB be supervised.

---

[2] On January 20, 2014, Molly signed a "safety plan," which limited her custodial rights to visitation with her children supervised by her sisters, who became custodians and caregivers under the safety plan.

On October 20, 2014, rather than taking part in a disposition hearing pursuant to § 2151, the twins' parents and maternal grandmother, Claire Blythe, signed a consent judgment entry, whereby the Court awarded custody of the twins to their grandmother, Claire Blythe.

Against CSB, plaintiffs assert that the agency failed properly to train the medical staff at the Toledo Hospital, including, specifically, the five doctors whom they also have sued (and whose motions to dismiss I am granting) and medical coding personnel. As a result of that alleged failure, according to the plaintiffs, the doctor defendants intentionally, deliberately, and recklessly fabricated false evidence–*i.e.*, the § 2151.421 report of suspected child abuse sent to the CSB. That report, in turn, led to the separation of Molly and KB and LB.

## Standard of Review

A Rule 12(c) motion is analyzed using the same standard of review as a 12(b)(6) motion. *Tucker v. Middleburg-Legacy Place*, 539 F.3d 345, 549 (6th Cir. 2008).[3]

A complaint must contain a "short and plain statement of the claim showing the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

To survive a motion to dismiss under Rule 12(b)(6), the complaint "must contain sufficient factual matter, accepted as true, to state a claim that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

In ruling on a motion to dismiss, I may consider "the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's

---

[3] I note the similarity in standard because defendant Schlievert labeled his motion as a motion to dismiss despite having previously filed an answer to plaintiff's complaint. Therefore, I construe the pending motion as a motion for judgment on the pleadings pursuant to Fed. R. Civ. Pro. 12(c).

motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

## Discussion

### 1. No Failure to Train Led to a Constitutional Violation

As noted, in a separate order, I am dismissing the plaintiffs' complaint as to the five defendant doctors affiliated with ProMedica Toledo Hospital who diagnosed KB as an abused child, thereby causing the § 2151.421 notification to CSB. In that order, in addition to finding lack of state action and entitlement to qualified immunity, I concluded that the complaint failed to state a plausible or otherwise cognizable constitutional shock the conscience claim against any of those defendants.

That being so, any failure to train those defendants on CSB's part has no causal connection to the resulting interference with the plaintiffs' mutual interest in custody, care, and companionship.

CSB is, accordingly, entitled to dismissal.

### 2. Beal and Wegman Did Not Violate LB's Fourth Amendment Interest

Plaintiffs claim that the examination that determined LB had no indicia of abuse violated LB's Fourth Amendment right against unreasonable searches and seizures because Molly had not consented to the examination.

Whether Molly did so or not or whether, if asked, she would have agreed does not matter in light of well-established Fourth Amendment doctrine:

> The question here is: how does the consent doctrine work when the room has two occupants, one of them consents and the other is silent? So long as the consenting individual has actual common authority over the room, *United States v. Matlock*, 415 U.S. 164, 170-71, 94 S. Ct. 988, 39 L.Ed.2d 242 (1974), or apparent common authority over the room, *Illinois v. Rodriguez*, 497 U.S. 177, 181, 186, 110 S. Ct. 2793, 111 L.Ed.2d 148 (1990), officers may rely on the consent of one of the occupants in this setting. "Common authority," the Supreme Court tells us, refers to the "mutual use of the property by persons generally having joint access or control

for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *Matlock*, 415 U.S. at 171 n. 7, 94 S. Ct. 988; *see also Georgia v. Randolph*, 547 U.S. 103, 110, 126 S. Ct. 1515, 164 L.Ed.2d 208 (2006).

*U.S. v. Caldwell*, 518 F.3d 426, 429 (6th Cir. 2008).

At issue here is shared custodial authority and duty–not shared physical space–but the third party search doctrine is equally applicable to the situation here as it is in the more conventional and typical case of shared occupancy.

Because LB was with Erin, she could independently decide whether to go to the hospital and, on doing so, permit the child's examination. She had the "common authority" that enabled her to give actual consent to the examination. *Id.* (citing *Matlock*, *supra,* 415 U.S. at 170-71).

Also, from Wegman's perspective, Erin had "apparent common authority" to acquiesce in his request that she bring LB to the hospital and permit the examination. *Id.* (citing *Rodriguez*, *supra,* 497 U.S. at 181, 186).

All that aside, though that is enough to dismiss the Fourth Amendment claim against Wegman and Beal, no constitutional violation would have occurred even if they did not have consent for the examination. By its own terms, the Fourth Amendment protects only against "unreasonable searches and seizures." No rational jury could find anything unreasonable in what Beal and Wegman did. LB's sister manifested injuries that examining physicians had concluded reasonably gave rise to suspected child abuse. LB was no less vulnerable than KB: it was entirely reasonable for Beal to direct Wegman to take steps to determine whether LB likewise had been harmed.[4]

---

[4] Defendants point to O.R.C. § 2151.31(A)(3)(c), which allows removal of other children from a home as to which there has been a § 2151.421 report. That statute is only somewhat supportive of the reasonableness of any "search" in this case; the statute requires that the other children be endangered–a species of exigent circumstances. Here, there was no such exigency, as LB was in Erin and Amy's custody and, thus, presumably safe from harm in the home.

Moreover, once the examination showed no injury, the "search" of LB ended. *See Mincey v. Arizona*, 437 U.S. 385, 390 (1978) (holding the scope of a warrantless search must not exceed its purpose).

Finally, even if that were not enough to grant the individual defendants' motion, qualified immunity would protect them. Nothing in the law would have alerted those defendants that having LB brought to the hospital for a protective examination somehow violated her Fourth Amendment right to be free from unreasonable searches and seizures. This simply is not like the situation in *Walsh v. Erie Cty. Dep't of Job & Family Servs.*, 240 F. Supp. 2d 731, 759 (N.D.Ohio 2003), in which I withheld qualified immunity from caseworkers who had entered a home without a warrant and over parental objection in non-exigent circumstances and taken custody of children. Indeed, the circumstances here are vastly more forgivable, as a matter of law, than those in *Young v. Vega*, 574 F. App'x 684, 690-91 (6th Cir.2014) (holding caseworker entitled to qualified immunity despite alleged misstatements about the parent's conduct and omissions in petition supporting juvenile court's determinations that led to *ex parte* order removing children).

## Conclusion

There is no merit to plaintiffs' claims against either the Lucas County Children Services Board or its employees.[5]

It is, accordingly,

ORDERED THAT:

1. Defendants' motion for judgment on the pleadings (Doc. 50) be, and the same hereby is, granted; and

---

[5] This order includes the CSB Doe defendants, as to whom plaintiffs' contentions are entirely conclusory and unsupported by sufficient factual allegations to state a plausible claim for relief.

7

2. The CSB Doe defendants be, and the same hereby are, *sua sponte* dismissed.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge