**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

Molly S. Blythe, *et al.*,                Case No. 3:16CV97

    Plaintiffs,

    v.                                         **ORDER**

Dr. Randall S. Schlievert, *et al.*,

    Defendants.

This is a suit under 42 U.S.C. § 1983 by a mother, Molly Blythe, on behalf of herself and her twin daughters, co-plaintiffs KB and LB. Plaintiffs allege that the defendants, various parties involved in KB's medical care and subsequent child abuse investigation and court proceedings, were incompetently trained, fabricated evidence of abuse, and reported such evidence to Lucas County Children's Services (CSB), resulting in KB and LB's removal from their parents' care and custody.

Specifically, plaintiffs allege that defendant Dr. Randall S. Schlievert–a Mercy St. Vincent Medical Center employee–fabricated evidence of child abuse and disregarded evidence showing the absence of abuse, ultimately depriving plaintiffs of their constitutional rights relating to family relationships.

Pending, and the subject of this opinion, is a motion for judgment on the pleadings by Dr. Schlievert (Doc. 52). For the reasons that follow, I grant the motion.[1]

---

[1] By separate orders, I am granting the motions to dismiss and motion for judgment on the pleadings of five defendant doctors affiliated with ProMedica Toledo Children's Hospital, as well as the motion for judgment on the pleadings of defendants CSB and its employees.

**Background**

Plaintiff Molly Blythe gave birth five weeks prematurely to twin daughters, KB and LB, on November 12, 2013. Molly regularly took the children to their pediatrician. Molly expressed concerns that KB did not appear to be developing normally, was not putting on weight, and was vomiting. On January 16, 2014, the pediatrician, noticing that KB's head appeared abnormally large, told Molly to take KB to ProMedica Toledo Children's Hospital. Molly did so that day.

The hospital admitted KB and placed her in the pediatric intensive care unit. After KB's admission, a cranial CT scan disclosed bilateral subdural hematomas and large extra-axial fluid collections of mixed signal attenuation under some degree of tension and downward displacement of cerebral hemispheres. The following day, KB underwent surgery to relieve pressure on her brain. Thereafter, an opthalmological examination revealed retinal bleeding.

Molly offered no explanation for KB's injuries. Others who had unsupervised access to the twins since birth–namely Claire Blythe, Molly's mother, and Eric Bonk, the twins' father–denied causing or knowing how KB's injuries occurred.

During an ensuing four-day hospital stay, the medical staff concluded there was reason to believe that KB had suffered non-accidental head trauma and was a child abuse victim. In the absence of any other explanation, the doctors diagnosed KB with Shaken Baby Syndrome and, on January 19, 2014, made a referral to CSB pursuant to O.R.C. § 2151.421.[2]

---

[2] Section 2151.421 of the Ohio Revised Code requires health care providers to notify the local child welfare agency immediately when there is reason to believe a child is a victim of abuse. Failure to comply with the reporting requirement exposes the person failing to make a § 2151.421 report to criminal prosecution.

Later on January 19, 2014, after CSB had received the § 2151.421 notice of suspected child abuse, a CSB caseworker, Jason Wegman, contacted Molly at the direction of his supervisor, Chanda Beal. Wegman told Molly that CSB would, in light of KB's injuries, be removing LB from the home. Wegman also informed Molly that if she did not consent to transfer of custody to a relative, CSB would obtain a court order placing LB in foster care.

Thereon, Molly agreed that her sisters, Erin and Amy, would assume temporary care of LB in her home.[3] Later, at about 7:50 p.m., CSB supervisor Beal told Wegman to have LB brought to the hospital. Wegman called Erin about 8:20 p.m., informing her that she had to bring LB to the hospital. Erin did so, arriving at 9:40 p.m.

Ensuing cranial and skeletal examinations of LB disclosed no indicia of injury.

Thereafter, CSB sought an evaluation of KB's injuries and their possible cause or causes from Dr. Schlievert, who is board certified in both pediatrics and child abuse pediatrics. Dr. Schlievert regularly provides consultations to CSB and other Northwest Ohio child welfare agencies with respect to child abuse investigations.

After reviewing KB's medical file, Dr. Schlievert concurred in the initial child abuse diagnosis. Dr. Schlievert included this medical opinion in the February report he provided to CSB. Specifically, Dr. Schlievert concluded that KB suffered from abusive head trauma–namely, Shaken

---

[3] On January 20, 2014, Molly signed a "safety plan," which limited her custodial rights to visitation with her children supervised by her sisters, who became custodians and caregivers under the safety plan.

Baby Syndrome.[4] Based on this conclusion, Dr. Schlievert recommended that "[KB and LB] should not return to the environment that caused these injuries." (Compl. ¶312).

Notably absent from Dr. Schlievert's report, plaintiffs argue, are any notes regarding several circumstances they believe were known, or should have been known to, and taken into consideration by Dr. Schlievert. These include: the difficult nature of KB's birth (which involved vacuum extraction, and which, plaintiffs now argue caused KB's injuries); the surgeries KB underwent while at ProMedica Toledo Children's Hospital; and the alleged ambiguities surrounding KB's post-surgery retinal presentation.[5] Plaintiffs also fault Dr. Schlievert for claiming that a dime-sized bruise where KB's buttock and leg were joined was also indicative of physical abuse.

On February 3, 2014, CSB filed an abuse, neglect, and dependency complaint in the Lucas County Juvenile Court. The Court found probable cause to believe placement in shelter care was needed to protect KB and LB from immediate or threatened physical harm and placed the children in the temporary custody of their maternal aunts–Erin and Amy. The Court also ordered that Molly live outside the home and any visits she had with KB and LB be supervised.

After Dr. Schlievert issued his February report, Molly, presumably through her attorneys, obtained reports from several nationally ranked abusive head trauma experts–Drs. Patrick Barnes, Gregory Shoukimas, Khaled A. Tawansy, Stephen Guertin, and Faris A. Bandak. According to

---

[4] In the February report, Dr. Schlievert stated, "KB is a two month old who has injuries that are due to abusive head trauma, sometimes called Shaken Baby Syndrome. I see no other possible cause for these injuries . . . . The injuries to the head and buttocks are abuse . . . ." (Compl. ¶312).

[5] The complaint does not allege that at the time he provided his February consultative report to CSB, Dr. Schlievert knew about the traumatic birth or that the surgeries had preceded the first, and thus baseline, retinal examination. According to plaintiffs, the retinal bleeding could have resulted from the surgical efforts to reduce the pressure of the hematomas on KB's brain.

4

plaintiffs, each of these reports stated that Dr. Schlievert's February report was false, contrary to evidence-based medicine, and failed to consider all possible explanations regarding KB's clinical presentation.

In April, 2014, after receiving plaintiffs' expert reports, Dr. Schlievert issued a second report. In his April report, Dr. Schlievert critiqued plaintiffs' expert reports and reaffirmed his original conclusion that KB's injuries were cause by child abuse. Further, Dr. Schlievert stated, "Because [my diagnosis] is not accepted by the family, ongoing placement is needed for the children's safety." (Compl. ¶329).[6]

On October 20, 2014, rather than taking part in a contested disposition hearing, the twins' parents agreed to a Juvenile Court consent judgment awarding custody of the twins to their maternal grandmother, Claire Blythe.

Plaintiffs assert that Dr. Schlievert violated their rights under the Fourteenth and First Amendments by fabricating inculpatory evidence of abuse, disregarding information in KB's clinical presentation showing an absence of abuse, and conclusively representing to CSB that KB was an abused child.[7] As a result of those alleged violations, Dr. Schlievert, plaintiffs claim, interfered with

---

[6] The complaint does not allege that Dr. Schlievert's second report came before the Juvenile Court or that the Juvenile Court admitted that report into evidence.

[7] Plaintiffs allege constitutional violations based on both Dr. Schlievert's February and April reports. With respect to the February report, plaintiffs allege Dr. Schlievert:

> fabricated inculpatory evidence of physical abuse when he: (1) falsely and recklessly determined and represented to [CSB] that abusive head trauma alone, to the exclusion of all other causes, was responsible for KB's clinical presentation; (2) represented to [CSB] that KB had abusive injuries to her buttocks, given that KB never had abusive injuries to her buttocks; and (3) verified to [CSB] that pediatric hematologist Defendant Dargart conducted a complete bleeding workup on KB and when Defendant Schlievert supported Defendant Dargart's conclusion that KB's injuries could not be attributed to a bleeding disorder.

5

plaintiffs' rights to familial association, autonomy, integrity, and privacy and Molly's right to make decisions about the care, custody, and management of children.

According to plaintiffs, those actions shock the conscience, thus giving rise to a substantive due process violation.[8]

**Standard of Review**

A Rule 12(c) motion is analyzed using the same standard of review as a 12(b)(6) motion. *Tucker v. Middleburg-Legacy Place*, 539 F.3d 345, 549 (6th Cir. 2008).[9]

---

(Doc. 54 at 8).

With respect to the April report, plaintiffs allege Dr. Schlievert:

> fabricate [*sic*] inculpatory evidence of physical abuse when he: (1) again falsely and recklessly determined and documented that the single make [*sic*] Molly showed to KB's pediatrician, smaller in size than a dime, necessitated KB was physically abused; (2) repeatedly, deliberately, and recklessly mischaracterized and distorted reports rendered by Plaintiffs' Experts to [CSB], evidence wither [*sic*] Defendant Schlievert's deliberate intent to mislead [CSB] or Defendant Schlievert's inability to accurately review and analyze complex clinical presentations, thereby making any determination and conclusions he rendered reckless; (3) failed to convey reliable, objective, accurate, and truthful analyses to [CSB] in the context of KB's ocular presentation; (4) represented to [CSB] that KB could not have had external hydrocephalus; (5) represented to [CSB] that a full blood workup had been performed on KB; (6) repeatedly, intentionally, and recklessly misrepresented medical literature as supportive of his determination and also intentionally and recklessly omitted from his report [any] and all information within the article he cited that contradicted his original determination; and (7) invoked shaken baby syndrome as a "default" diagnosis, as KB's clinical presentation consisted of findings with a wide range of causes.

(*Id.* at 8-9).

[8] I note that despite discussion in Dr. Schlievert's motion to dismiss, plaintiffs do not assert a procedural due process claim in the complaint. This is further evidenced by plaintiffs' lack of opposition to the procedural due process arguments raised in Dr. Schlievert's motion to dismiss. As such, my analysis focuses solely on the substantive due process arguments.

[9] I note the similarity in standard because Dr. Schlievert labeled his motion as a motion to dismiss despite having previously filed an answer to plaintiff's complaint. Therefore, I construe and refer to the

A complaint must contain a "short and plain statement of the claim showing the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

To survive a motion to dismiss under Rule 12(b)(6), the complaint "must contain sufficient factual matter, accepted as true, to state a claim that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

In ruling on a motion to dismiss, I may consider "the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

## Discussion

### A. Substantive Due Process

There are two types of substantive due process claims: 1) "deprivations of a particular constitutional guarantee; and 2) actions that 'shock the conscience.'" *Valot v. Se. Local Sch. Dist. Bd. of Educ.*, 107 F.3d 1220, 1228 (6th Cir. 1997); *see also Midkiff v. Adams Cty. Reg'l Water Dist.*, 409 F.3d 597, 609 (6th Cir. 2005).

The first basis for asserting a substantive due process claim requires a plaintiff to assert denial of a right, privilege, or immunity guaranteed by the Constitution or federal statute. *Mertik v. Blalock*, 983 F.2d 1353, 1367 (6th Cir. 1993).

---

pending motion as a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).

The second basis for asserting a substantive due process claim involves conduct by a state actor that, while not infringing on a fundamental right, is so unjust that it shocks the conscience. *E.g., Howard v. Grinage*, 82 F.3d 1343, 1349 (6th Cir. 1996); *see also McKenna v. Bowling Green State. Univ.*, 2012 WL 3809094, *2 (N.D. Ohio).

Because plaintiffs do not allege a violation of a fundamental right, they must satisfy the "shocks the conscience" test. *See Rochin v. California*, 342 U.S. 165, 211 (1952).

The "shocks the conscience" standard is difficult to satisfy. To shock the conscience, the conduct must be "so 'egregious' that it can be said to be 'arbitrary in the constitutional sense.'" *Ewolski v. City of Brunswick*, 287 F.3d 492, 510 (6th Cir. 2002) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)); *see also Lewis, supra,* 523 U.S. at 846 ("[O]nly the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.'") (quoting *Collins v. Harker Heights*, 502 U.S. 115, 129 (1992)); *Range v. Douglas*, 763 F.3d 573, 589-90 (6th Cir. 2014) ("[T]he 'shocks the conscience' standard sets a high bar . . . . Conduct shocks the conscience if it violates the decencies of civilized conduct. Such conduct includes actions so brutal and offensive that [they do] not comport with traditional ideas of fair play and decency.") (internal citations and quotation marks omitted); *Dohner v. Neff*, 240 F. Supp. 2d 692, 703 (N.D. Ohio 2002) ("To pass this test, the conduct must be so egregious as to violate society's ideas of decency and fair play.").

The Sixth Circuit recognizes "the difficulty of determining where conscience-shocking behavior resides on the continuum of actions." *Range, supra,* 736 F.3d at 590.

> The bookends present the easier cases. Merely negligent tortious conduct is categorically beneath constitutional due process, but conduct on the other extreme end of the culpability spectrum, that which is intended to injure without any justifiable government interest, most clearly rises to the "conscience-shocking" level. Conduct that is more akin to recklessness or gross recklessness . . . is a matter for

8

closer calls. These middle states of culpability may or may not be shocking depending on the context.

*Id.* (internal citations and quotation marks omitted).

Ultimately, my determination of whether the behavior at issue "shocks the conscience" depends on the unique facts of each case. *Ewolski, supra,* 287 F.3d at 510.

### B. Plaintiffs Fail to Allege Facts Sufficient to Support a Finding that Dr. Schlievert's Actions "Shocked the Conscience"

In the Sixth Circuit's language, this case falls within the "middle state[] of culpability" category. *Range, supra,* 736 F.3d at 590. In other words, this case does not pose a "bookend" scenario, *id.*; accordingly, that is the context in which I must determine whether Dr. Schlievert's conduct was conscience-shocking.

I certainly understand the severity and magnitude of the consequences that resulted from Dr. Schlievert's medical determinations and subsequent recommendations to CSB regarding KB and LB–namely, their removal, potentially permanently, from their parents' custody and care. However, I agree with the defendant that plaintiffs plead no facts rising to the level of egregious behavior that shocks the conscience. Specifically, Dr. Schlievert's allegedly false and reckless medical determinations regarding KB's medical presentation, his disregard of evidence showing the absence of abuse, and the various representations and verifications to CSB do not constitute conscience-shocking conduct.

Simply put, considering the unique facts of this case as instructed by the Sixth Circuit in *Ewolski, supra,* 287 F.3d at 510, and viewing those facts in the light most favorable to plaintiffs, *Twombly, supra,* 550 U.S. at 555, there are no underlying facts to show Dr. Schlievert fabricated or included fictitious evidence to support his conclusion that KB was an abused child.

First, I note that the medical staff that treated KB at ProMedica Toledo Children's Hospital–an entity with which Dr. Schlievert has no connection–reached the same conclusion as Dr. Schlievert with respect to the cause of KB's injuries.[10] Before Dr. Schlievert's involvement in the CSB investigation, the ProMedica Toledo Children's Hospital staff concluded that KB suffered non-accidental head trauma and diagnosed KB with Shaken Baby Syndrome. The fact that Dr. Schlievert reached nearly identical conclusions supports a determination that his conduct did not "shock the conscience" but rather was a sound medical conclusion based on his review of KB's medical file.

Second, Dr. Schlievert and plaintiffs' experts employed a similar analytical approach–namely, they examined KB's medical records in light of their training and experience. Though the disagreed on the ultimate assessment, that they did so reflects, in light of the comparative resumes and backgrounds, a difference of professional judgment. Assuming, as the complaint suggests, that Dr. Schlievert was less expert and less able to make an accurate diagnosis, that would not support a conclusion that Dr. Schlievert's opinion shocks the conscience. The essential *factual* allegation–that Dr. Schlievert reached a conclusion contrary to that of plaintiffs' experts–does not render his opinion false, cause it to be fabricated evidence, or make it conscience-shocking. There are no facts to support such a finding.

Third, the fact that different medical professionals (*i.e.,* the staff of ProMedica Toledo Children's Hospital, Dr. Schlievert, and plaintiffs' experts) ultimately reached various conclusions about the cause of KB's injuries further supports a determination that Dr. Schlievert did not engage in conduct that shocks the conscience. This fact seems to show that KB's clinical presentation posed

---

[10] In a related order, I discuss the specific medical determinations reached by each of those doctors. As such, I do not discuss them in detail here.

a close call for the medical professionals involved in either treating her injuries or evaluating their cause. As a result, I simply cannot conclude that because one doctor reached one conclusion while others reached another, one must have fabricated the evidence in order to reach his conclusion.[11]

Thus, even accepting plaintiffs' allegations as true, the conduct alleged was not so severe that it "shocks the conscience" or, in other words, "so 'egregious' that it can be said to be 'arbitrary in the constitutional sense.'" *Ewolski, supra,* 287 F.3d at 510.

Therefore, dismissal is proper.

## Conclusion

There is no merit to plaintiffs' claims against defendant Dr. Randall S. Schlievert.

It is, accordingly,

ORDERED THAT: defendant's motion for judgment on the pleadings (Doc. 52) be, and the same hereby is, granted.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge

---

[11] I also note that although plaintiffs claim Dr. Schlievert falsely fabricated "evidence," their complaint contains no assertion that any knowingly false evidence came before the Juvenile Court. To be sure, his February report probably became part of the record in the initial proceeding leading to a temporary custody order. However, the complaint does not allege Dr. Schlievert knew, when he wrote his confirmation of the treating physician's assessment, of the trauma KB suffered at birth or the possibly questionable timing of the baseline retinal examination. Absent that information, it can hardly be determined that in light of KB's clinical presentation, Dr. Schlievert's opinion was false or fabricated–much less that the February report shocks the conscience. At the other end of the Juvenile Court proceeding, that Dr. Schlievert, even in the face of the expertise of plaintiffs' experts, obdurately abided by his original opinion, is not conscience shocking, especially in view of the lack of any allegation that his later report ever came before the court or played a role in anything it did.